No. _____

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

LSP TRANSMISSION HOLDINGS II, LLC, LS POWER MIDCONTINENT, LLC, CENTRAL TRANSMISSION, LLC, *and* LS POWER GRID DRS HOLDINGS, LLC,
PLAINTIFFS-APPELLEES,

*v.*

JAMES F. HUSTON, *Chairman, Indiana Utility Regulatory Commission*, WESLEY R. BENNETT, *Commissioner, Indiana Utility Regulatory Commission*, SARAH E. FREEMAN, *Commissioner, Indiana Utility Regulatory Commission*, DAVID E. VELETA, *Commissioner, Indiana Utility Regulatory Commission, and* DAVID E. ZIEGNER, *Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity*,
DEFENDANTS-APPELLANTS,

*and*

NORTHERN INDIANA PUBLIC SERVICE COMPANY, INDIANAPOLIS POWER & LIGHT COMPANY *d/b/a AES Indiana*, SOUTHERN INDIANA GAS AND ELECTRIC COMPANY *d/b/a CenterPoint Energy Indiana South, and* DUKE ENERGY INDIANA, LLC,
INTERVENOR-DEFENDANTS-APPELLANTS.

On Appeal From The United States District Court
For The Southern District of Indiana
Case No. 1:24-cv-1722-TWP-MG
The Honorable Tanya Walton Pratt, Chief Judge

## INTERVENOR-DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY

*(Counsel listed on following page)*

WILLIAM R. DERASMO
TROUTMAN PEPPER
HAMILTON SANDERS LLP
401 9th Street, N.W.
Suite 1000
Washington, D.C. 20004
(202) 274-2886
william.derasmo@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
KAITLIN L. O'DONNELL
SIERRA C. STOCKLEY
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe, Suite 3900
Chicago, Illinois 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(302) 777-6541 (KO)
(215) 981-4692 (SS)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com
kaitlin.o'donnell@troutman.com
sierra.stockley@troutman.com

*Attorneys for Intervenor-Defendants-Appellants Northern Indiana Public Service Company, Indianapolis Power & Light Company, d/b/a AES Indiana, Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South, and Duke Energy Indiana, LLC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF THE CASE ............................................................. 4

    A. Legal Background ................................................................... 4

    B. Factual And Procedural Background ........................................ 7

STANDARD OF REVIEW ................................................................. 8

ARGUMENT .................................................................................... 9

    I. Intervenor Defendants Are Likely To Succeed In This Appeal ....................... 9

    A. HEA 1420 Does Not Discriminate Against Interstate Commerce ........... 10

        1. HEA 1420 Does Not Expressly Distinguish Between In-State And Out-Of-State Actors ................... 10

        2. Under *Pike*, HEA 1420's Local Benefits Outweigh Any Incidental Burden On Interstate Commerce ........................ 14

    B. The FPA Sanctions ROFR Laws Like HEA 1420 ....................... 16

    C. The District Court Erred As To The Equitable Considerations ............... 16

    II. The Equitable Factors Strongly Favor A Stay Pending Appeal .................... 17

CONCLUSION .................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n,*
    461 U.S. 375 (1983) ...................................................................... 4, 16

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
    520 U.S. 564 (1997) .......................................................................... 10

*Colon Health Ctrs. of Am., LLC v. Hazel,*
    813 F.3d 145 (4th Cir. 2016) ...................................................... 11, 12

*D.U. v. Rhoades,*
    825 F.3d 331 (7th Cir. 2016) ............................................................ 9

*General Motors Corp. v. Tracy,*
    519 U.S. 278 (1997) ................................................................. *passim*

*Hillside Dairy, Inc. v. Lyons,*
    539 U.S. 59 (2003) ............................................................................ 16

*Ill. Com. Comm'n v. FERC,*
    721 F.3d 764 (7th Cir. 2013) ............................................................ 4

*LSP Trans. Holdings, LLC v. Sieben,*
    954 F.3d 1018 (8th Cir. 2020) ............................................... *passim*

*MISO Trans. Owners v. FERC,*
    819 F.3d 329 (7th Cir. 2016) ................................................... 4, 5, 16

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ............................................................................ 9

*NextEra Energy Cap. Holdings, Inc. v. Lake,*
    48 F.4th 306 (5th Cir. 2022) ........................................................... 12

*Nken v. Holder,*
    556 U.S. 418 (2009) ..................................................................... 8, 17

*Norfolk S. Corp. v. Oberly,*
    822 F.2d 388 (3d Cir. 1987) ........................................................... 12

*Park Pet Shop, Inc. v. City of Chicago,*
    872 F.3d 495 (7th Cir. 2017) ............................................... 10, 12, 15

*Philadelphia v. New Jersey,*
    437 U.S. 617 (1978) .......................................................................... 14

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) .......................................................................... 10

*Regan v. City of Hammond, Indiana,*
    934 F.3d 700 (7th Cir. 2019) ............................................... 9, 10, 12

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) .............................................................. 4

**Constitutional Provisions**

U.S. Const. art. I ............................................................................................. 9

**Statutes And Rules**

16 U.S.C. § 791a ............................................................................................. 4

16 U.S.C. § 824 ......................................................................................... 4, 16

16 U.S.C. § 824d ............................................................................................. 7

16 U.S.C. § 824e ............................................................................................. 7

Ind. Code § 8-1-2-4 ........................................................................................ 7

Ind. Code  § 8-1-38-2 ................................................................................ 6, 7

Ind. Code § 8-1-2.3-1 .............................................................................. 5, 13

Ind. Code § 8-1-2.3-4 ..................................................................................... 5

Ind. Code § 8-1-38-9 ............................................................................. *passim*

Mich. Comp. Laws § 460.593 ........................................................................ 5

Minn. Stat. § 216B.246 .................................................................................. 5

Miss. Code tit. 77, ch. 3 ................................................................................. 5

N.D. Cent. Code § 49-03-02 .......................................................................... 5

S.D. Codified Laws § 49-32-20 ...................................................................... 5

**Regulations**

*Transmission Planning & Cost Allocation by Transmission Owning &*
    *Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61051, 76 Fed.
    Reg. 49,842 (2011) ...................................................................................... 5

**Other Authorities**

IURC Annual Report (2023) ........................................................................... 6

*Midwest Independent Transmission System Operator, Inc.*, 142 FERC
    ¶ 61,215 (Mar. 22, 2013) ........................................................................... 5

# INTRODUCTION

In May of 2023, Indiana enacted Indiana House Enrolled Act No. 1420 ("HEA 1420"), which gives "incumbent electric transmission owner[s]" a right of first refusal ("ROFR") for certain regional transmission projects. *See* Ind. Code § 8-1-38-9. Such laws are common in other States, and provide incumbent utilities the first opportunity to build, own, operate, and maintain new transmission facilities that connect to the incumbent's existing facilities. Well over a year later, in October 2024, Plaintiffs—who are not incumbents under HEA 1420—filed this lawsuit and sought to preliminarily enjoin HEA 1420 before a long-scheduled meeting of Midcontinent Independent System Operator, Inc. ("MISO"). Plaintiffs requested an injunction before December 10, 2024, when MISO was expected to vote on several critically important Indiana transmission projects. Under HEA 1420, MISO would have designated any approved Indiana projects to incumbent utilities. But the district court granted Plaintiffs' preliminary injunction request and, in doing so, rendered uncertain the fate of these crucial projects.

*Given Plaintiffs' inexplicable delay in filing their challenge to HEA 1420, Intervenor Defendants—each of which is an incumbent utility under HEA 1420—are now forced to seek emergency relief before this Court. MISO is now projected to vote on the Indiana projects at issue at an 8:30AM meeting, tomorrow, December 12, 2024.* Ex.F (meeting agenda for December 12, 2024 Annual MISO Members Meeting).[1]

---

[1] Unless otherwise noted, all citations to "R.__" are to the district court docket, No.1:24-cv-01722-TWP-MG (S.D. Ind.). Citations to "Ex.__" are to the exhibits that

Absent an immediate administrative stay from this Court, as well as a full stay pending appeal, MISO is likely to either designate these projects for competitive bidding or freeze them altogether, both of which options threaten significant, irreparable harm. This relief is eminently appropriate, as the relevant factors weigh strongly in favor of a stay pending appeal.

Intervenor-Defendants-Appellants ("Intervenor Defendants") are likely to succeed in this appeal. HEA 1420 is not facially discriminatory under the dormant Commerce Clause, and easily satisfies *Pike* balancing. HEA 1420's framework is consistent with Indiana's decision to structure its transmission system as a regulated monopoly, and ensures that the incumbent utilities that own and operate the facilities to which new transmission projects will connect have the ongoing responsibility to continue operating these facilities. Moreover, it furthers the State's current energy policy by promoting reliability, affordability, resiliency, stability, and environmental sustainability. That this regulatory framework satisfies the dormant Commerce Clause follows from the Supreme Court's decision in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), which the district court did not even mention in concluding that HEA 1420 is likely unconstitutional. The district court's reading also conflicts with *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020), in which the Eighth Circuit upheld a similar state ROFR law against a dormant Commerce Clause challenge.

---

Intervenor Defendants attach to this Motion, in accordance with Federal Rule of Appellate Procedure 8(a)(2)(B).

The equities strongly favor a stay. If MISO approves these critical Indiana transmission projects tomorrow and designates them for competitive bidding, as the preliminary injunction appears to envision, all of the significant public interests that HEA 1420 serves—such as ensuring that Hoosiers have a safe and reliable electric grid—will begin to be undermined. Further, MISO may well treat its actions tomorrow as irrevocable, without regard to whether HEA 1420 is later put back into effect (notwithstanding Intervenor Defendants' objections to such a course of action), thereby effectively depriving Intervenor Defendants of their right to appeal the preliminary injunction and eliminating HEA 1420's protections for this set of critical projects. And if MISO decides to freeze its decision-making on these Indiana projects in response to the injunction, or otherwise issues a decision tomorrow that puts the nature of the bidding on these projects or their timing into doubt, that too will cause grave uncertainty as to these needed projects.

This Court should grant Intervenor Defendants' Emergency Motion For Stay Pending Appeal And Request For Immediate Administrative Stay. Intervenor Defendants also respectfully request that this Court issue an administrative stay by *8:30 a.m. tomorrow, December 12, 2024,* to avoid MISO taking any potentially irrevocable actions. Defendants in this case, the Chairman and Commissioners of the Indiana Utility Regulatory Commission ("IURC"), have filed a separate Notice Of Appeal, R.79, and concur in the relief sought in this Motion.

## STATEMENT OF THE CASE

### A.    Legal Background

1. The Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, authorizes the Federal Energy Regulatory Commission ("FERC") to regulate interstate transmission of electricity and the sale of electricity at wholesale in interstate commerce. *See id.* § 824(a)–(b); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 49 (D.C. Cir. 2014). At the same time, the FPA strikes a "balance between federal and state authority in the regulation of electric and other energy utilities." *Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). States retain jurisdiction over the retail sale, generation, transmission, and distribution of electricity in intrastate commerce, 16 U.S.C. § 824(b)(1); *see S.C. Pub. Serv. Auth.*, 762 F.3d at 49, and also have authority to "regulat[e] the siting and construction of transmission facilities," consistent with their "traditional role," *MISO Trans. Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016) (citation omitted); *S.C. Pub. Serv. Auth.*, 762 F.3d at 62.

2. Many transmission projects are planned by "regional transmission organizations" ("RTOs") and "independent system operators" ("ISOs"). *See MISO*, 819 F.3d at 331; *see also Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 769 (7th Cir. 2013). As relevant here, Indiana is part of MISO's region. *MISO*, 819 F.3d at 331.

Before 2011, FERC allowed RTOs and ISOs to include in their tariffs a federal ROFR giving incumbent utilities the option to construct new transmission facilities within their service areas. *See id.* at 332. But then the agency issued Order No. 1000, directing these organizations "to remove provisions from [FERC] jurisdictional tariffs

and agreements that grant incumbent transmission providers a federal [ROFR] to construct transmission facilities selected in a regional transmission plan." *Id.* (citing *Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61051, ¶ 253, 76 Fed. Reg. 49,842, 49,885 (2011)). MISO thereafter eliminated the federal ROFR from its tariffs and agreements for certain projects, such as the ones at issue here. *See Midwest Independent Transmission System Operator, Inc.*, 142 FERC ¶ 61,215, ¶¶ 1, 7 (Mar. 22, 2013).

Order No. 1000 "terminated only *federal* rights of first refusal" and "did not 'limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities.'" *MISO*, 819 F.3d at 336 (citation omitted) (emphasis added). The Order covered only federal ROFRs because "FERC wanted to avoid intrusion on the traditional role of the States' in regulating the siting and construction of transmission facilities." *Id.* (citation omitted). And so, state law may "give an incumbent transmission company a right of first refusal." *Id.* Other States in the MISO region have, accordingly, enacted ROFR laws similar to Indiana's here.[2]

3. Indiana, like many States, is divided into several exclusive service territories in which a single utility has the "sole right" to provide retail electric service to customers. Ind. Code § 8-1-2.3-1; *see also id.* § 8-1-2.3-4. Many of these utilities are

---

[2] *See* Mich. Comp. Laws § 460.593; Minn. Stat. § 216B.246; Miss. Code tit. 77, ch. 3; N.D. Cent. Code § 49-03-02; S.D. Codified Laws § 49-32-20.

vertically integrated, meaning they generate, transmit, and distribute electricity to residential and commercial customers. *See* IURC Annual Report at 7 (2023).[3]

4. HEA 1420 gives "incumbent electric transmission owner[s]" a state ROFR to "construct, own, operate, and maintain . . . [a]n electric transmission facility that has been approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner." Ind. Code § 8-1-38-9(a)(1). HEA 1420 defines an "incumbent electric transmission owner" as "a public utility that owns, operates, and maintains an electric transmission facility in whole or in part in Indiana," *id.* § 8-1-38-2, and permits "another entity" to construct covered transmission facilities if an incumbent does not exercise its statutory ROFR, *id.* § 8-1-38-9(c).

5. For the past two years, MISO has been planning Long Range Transmission Planning ("LRTP") Tranche 2.1, a portfolio of critically important projects—including significant Indiana-based projects—to support interstate electricity transmission. Ex.G (Cocking) ¶¶ 26–27. MISO's Board of Directors is currently scheduled to vote on these LRTP Tranche 2.1 projects early tomorrow morning, December 12, 2024. Ex.F (meeting agenda for December 12, 2024 MISO Board meeting).

---

[3] Available at https://www.in.gov/iurc/files/IURC-Annual-Report,-2023.pdf (last visited Dec. 12, 2024).

### B. Factual And Procedural Background

1. On October 2, 2024—well over a year after Indiana enacted HEA 1420—Plaintiffs-Appellees ("Plaintiffs") filed this action against the Chairman and Commissioners of the IURC. R.3. Plaintiffs simultaneously moved for a preliminary injunction to enjoin the Commissioners from enforcing HEA 1420. R.5. Plaintiffs asked the district court to issue a preliminary injunction by December 10, 2024, before a long-scheduled MISO meeting at which the Board would vote on the LRTP Tranche 2.1 projects. R.4.

2. Intervenor Defendants—each of which is an "incumbent electric transmission owner" under HEA 1420 with respect to certain covered projects, Ind. Code § 8-1-38-9(a); *id.* § 8-1-38-2—successfully intervened below. R.56. Intervenor Defendants are vertically integrated public utilities that collectively generate, transmit, distribute, and sell electric energy to millions of Hoosiers across their exclusive service territories, *see* Ex.G (Cocking) ¶¶ 3–4; Ex.H (Pinegar) ¶¶ 3, 5; Ex.I (Melara) ¶ 3; Ex.J (Bradford) ¶¶ 3–4, and are subject to extensive state and federal regulations, *see, e.g.*, Ind. Code § 8-1-2-4; *accord* 16 U.S.C. §§ 824d, 824e.

3. On December 6, 2024, the district court granted Plaintiffs' request for a preliminary injunction and entered an order prohibiting the IURC's Chair, Commissioners, and agents "from enforcing the [ROFRs]" under HEA 1420. Ex.A (R.70); Ex.B (R.71). As relevant to this Motion, the district court held that Plaintiffs are likely to succeed on the merits of their dormant Commerce Clause claim. Ex.A (R.70) at 17. The district court was "convinced that absent an injunction, MISO will

grant its Tranche 2.1 projects to an incumbent," leaving Plaintiffs unable to recover monetary damages from the state official Defendants. *Id.* at 20. The district court also rejected Intervenor Defendants' arguments and evidence concerning "fragmentation on the transmission grid," without grappling with the harms that will very likely arise if MISO designates (or declines to designate) the Indiana-based LRTP Tranche 2.1 projects. *See id.*[4]

## STANDARD OF REVIEW

In deciding whether to grant a stay pending appeal, this Court considers: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). These factors are considered on a "sliding scale," whereby "the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters., Inc. II*, 742 F.3d at 766 (citations omitted). And so, if a movant shows "at least a negligible change of success on the merits," it may be entitled to relief if the "balance of harms

---

[4] On December 10, 2024, Intervenor Defendants filed a Notice Of Appeal, Ex.C (R.75), and Docketing Statement, Ex.D (R.76), as well as a motion to stay the injunction, pursuant to Federal Rule of Appellate Procedure 8(a)(1), R.77. Intervenor Defendants requested a decision from the district court on their stay request by 2:00 p.m. on December 11, 2024. *Id.* In an order dated December 11, 2024, the district court stated that it "is unable to rule on the Motion" within that timeframe, Ex.E (R.83), necessitating the filing of this Motion.

would weigh heavily against [it] if the relief were not granted." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) (citation omitted).

ARGUMENT

## I. Intervenor Defendants Are Likely To Succeed In This Appeal

The Commerce Clause grants Congress power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Under Supreme Court precedent, this provision "also contains a further, negative command"—the so-called "dormant" Commerce Clause. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (citations omitted; alterations omitted). The dormant Commerce Clause "precludes states . . . from erecting obstacles to interstate commerce even where Congress has not regulated." *Regan v. City of Hammond, Indiana*, 934 F.3d 700, 702 (7th Cir. 2019) (citation omitted). As the Supreme Court reaffirmed just last year in *National Pork Producers Council*, the dormant Commerce Clause should be narrowly applied. 598 U.S. at 390.

This Court separates dormant Commerce Clause challenges into "three categories." *Regan*, 934 F.3d at 703; *accord LSP Trans.*, 954 F.3d at 1026. The first is for "laws that expressly discriminate against interstate commerce," which are subject to "rigorous" scrutiny. *Regan*, 934 F.3d at 703. The second is for "laws that, although neutral on their face, bear more heavily on interstate than local commerce." *Id.* This type of law is treated like a facially discriminatory statute if its "effect" on interstate commerce "act[s] as an embargo on interstate commerce without hindering intrastate sales." *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir.

2017) (citations omitted). If such a law "regulates even-handedly and only incidentally burdens interstate commerce," it is subject to the balancing inquiry in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Regan*, 934 F.3d at 703. And the third category is for laws "that do not give local firms any competitive advantage over those located elsewhere," which are subject to rational-basis review. *Id.*

Here, Intervenor Defendants are likely to succeed in this appeal of the district court's preliminary injunction, as HEA 1420 does not discriminate against interstate commerce and so does not violate the dormant Commerce Clause.

### A.    HEA 1420 Does Not Discriminate Against Interstate Commerce

#### 1.    HEA 1420 Does Not Expressly Distinguish Between In-State And Out-Of-State Actors

a. A law "expressly discriminate[s] against interstate commerce" under the dormant Commerce Clause's first category, *Regan*, 934 F.3d at 703, if its text facially distinguishes between similarly situated in-state and out-of-state commercial actors, *see Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 576 (1997). Notably, "any notion of discrimination," including under the dormant Commerce Clause, "assumes a comparison of substantially similar entities." *Tracy*, 519 U.S. at 298–99. And so, a plaintiff that claims a state law violates the dormant Commerce Clause by facially favoring certain companies over others must first satisfy the "threshold question whether the companies are indeed similarly situated." *Id.* at 299.

The leading case from the Supreme Court on the issue in dispute here is *Tracy*. There, the Court applied the above-described principles to uphold an Ohio law that provided more favorable tax treatment of natural-gas sales by regulated local gas

utilities as compared to sales by unregulated marketers, whether in-state or out-of-state.  *Id.* at 310.  As *Tracy* explained, these two groups of regulated entities were not "similarly situated" because they provided different products to different markets under Ohio law.  *Id.*  Ohio law permitted local gas utilities to provide natural gas to "captive" markets of residential customers, "bundled" with certain "services and protections," *id.* at 294–97, 303–04, including the requirements to charge only "just and reasonable" rates with "a limited return on investment," *id.* at 296; "serve all members" without discrimination, *id.* at 297, and "provide a firm backup supply of gas," *id.*; *see also id.* at 296–97 (listing other regulations).  By contrast, the unregulated marketers did not compete with the local gas utilities in these captive markets, instead selling natural gas only to "bulk buyers" who had "no need for bundled protection[s]" in a "noncaptive," "competitive market."  *Id.* at 302–03.

Several of this Court's Sister Circuits have recognized that a law's favoring of incumbent businesses is not a sufficient reason alone to find that a state law facially discriminates against out-of-state businesses.  Most relevant here, the Eighth Circuit in *LSP Transmission*, 954 F.3d 1018, held that Minnesota's ROFR law was not facially discriminatory because that law simply expressed a "preference [ ] for electric transmission owners who have existing facilities" and "applie[d] evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere."  *Id.* at 1028.  Similarly, the Fourth Circuit has explained that "incumbency is not the focus of the dormant Commerce Clause."  *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 154 (4th Cir. 2016); *see Norfolk S. Corp. v. Oberly*,

822 F.2d 388, 403–04 & n.23 (3d Cir. 1987). The Fifth Circuit, however, took the opposite view from the Eighth Circuit as to State ROFRs in *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022).

b. Here, HEA 1420 provides ROFRs to "incumbent electric transmission owner[s]" to "construct, own, operate, and maintain" transmission projects that would be connected to a facility that the incumbent owns, Ind. Code § 8-1-38-9(a)(1), or that would upgrade a facility that the incumbent owns, *id.* § 8-1-38-9(a)(2). Because HEA 1420 does not "expressly discriminate against interstate commerce," it does not fall within this Court's first category. *Regan*, 934 F.3d at 703.

HEA 1420 does not distinguish between in-state and out-of-state commercial actors. *See id.*; *Park Pet Shop*, 872 F.3d at 502. HEA 1420 equally provides a ROFR to all "incumbent electric transmission owner[s]," regardless of where they are incorporated and/or have their principal place of business. *See* Ind. Code § 8-1-38-9(a); *LSP Trans.*, 954 F.3d at 1027–28. HEA 1420 likewise equally prohibits any transmission company not qualifying as the "incumbent electric transmission owner" from obtaining a ROFR for a given project, no matter where the transmission company is incorporated or headquartered. *See* Ind. Code § 8-1-38-9(a). In sum, "[Indiana]'s ROFR statute draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state." *LSP Trans.*, 954 F.3d at 1027.

"[I]ncumbency is not the focus of the dormant Commerce Clause" and does not "serve as the proxy for in-state status." *Colon Health Ctrs. of Am.*, 813 F.3d at 154.

HEA 1420's regulation of "incumbent electric transmission owner[s]," Ind. Code § 8-1-38-9(a), expresses only the state legislature's "preference [ ] for electric transmission owners who have existing facilities," which preference "applies evenhandedly to all entities, regardless of whether they are [Indiana]-based entities or based elsewhere," *LSP Trans.*, 954 F.3d at 1028.

Finally, the Supreme Court's decision in *Tracy*, 519 U.S. 278, is dispositive. The "incumbent electric transmission owner[s]," Ind. Code § 8-1-38-9(a), covered by HEA 1420 are not "similarly situated" to transmission companies like Plaintiffs, for the same reasons that the regulated local gas utilities in *Tracy* were not "similarly situated" to unregulated marketers, *Tracy*, 519 U.S. at 310. HEA 1420's "incumbent electric transmission owner[s]," Ind. Code § 8-1-38-9(a), are all "public utilit[ies]" under Indiana law, *id.* § 8-1-38-2. This means that the incumbents subject to HEA 1420 all generate and distribute electricity within state-designated service territories, *see id.* § 8-1-2.3-1, subject to extensive regulation on rates, standards of service, and other factors to ensure the provision of reliable, high-quality service to residences and businesses at just and reasonable costs, *see, e.g.*, *id.* § 8-1-2-4. That is similar to the local gas utilities in *Tracy*, 519 U.S. at 294–97, 303–04. And like the unregulated marketers in that case, Plaintiffs neither compete with these public utilities in their designated service territories nor must comply with the same extensive regulations. *See id.* at 302–03.

c. In subjecting HEA 1420 to strict scrutiny, the district court erroneously concluded that HEA 1420 "concerns property ownership in the state," and so

"expressly mandates differential treatment of in-state and out-of-state economic interests that benefits owners of transmission facilities in Indiana and burdens owners of transmission facilities outside of Indiana."  R.70 at 16.  In doing so, the district court did not grapple with the Supreme Court's *Tracy* decision, *see generally* R.70, not even citing that decision once in its opinion.  Moreover, although the district court was persuaded by the Fifth Circuit's *NextEra* decision, which held that Texas' ROFR regime violated the Commerce Clause, it acknowledged that the Eighth Circuit has reached the opposite conclusion.  R.70 at 17.

> ### 2.  Under *Pike*, HEA 1420's Local Benefits Outweigh Any Incidental Burden On Interstate Commerce

Because HEA 1420 does not facially discriminate against interstate commerce, the statute is subject to *Pike* balancing, which it easily survives.  The district court did not address *Pike* balancing in its decision, *see generally* R.70, but Intervenor Defendants' strong arguments on this point are likely to succeed on appeal.

a. State laws "directed to legitimate local concerns, with effects upon interstate commerce that are only incidental," fall into this Court's second dormant Commerce Clause category and are analyzed under the *Pike* balancing test.  *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).  Under this test, a facially nondiscriminatory statute will generally be upheld despite an incidental burden on interstate commerce "unless the burden imposed . . . is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142.  The "extent of the burden that will be tolerated" depends upon "the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."  *Id.*

b. Whatever incidental burden HEA 1420 may place on interstate commerce is substantially outweighed by its local benefits, including its ability to promote continuity of service, reliable service quality, and cost-effective infrastructure in Indiana. *See LSP Trans.*, 954 F.3d at 1030; *Park Pet Shop*, 872 F.3d at 501–02. HEA 1420 grants ROFRs to incumbent utilities with respect to transmission facility projects that "connect[ ] to an electric transmission facility owned by the incumbent," Ind. Code § 8-1-38-9, to the exclusion of all other incumbent or non-incumbent electric companies, regardless of where such companies are located or incorporated, *see LSP Trans.*, 954 F.3d at 1030. Incumbents that do benefit under HEA 1420 may decide not to exercise the ROFR, in which case a project will be open to all competitors— both in-state and out-of-state. *See* Ind. Code. § 8-1-38-9. The statute's purpose is nondiscriminatory; indeed, Indiana has long structured its transmission system as a regulated monopoly to avoid the "predictable and disastrous" results associated with "free market competition in the manufactured gas and electricity industries." *See Tracy*, 519 U.S. at 288–90 & nn.5–7. And it promotes Indiana's strong and legitimate interest in a safe and reliable electric grid. *See LSP Trans.*, 954 F.3d at 1031. In enacting HEA 1420, Indiana made a sensible policy decision that incumbent utilities should own and operate the lines that integrate with their existing facilities. *See infra* Part II. This avoids fragmentation in transmission ownership, which can adversely complicate grid management including by increasing outage restoration times and increasing transmission outage costs for consumers. *See infra* Part II. As such, HEA 1420 easily survives *Pike* balancing.

## B.    The FPA Sanctions ROFR Laws Like HEA 1420

Even if this Court were to conclude on appeal that HEA 1420 discriminates against interstate commerce, the statute still comports with the dormant Commerce Clause because Congress authorized States to enact ROFR laws like HEA 1420 in the FPA.  Congress may authorize state laws that might otherwise burden interstate commerce under the dormant Commerce Clause.  *See Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59, 66 (2003).  The FPA itself largely leaves the authority over transmission siting to the States.  FPA Section 824(b)(1) also preserved one of the States' "most important" and "traditional[ ] . . . police power[s]"—the "regulation of utilities," *Ark. Elec. Co-op*, 461 U.S. at 377—recognizing that States like Indiana retain authority over the retail sale of electricity and the generation, transmission, and distribution of electricity in intrastate commerce, 16 U.S.C. § 824(b)(1).  Section 824(b)(1) reflects Congress' continuing approval of States' regulation of the location, siting, and construction of interstate transmission lines—authority that encompasses state ROFR laws like HEA 1420, since such laws are part of the States' "traditional role" in this domain.  *See MISO*, 819 F.3d at 336.[5]

## C.    The District Court Erred As To The Equitable Considerations

Intervenor Defendants are also likely to succeed on appeal because the district court erred in its consideration of the equitable factors in issuing its injunction,

---

[5] The elimination of *federal* ROFRs in Order No. 1000 does not bear on state authority to grant ROFRs.  Order No. 1000 "did not 'limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities."  *MISO*, 819 F.3d at 336 (quoting 136 FERC ¶ 61051 at P 227).

Because these considerations are largely duplicative of the equitable factors that this Court considers in evaluating a stay-pending-appeal request, addressed immediately below, *see infra* Part II, Intervenor Defendants do not duplicate that discussion here.

## II. The Equitable Factors Strongly Favor A Stay Pending Appeal

The substantial public harm that stands to result from the district court's preliminary injunction weighs heavily in favor of a stay pending appeal. MISO's Board of Directors is scheduled to vote on the LRTP Tranche 2.1 projects, including critical Indiana projects subject to HEA 1420, tomorrow, December 12, 2024. The two most likely outcomes of the district court's preliminary injunction—either that MISO designates the Indiana LRTP Tranche 2.1 projects for competitive bidding or that it halts these projects altogether—show that the equitable considerations strongly favor a stay, as set forth immediately below. *See Nken*, 556 U.S. at 433–34.

First, in light of the district court's preliminary injunction, MISO could decide tomorrow to act as if HEA 1420 does not exist and designate the Indiana LRTP Tranche 2.1 projects for a competitive-bidding process inconsistent with HEA 1420. *See* Ex.G (Cocking) ¶ 28. Bidding these projects without HEA 1420 would cause substantial harm to the public, the parties, and the electric grid. *See* Ex.G (Cocking) ¶¶ 32–36; Ex.H (Pinegar) ¶¶ 33–38; Ex.I (Melara) ¶¶ 27–29; Ex.J (Bradford) ¶¶ 27–31. With HEA 1420, the Indiana General Assembly made a policy choice concerning how to best ensure a safe and reliable transmission grid, premised on endpoint owners' existing resources, as well as their extensive knowledge of and experience with the existing transmission system, which allow them to efficiently build, operate,

and maintain the critical infrastructure necessary for grid reliability. Ex.H (Pinegar) ¶¶ 31–33; *see* Ex.G (Cocking) ¶¶ 30–32. This policy call was generally consistent with the structure of the industry and how it has been regulated for the past century. Further, if MISO were to treat tomorrow's designations as irrevocable, not only will this State's policy decision will be completely undermined, but Intervenor Defendants will also lose statutory ROFR, as well as the ability to appeal the preliminary injunction as a practical matter. And if this Court later overturns the preliminary injunction, such that additional litigation is necessary regarding MISO's designations, the much-needed Indiana projects in LRTP Tranche 2.1 will be subject to harmful delays. These delays will, in turn, undermine grid reliability throughout the MISO region.

Second, MISO might alternatively decide to freeze its planning process for the Indiana projects altogether, or otherwise place that process into some doubt, to avoid the uncertainty and chaos associated with designating these projects in the middle of this litigation. *See* Ex.G (Cocking) ¶ 29; Ex.H (Pinegar) ¶ 30; Ex.I (Melara) ¶ 25; Ex.J (Bradford) ¶ 25. As Intervenor Defendants have argued throughout this litigation, if MISO were to irrevocably designate an Indiana project for competitive bidding in violation of HEA 1420, only for the statute to ultimately be held constitutional on the merits, then those bids would need to be unwound. *See* Ex.G (Cocking) ¶ 28; Ex.H (Pinegar) ¶ 29; Ex.I (Melara) ¶ 24; Ex.J (Bradford) ¶ 24. Accordingly, it would be entirely reasonable for MISO to halt these projects pending this litigation's resolution. But these projects are critical to the long-term stability and resilience of

the interstate transmission grid. *See* Ex.G (Cocking) ¶ 27; Ex.H (Pinegar) ¶ 28; Ex.I (Melara) ¶ 23; Ex.J (Bradford) ¶ 23. Moreover, either MISO or Plaintiffs here could well take a different view on whether the competitive-bidding process would need to be unwound, resulting in grave uncertainty as to these crucial projects.

The public interest also supports a stay, as HEA 1420 is consistent with Indiana's longstanding policy goals as well as its decision to structure its transmission industry as a regulated monopoly. *See Tracy*, 519 U.S. at 308–10. That public utilities in Indiana have exclusive service areas, ensures that there are existing service centers and personnel to respond quickly and efficiently to service issues, such as outages and extreme weather events. *See, e.g.*, Ex.I (Melara) ¶¶ 4, 27; Ex.H (Pinegar) ¶¶ 9, 33. Intervenor Defendants have all operated in the State for roughly a century or more, and have invested significant resources in providing safe, reliable, and cost-effective electric service. Ex.G (Cocking) ¶¶ 4–5; Ex.H (Pinegar) ¶¶ 9–10; Ex.I (Melara) ¶¶ 3–4; Ex.J (Bradford) ¶¶ 4–5. Contrary to the goal of "provid[ing] key stability and direct lines of communication for coordination during sensitive system conditions," additional owners "could inject confusion and chaos into critical moments," Ex.I (Melara) ¶ 27, and reduce responsiveness, including because non-incumbents are often not based in the State, Ex.G (Cocking) ¶ 34. The incumbent utilities that have a ROFR to transmission projects also have significant expectation interests in HEA 1420 that they will lose if MISO does not follow HEA 1420, causing substantial losses for these utilities. *See* Ex.G (Cocking) ¶¶ 35–36; Ex.H (Pinegar) ¶¶ 37–38; Ex.I (Melara) ¶¶ 28–29; Ex.J (Bradford) ¶¶ 30–31.

The district court's decision granting Plaintiffs' preliminary injunction request did not grapple with these significant injuries, which are not only likely, but are near certain to occur absent a stay pending appeal. The court instead focused its decision on Plaintiffs' alleged irreparable harm, without balancing that alleged harm against the confusion and chaos that will result from MISO's designation process. *See* R.70 at 20–21. Regardless of which path MISO decides to take tomorrow in voting on the LRTP Tranche 2.1 projects, these projects are likely to suffer significant, harmful delays due to the preliminary injunction, injuring both the electric grid and economic development within this State. The timing of Plaintiffs' actions have resulted in Intervenor Defendants needing to seek a stay on an emergency basis, but given the gravity of the issues raised and the practical implications on the ground, Intervenor Defendants respectfully request prompt action.

## CONCLUSION

This Court should grant this Emergency Motion For Stay Pending Appeal And Request For Immediate Administrative Stay.

Dated: December 11, 2024

Respectfully submitted,

WILLIAM R. DERASMO*
TROUTMAN PEPPER
HAMILTON SANDERS LLP
401 9th Street, N.W.
Suite 1000
Washington, D.C. 20004
(202) 274.2886
william.derasmo@troutman.com

*Admitted pro hac vice

/s/ Misha Tseytlin
MISHA TSEYTLIN
Counsel of Record
KEVIN M. LEROY
KAITLIN L. O'DONNELL
SIERRA C. STOCKLEY
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe, Suite 3900
Chicago, Illinois 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
(302) 777-6541 (KO)
(215) 981-4692 (SS)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com
kaitlin.o'donnell@troutman.com
sierra.stockley@troutman.com

*Attorneys for the Northern Indiana Public Service Company, Indianapolis Power & Light Company d/b/a AES Indiana, Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South, and Duke Energy Indiana, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,186 words. This Motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and Circuit Rule 32(b) because it was prepared using Microsoft Word 2016 in Century Schoolbook 12-point font, a proportionally spaced typeface.

Dated: December 11, 2024

/s/ *Misha Tseytlin*
MISHA TSEYTLIN

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of December, 2024, I filed the foregoing Motion with the Clerk of the Court by email to the following address: USCA7_Clerk@ca7.uscourts.gov. I served the foregoing on counsel for Plaintiffs-Appellees via email to the following addresses:

Aaron A. Schmoll <aschmoll@lewis-kappes.co>;

Erin E. Murphy <erin.murphy@clementmurphy.com>;

James E. Zoccola <jzoccola@lewis-kappes.com>;

Joseph DeMott <joseph.demott@clementmurphy.com>;

Matthew D. Rowen <matthew.rowen@clementmurphy.com>;

Paul D. Clement <paul.clement@clementmurphy.com>;

Thomas R. Jones <tjones@lewis-kappes.com>;

Todd Arthur Richardson <trichardson@lewis-kappes.com>

I served the foregoing on counsel for Defendants-Appellants via email to the following addresses:

Bradley Davis <bradley.davis@atg.in.gov>;

Jade Poorman <jade.poorman@atg.in.gov>;

James A. Barta <james.barta@atg.in.gov>;

Jenna Lorence <jenna.lorence@atg.in.gov>;

Rebekah Bennett <rebekah.bennett@atg.in.gov>

Dated: December 11, 2024

/s/ *Misha Tseytlin*

MISHA TSEYTLIN

No. _____

# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

LSP TRANSMISSION HOLDINGS II, LLC, LS POWER MIDCONTINENT, LLC, CENTRAL TRANSMISSION, LLC, *and* LS POWER GRID DRS HOLDINGS, LLC,
PLAINTIFFS-APPELLEES,

*v.*

JAMES F. HUSTON, *Chairman, Indiana Utility Regulatory Commission*, WESLEY R. BENNETT, *Commissioner, Indiana Utility Regulatory Commission*, SARAH E. FREEMAN, *Commissioner, Indiana Utility Regulatory Commission*, DAVID E. VELETA, *Commissioner, Indiana Utility Regulatory Commission*, and DAVID E. ZIEGNER, *Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity*,
DEFENDANTS-APPELLANTS,

*and*

NORTHERN INDIANA PUBLIC SERVICE COMPANY, INDIANAPOLIS POWER & LIGHT COMPANY *d/b/a AES Indiana*, SOUTHERN INDIANA GAS AND ELECTRIC COMPANY *d/b/a CenterPoint Energy Indiana South*, and DUKE ENERGY INDIANA, LLC,
INTERVENOR-DEFENDANTS-APPELLANTS.

On Appeal From The United States District Court
For The Southern District of Indiana
Case No. 1:24-cv-1722-TWP-MG
The Honorable Tanya Walton Pratt, Chief Judge

**DECLARATION OF MISHA TSEYTLIN TO ACCOMPANY INTERVENOR-DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY**

# DECLARATION OF MISHA TSEYTLIN

I, Misha Tseytlin, do hereby declare that the following statements made by me under oath are true and accurate to the best of my knowledge, information, and belief:

1. I am over the age of 18 and am otherwise competent to render this declaration.

2. I am a partner with the firm Troutman Pepper Hamilton Sanders, LLP, which firm is counsel to Intervenor-Defendants-Appellants Northern Indiana Public Service Company, Indianapolis Power & Light Company d/b/a AES Indiana, Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South, and Duke Energy Indiana, LLC (collectively, "Intervenor Defendants") in this case.

3. Attached as **Exhibit A** is a true and correct copy of the December 6, 2024 Entry On Plaintiffs' Motion For Preliminary Injunction, filed on the district court docket at R.70.

4. Attached as **Exhibit B** is a true and correct copy of the December 6, 2024 Preliminary Injunction, filed on the district court docket at R.71.

5. Attached as **Exhibit C** is a true and correct copy of Intervenor-Defendants-Appellants' Notice Of Appeal dated December 10, 2024, filed on the district court docket at R.75.

6. Attached as **Exhibit D** is a true and correct copy of Intervenor-Defendants-Appellants' Docketing Statement dated December 10, 2024, filed on the district court docket at R.76.

7.      Attached as **Exhibit E** is a true and correct copy of the December 11, 2024 Entry, filed on the district court docket at R.83.

8.      Attached as **Exhibit F** is a true and correct copy of the Meeting Agenda for the December 12, 2024 Annual MISO Members Meeting in The Woodlands, Texas filed on the district court docket at R.78-3.

9.      Attached as **Exhibit G** is a true and correct copy of the Declaration of Orville Cocking, Senior Vice President of Electric Operations of Northern Indiana Public Service Company LLC, executed on November 4, 2024 and first submitted in this case in support of Intervenor Defendants' Response In Opposition To Motion For Preliminary Injunction, filed on the district court docket at R.60-2.

10.     Attached as **Exhibit H** is a true and correct copy of the Declaration of Stan Pinegar, President of Duke Energy, LLC, executed on November 4, 2024 and first submitted in this case in support of Intervenor Defendants' Response In Opposition To Motion For Preliminary Injunction, filed on the district court docket at R.60-3.

11.     Attached as **Exhibit I** is a true and correct copy of the Declaration of Americo Melara, Chief Operations Officer of Transmission and Distribution Operations of Indianapolis Power & Light Company d/b/a AES Indiana, executed on November 4, 2024 and first submitted in this case in support of Intervenor Defendants' Response In Opposition To Motion For Preliminary Injunction, filed on the district court docket at R.60-4.

12.     Attached as **Exhibit J** is a true and correct copy of the Declaration of F. Shane Bradford, Vice President Indiana Electric of CenterPoint Energy, Inc., executed on November 4, 2024 and first submitted in this case in support of Intervenor Defendants' Response In Opposition To Motion For Preliminary Injunction, filed on the district court docket at R.60-5.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 11, 2024.

/s/ Misha Tseytlin
MISHA TSEYTLIN

# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LSP TRANSMISSION HOLDINGS II, LLC,<br>LS POWER MIDCONTINENT, LLC,<br>CENTRAL TRANSMISSION, LLC,<br>LS POWER GRID DRS HOLDINGS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CHAIRMAN JAMES F. HUSTON Indiana Utility<br>Regulatory Commission,<br>COMMISSIONER WESLEY R. BENNETT<br>Indiana Utility Regulatory Commission,<br>COMMISSIONER SARAH E. FREEMAN<br>Indiana Utility Regulatory Commission,<br>COMMISSIONER DAVID E. VELETA Indiana<br>Utility Regulatory Commission,<br>COMMISSIONER DAVID E. ZIEGNER Indiana<br>Utility Regulatory Commission,<br><br>Defendants.<br>_____<br>NORTHERN INDIANA PUBLIC SERVICE<br>COMPANY,<br>INDIANAPOLIS POWER & LIGHT COMPANY<br>d/b/a AES Indiana,<br>SOUTHERN INDIANA GAS AND ELECTRIC<br>COMPANY d/b/a CenterPoint Energy Indiana<br>South,<br>DUKE ENERGY INDIANA, LLC,<br><br>Intervenor Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:24-cv-01722-TWP-MG |

## <u>ENTRY ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

This matter is before the Court on plaintiffs LSP Transmission Holdings II, LLC, LS Power

Midcontinent, LLC, Central Transmission LLC, and LS Power Grid DRS Holdings, LLC's

(collectively, "LSP") Motion for Preliminary Injunction ("the Motion"). (Filing No. 4.) LSP, a

developer and owner of transmission projects throughout the United States, seeks to bid on several

forthcoming transmission projects in Indiana, but claims that Indiana House Enrolled Act 1420 of 2023 ("HEA 1420") blocks them from doing so. LSP asserts its claim under 42 U.S.C. § 1983 and seeks to enjoin the Chairman and Commissioners of the Indiana Utility Regulatory Commission (collectively, "IURC" or "IURC Defendants") from enforcing HEA 1420 because it violates the dormant Commerce Clause of the U.S. Constitution.  (Filing No. 4 at 1.)  For the reasons that follow, the Court **grants** LSP's request for preliminary injunctive relief.

## I.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  To obtain a preliminary injunction, the party seeking the injunctive relief must demonstrate that:

> (1) it has some likelihood of success on the merits of its claim; (2) it has no adequate remedy at law; (3) without relief it will suffer irreparable harm. If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction. However, if the plaintiff passes that threshold, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) ("*GEFT I*") (citations and quotation marks omitted).  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters.*, Inc., 695 F.3d 676, 678 (7th Cir. 2012) (citations and internal

quotation marks omitted).  "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.    FINDINGS OF FACT

### A.    Regulatory Background

In 1920, Congress enacted the Federal Power Act ("the Act") to regulate the interstate transmission of electricity across the United States.  *See generally,* 16 U.S.C. §§ 791, 824.  The Act authorizes the Federal Energy Regulatory Commission ("FERC") (formerly, the Federal Power Commission) to regulate interstate electricity transmission by monitoring interstate energy markets to ensure they remain reliable, open and competitive.[1]  In particular, FERC is charged with the "establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy, including … the interconnection … of facilities for the generation, transmission, and sale of electric energy."  42 U.S.C. §§ 7134, 7172(a)(1)(B).

In the decades following the Act's enactment, FERC sought to transform the electric power market to make electric transmission more efficient, competitive, and affordable.  In 1996, FERC issued a rule, known as Order No. 888, to "remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers." *Promulgating Wholesale Competition Through Open Access Non-Discriminatory Transmission Services*, Order No. 888, 61 Fed. Reg. 21,540 (Apr. 24, 1996).  Order No. 888 required all owners of high-voltage interstate transmission lines to allow access to their systems by any power generator or power consumer who wanted to use them.  *Id*.  It also encouraged the

---

[1] Federal Energy Regulatory Commission, *Open Access: Major FERC Orders: Part II, Order No. 888*, YOUTUBE (Apr. 27, 2017), https://www.youtube.com/watch?v=Qj_ElKbVKFE.

creation of independent system operators ("ISOs") and regional transmission organizations as a mechanism for streamlining regional electric transmission planning. *Id.* at 279. ISOs and regional transmission organizations are comprised of individual transmission owners that work together to develop procedures to manage electric transmission equitably.[2] They are required to submit an "open-access tariff," subject to FERC's approval, describing the services they would provide, the cost of those services, and how their services would be regulated. 18 C.F.R. § 35.34(k); *see also* 18 C.F.R. § 35.2(c)(1).

Indiana's power grid is managed by two regional transmission organizations: Midcontinent Independent System Operator ("MISO") and PJM Interconnection ("PJM"). Before 2011, MISO's tariff gave transmission owners already serving a particular area the right to be the first to decide whether to construct an electric transmission project. *See MISO Transmission Owners v. F.E.R.C.*, 819 F.3d 329, 332 (7th Cir. 2016). These grants were known as federal "rights of first refusal." *Id.* at 331. In July 2011, however, FERC eliminated federal rights of first refusal in Order No. 1000 to further its open-access goal. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 77 Fed. Reg. 64,890 (July 21, 2011) (18 C.F.R. § 35). In FERC's view, rights of first refusal are "unjust and unreasonable" because they eliminate potential solutions to regional transmission needs. Order No. 1000 at 225. Indeed, federal rights of first refusal "create opportunities for undue discrimination and preferential treatment against nonincumbent transmission developers within existing regional transmission planning processes." *Id.* at 226. Instead of avoiding competition, individual providers would be required to meet certain qualification criteria and submit proposals to ISOs and regional

---

[2] Federal Energy Regulatory Commission, *Electric Power Markets: National Overview*, FERC (May 16, 2023), https://www.ferc.gov/electric-power-markets.

transmission organizations for the construction of new transmission lines in an open and competitive bidding process. *See id.* at 12.

Nevertheless, FERC stopped short of eliminating *state* rights of first refusal. *Id.* at 227. Order No. 1000 specifically states that it does not "limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities." *Id.* As the Seventh Circuit explained, "FERC wanted 'to avoid intrusion on the traditional role of the States' in regulating the siting and construction of transmission facilities." *MISO Transmission Owners*, 819 F.3d at 336 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 72 (D.C. Cir. 2014)). As a result, many states, including Indiana, enacted statutes reintroducing state rights of first refusal for transmission providers with an existing presence in the state. And many regional transmission organizations, including MISO, reintroduced tariff provisions honoring state rights of first refusal consistent with Order No. 1000. (Filing No. 45-2, MISO Tariff, at 2.)

**B.    Electric Transmission in Indiana**

Following the enactment of Order No. 1000, the Indiana state legislature enacted House Enrolled Act 1420 of 2023, which provides:

> (a) An incumbent electric transmission owner has the right to construct, own, operate, and maintain the following: (1) An electric transmission facility that has been approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner. (2) Upgrades to an existing electric transmission facility owned by the incumbent electric transmission owner if the upgrades have been approved for construction through a regional transmission organization planning process.

Ind. Code § 8-1-38-9(a).  "Incumbent electric transmission owners" are public utilities[3] that own, operate, and maintain an electric transmission facility[4] in whole or in part in Indiana.  *Id.* § 8-1-38-2.  If the incumbent is approved for construction by an ISO or regional transmission organization, then it must notify IURC within ninety days of approval that it intends to construct such a facility.  *Id.* § 8-1-38-9(c).  If the incumbent does not intend to exercise its rights under HEA 1420, then another entity may seek approval to construct the facility.  *Id.*

In enacting HEA 1420, "the Indiana General Assembly concluded that this transmission-project designation framework would best address the critical and ongoing responsibility of owning and operating new transmission facilities as part of an integrated network." (Filing No. 60 at 6).  The IURC Defendants proffer that "this framework furthers the health and safety of all Hoosiers by promoting continuity of service, reliable service quality, and cost-effective infrastructure in Indiana, consistent with Indiana's traditional regulatory design and current energy policy." *Id.*

The Indiana Utility Regulatory Commission is the entity charged with regulating electric transmission in Indiana.  *See generally* Ind. Code. § 8-1-1-1.  It is IURC's "duty to enforce [Indiana utility regulations], as well as all other laws, relating to public utilities," *id.* § 8-1-2-115, including HEA 1420.

## C.    MISO's Response to Order No. 1000

MISO is one of two regional transmission organizations that serve Indiana.  After FERC implemented Order No. 1000, MISO revised its tariff to include a provision requiring it to honor

---

[3] A "public utility" is a "public, municipally owned, or cooperatively owned utility" or a "joint agency created under Ind. Code § 8-1-2.2."  Ind. Code § 8-1-8.5-1(a).

[4] To be sure, an "electric transmission facility" is a "high voltage transmission line with a rating of at least one hundred (100) kilovolts and related transmission facilities and controls."  *Id.* § 8-1-38-1(a).

state rights of first refusal.  ([Filing No. 45-2 at 2](#)) (providing that transmission providers "shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner").  In 2022, MISO launched the second round ("Tranche 2.1") of its Long-Range Transmission Planning initiative, soliciting competitive bids for five transmission construction projects across the region, including in Indiana.  MISO is set to approve a new round of construction bids when its Board of Directors meets on December 10, 2024.  ([Filing No. 5-1 at 3](#).)

### D.     LSP's Background

LSP Transmission Holdings II, LLC, is a Delaware LLC with its principal place of business in Chesterfield, Missouri.  ([Filing No. 3 at 4](#).)  It has several subsidiaries and affiliates, including Plaintiffs LS Power Midcontinent, LLC ("LSP Midcontinent"); Central Transmission, LLC ("Central Transmission"); and LS Power Grid DRS Holdings, LLC ("LS Power Grid").  *Id.* at 4-5.  Each of the plaintiff-subsidiaries are qualified to bid in MISO except Central Transmission, which is qualified in PJM.  *Id.* at 5.  LS Power Grid is the majority owner of Republic Transmission, LLC ("Republic"), which has been certified as a public utility in Indiana and was awarded MISO's first post-Order No. 1000 project in December 2016.  ([Filing No. 5-1 at 3](#)).

LSP has a long history of active development of new electric transmission, partnering with communities across the country to create lower-cost, cleaner energy solutions. Since their inception, Plaintiffs and their affiliates have developed, constructed, managed, and acquired more than 47,000 megawatts of competitive power generation and more than 780 miles of long-distance, high-voltage transmission infrastructure in the United States, for which they have collectively raised over $60 billion in debt and equity financing. ([Filing No. 3 at 14](#)). More than 350 miles of additional transmission projects are currently under construction. *Id.*

LSP and its affiliates filed their Complaint for declaratory and injunctive relief against the Chairman of IURC, James Huston, and IURC's four commissioners in their official capacities because, pursuant to 42 U.S.C. § 1983, HEA 1420 violates the Commerce Clause.  (Filing No. 3.) Plaintiffs also filed the Motion for Preliminary Injunction at issue here.  (Filing No. 4.)  Shortly thereafter, four entities moved under Federal Rule of Civil Procedure 24 to intervene as defendants: Northern Indiana Public Service Company, Indianapolis Power & Light Company, Southern Indiana Gas and Electric Company, and Duke Energy Indiana (collectively, "Intervenors" or "Intervenor Defendants").  (Filing No. 50.)  Intervenor Defendants are vertically integrated, incumbent Indiana service providers that supply electric transmission service to customers from electricity generation through distribution and sale.  (Filing No. 60 at 10, 13.)  They intervened in this action to "defend their express statutory [rights of first refusal] under HEA 1420."  *Id.* at 13.

### III.    <u>DISCUSSION</u>

As previously stated, to obtain a preliminary injunction, LSP must establish the following factors as to the statute it seeks to enjoin: (1) that it is likely to succeed on the merits of its claims; (2) that it has no adequate remedy at law; (3) that it is likely to suffer irreparable harm in the absence of preliminary relief; (4) that the balance of equities tip in its favor; and (5) issuing the injunction is in the public interest.  *GEFT I,* 922 F.3d at 364.  The first two factors are threshold determinations.  "If the moving party meets these threshold requirements, the district court 'must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller, Inc.*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).  The Court will address the threshold factors before addressing the remaining factors.

**A.**    <u>**Likelihood of Success on the Merits**</u>

A party moving for preliminary injunctive relief need not demonstrate a likelihood of "absolute success on the merits." *Valencia v. City of Springfield*, 883 F.3rd 959, 966 (7th Cir. 2018). However, the plaintiff "must demonstrate that 'its claim has some likelihood of success on the merits,' not merely a 'better than negligible' chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Ty, Inc.*, 237 F.3d at 895). "What amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach." *Id.* (citing *Ty, Inc.*, 237 F.3d at 895).

The Commerce Clause gives Congress authority "to regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court has long held that the Commerce Clause also prohibits states from enacting laws that unduly restrict interstate commerce. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). State laws invalidly discriminate against interstate commerce in violation of the so-called "dormant Commerce Clause" if "they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). LSP seeks to enjoin IURC from enforcing HEA 1420 because the statute mandates differential treatment of incumbent transmission owners and transmission owners without an existing physical presence in Indiana.

The Defendants argue that LSP is not likely to succeed on the merits of the Commerce Clause claim because the text of HEA 1420 does not create the in-state versus out-of-state distinction, and because the Court lacks authority to hear the claim. In Defendants' view, the claim is barred because (1) § 1983 does not provide a cause of action for Commerce Clause claims, (2) LSP lacks standing to bring the claim, and (3) the IURC Defendants are immune from suit. As to the first assertion, the Defendants are mistaken that LSP lacks a cause of action. It is well-settled

that "violations of the Commerce Clause may be brought under … § 1983." *Dennis v. Higgins*, 498 U.S. 439, 440 (1991).

Before moving to the substantive issues, the Court will first address the Defendants' standing and sovereign immunity arguments because they implicate the Court's jurisdiction. *See McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 532 (7th Cir. 2022) ("When it applies, the Eleventh Amendment deprives federal courts of jurisdiction over claims against immune defendants.").

### 1.  <u>Standing</u>

Article III of the U.S. Constitution limits federal courts to resolving "cases" and "controversies." U.S. Const. art. III, § 2.  To establish the "irreducible constitutional minimum" of standing to challenge HEA 1420, the Plaintiffs must allege they suffered (1) an injury in fact, (2) that is fairly traceable to the defendants, and (3) that is likely to be redressed by a favorable judicial decision. *Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 639 (7th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  LSP's burden at the preliminary injunction stage is "at least as great as the burden of resisting a summary judgment motion." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (citation omitted).  Therefore, LSP must "'set forth' by affidavit or other evidence 'specific facts,' rather than 'general factual allegations of injury.'" *Id.* (citing *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801–02 (7th Cir. 2016)).

The IURC Defendants do not challenge LSP's assertion of an injury in fact.  But because it must assure itself of jurisdiction, the Court will briefly address this initial element of standing.  An injury in fact is one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Bost*, 114 F.4th at 634 (citing *Lujan*, 504 U.S. at 560).  The Plaintiffs submitted evidence that they "intend to bid, if allowed, on several—and possibly all—of the Tranche 2.1 projects in Indiana." (Filing No. 45-3 at 7.)  HEA 1420 allegedly impinges on LSP's

right to bid for those projects.  Thus, in this context, the "injury in fact" is "the inability to compete on an equal footing in the bidding process, not the loss of a contract."  *N. E. Fla. Contractors v. Jacksonville*, 508 U.S. 656, 666 (1993); *see also All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995).  LSP has satisfied the requirements to show it suffered an "injury in fact" at the preliminary injunction stage.

The IURC Defendants argue that even if LSP establishes an injury in fact, that injury is not traceable to IURC; instead, it is traceable to MISO's decision to honor state rights of first refusal in the first instance.  (Filing No. 45 at 14.)  "The traceability element of Article III standing examines the causal connection between the assertedly unlawful conduct and the alleged injury." *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024) (citation and quotations omitted).  The plaintiff "need not establish that the defendant's conduct was the most immediate cause, or even a proximate cause, of [its] injuries."  *Id.*  On the contrary, "Article III requires no more than a meaningful connection between the two."  *Id.* (cleaned up).  Here, a "meaningful connection" exists between LSP's inability to compete on an equal footing and the operation of HEA 1420.  If the right of first refusal conferred by HEA 1420 did not exist, MISO would award its new projects through a competitive process in which LSP could participate.  Because the IURC enforces the rights of first refusal, *see* Ind. Code § 8-1-2-115, LSP's alleged injury is traceable to the IURC Defendants.

Finally, the IURC Defendants argue that an injunction would not redress the alleged injury because it would not invalidate HEA 1420 or oblige MISO to act in any way.  (Filing No. 45 at 15.)  MISO would instead be required to follow its tariff, which orders MISO to honor state right of first refusal laws.  *Id.*  IURC is correct that "redressability requires that the court be able to afford relief *through the exercise of its power*."  *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023)

(emphasis in original). But its contention fails on the theory that an injunction would only redress an injury resulting from a third party—MISO—not before this Court. As explained above, LSP's injury is traceable to IURC through its enforcement of HEA 1420. The Indiana legislature has imposed on IURC a "duty, to enforce [utility regulations] as well as all other laws, relating to public utilities." Ind. Code § 8-1-2-115. HEA 1420 is situated within Title 8, Article 1, Chapter 38 of the Indiana Code covering "Utilities and Transportation." *See* Ind. Code § 8-1-38-9. By definition, HEA 1420 is a law "relating to public utilities" that IURC must enforce. Accordingly, this Court can, through the exercise of its powers, enjoin IURC from implementing HEA 1420. *See GEFT Outdoor, LLC v. City of Evansville*, 110 F.4th 935, 938 (7th Cir. 2024) ("*GEFT II*"). IURC would no longer be permitted to recognize an incumbent's right of first refusal, and neither, in turn, would MISO.

If IURC remains concerned that an injunction would affect only MISO as an independent third party, LSP can still satisfy the redressability element by showing there is a "substantial risk that, in the near future," MISO will limit Tranche 2.1 awards to incumbents in violation of the Commerce Clause. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("[T]he plaintiffs must show that the third-party platforms 'will likely react in predictable ways' to the defendants' conduct.") (citing *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). In a recent state case, an Iowa court enjoined enforcement of Iowa's right-of-first-refusal law. *See LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316 (Iowa 2023). MISO appeared as *amicus curiae* in a subsequent appeal, acknowledging that "no ROFR rights will be accorded to Iowa projects" following the Iowa court's decision. ([Filing No. 58-1 at 21](#).) IURC gives the Court no reason to believe MISO will deviate from this pattern should *this* Court enjoin enforcement of HEA 1420. Therefore, MISO's public statements suffice to show a "substantial risk" that, when its Board of Directors meets on December

10, 2024, it will decline to accord rights of first refusal to Indiana incumbents pursuant to HEA 1420.

Considering these requirements together, the Court is satisfied that LSP has standing to pursue its claims at this stage.

### 2.    <u>Sovereign Immunity</u>

Next, the IURC Defendants argue that LSP is unlikely to succeed on the merits of its claim because the Chairman and Commissioners are state officials to whom the Eleventh Amendment of the U.S. Constitution grants sovereign immunity. Sovereign immunity is an affirmative defense that IURC must prove. *See On-Site Screening, Inc. v. United States*, 687 F.3d 896, 899 (7th Cir. 2012). Because "the burdens at the preliminary injunction stage track the burdens at trial," *Gonzalez v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 429 (2006), IURC must show it is likely to succeed on this defense. *See id.* at 428–30.

The Eleventh Amendment bars suit against state officials acting in their official capacities unless, under *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff files suit seeking prospective equitable relief for ongoing violations of federal law. *Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 370–71 (7th Cir. 2010). The plaintiff must show that the named state official "plays some role in enforcing the statute" for the exception to apply. *Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018). The Court "need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" for *Ex parte Young* to apply. *Indiana Protection*, 603 F.3d at 370–71 (citing *Verizon Maryland Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)).

Here, LSP alleges that individual state officials tasked with enforcing utility laws commit an ongoing violation of the Commerce Clause by recognizing rights of first refusal under HEA 1420. LSP also seeks declaratory and injunctive relief, which are "paradigmatic examples of

prospective relief." *Driftless Area Land Conservancy v. Valq*, 16 F.4th 508, 521 (7th Cir. 2021). Still, the IURC Defendants insist *Ex parte Young* may not be invoked against state officials who merely regulate or supervise a particular area of state activity. In their view, IURC's only role with respect to HEA 1420 is ministerial in nature – namely, to accept and docket notices from Indiana incumbents wishing to exercise their rights under the statute. In support, IURC relies on *Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018), and *Peshek v. Johnson*, 111 F.4th 799 (7th Cir. 2024), but both cases are inapposite.

In *Doe*, the Seventh Circuit held that none among the Governor of Indiana, the Indiana Attorney General, or a state court official could be sued for violations of the First and Fourteenth Amendments because they did not play any role in enforcing the name-change statute at issue. *See, e.g.*, 883 F.3d at 976 (finding the Governor could not be sued because he "was not specifically charged with a duty to enforce the name-change statute"). Unlike the Indiana officials in that case, the IURC was "specifically charged" with the duty to enforce laws relating to public utilities, including HEA 1420. *See supra*, Section III(A)(1). Similarly, in *Peshek*, the court found that Wisconsin law imbued the Attorney General with enforcement authority rather than the defendant in that case, the Secretary of the Wisconsin Department of Health Services. 111 F.4th at 804. The plaintiffs had simply sued the wrong defendant. *Id.* The IURC Defendants identify no Indiana statute granting enforcement authority to any other state actor. Nor do they explain why the enforcement authority imposed upon them under Ind. Code § 8-1-2-115 is not enough to pass constitutional muster. The burden is on the defendants to show a likelihood of success on the sovereign immunity claim and they have failed to do so here.

To be sure, IURC's role in enforcing HEA 1420 is clear from the text of the statute. HEA 1420 is given effect when IURC accepts notices from incumbents intending to construct, own,

operate and maintain an approved electric transmission facility.  Ind. Code § 8-1-38-9(c).  IURC continues in its enforcement role by monitoring the project, including its costs and rate formulas, and ensuring the incumbent complies with Indiana's utility regulations, *id.*, violations of which IURC may sanction with monetary penalties, *see id.* § 8-1-2-115.  In sum, IURC plays an enforcement rather than ministerial role, and its Chairman and Commissioners may be sued in their official capacities pursuant to *Ex parte Young*.

### 3.   The Commerce Clause claim

With preliminaries out of the way, the Court may now address the substance of the Commerce Clause claim.  Recall that the dormant Commerce Clause prohibits states from enacting laws that mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.  *Granholm*, 544 U.S. at 472.  Almost all state laws and local regulations touch on interstate commerce in some way, but it is only those laws and regulations that *discriminate* against interstate commerce that run afoul of the dormant Commerce Clause.  *Regan v. City of Hammond*, 934 F.3d 700, 702 (7th Cir. 2019).  The Seventh Circuit identifies discriminatory state laws by placing them in one of three categories, "depending on the degree to which to which they affect interstate commerce: (1) laws that expressly discriminate against interstate commerce; (2) laws that, although neutral on their face, bear more heavily on interstate commerce; and (3) laws that may have a mild effect on interstate commerce but in practice do not give local firms any competitive advantage over firms located elsewhere."  *Id.* at 703.  A law that falls within the first category is *per se* unconstitutional and subject to strict scrutiny that allows the law to stand only if it serves a legitimate governmental interest for which there are no non-discriminatory alternatives to furthering that interest.  *Id.*

HEA 1420 grants a right of first refusal to incumbent transmission owners such that they may avoid competition in pursuit of electric transmission projects.  *See* Ind. Code § 8-1-38-9.  As

a reminder, "incumbent electric transmission owner" means a public utility that owns, operates, and maintains an electric transmission facility in whole or in part in Indiana. *Id.* § 8-1-38-2. The Plaintiffs are non-incumbent transmission owners who do not currently own, operate, or maintain transmission lines in Indiana. As the statute concerns property ownership in the state, it expressly mandates differential treatment of in-state and out-of-state economic interests that benefits owners of transmission facilities in Indiana and burdens owners of transmission facilities outside of Indiana. Entities, like Intervenor Defendants, that already own, operate, and maintain facilities in Indiana must do nothing more than inform IURC of their intent to construct or upgrade a transmission line that connects to one of their existing facilities to avoid competition for new transmission projects. On the other hand, entities like LSP are required to establish a physical presence in the state before they may compete in the Indiana electric transmission market. "Limiting competition based on the existence or extent of a business's local foothold is the protectionism that the Commerce Clause guards against." *NextEra Energy Capital Holdings v. Lake*, 48 F.4th 306, 326 (5th Cir. 2022) (citing *Granholm*, 544 U.S. at 466).

The facts in *Granholm* are instructive. A New York law permitted local wineries to make direct wine sales to New York customers on terms not available to out-of-state wineries. *Granholm*, 544 U.S. at 470. Out-of-state wineries were permitted to ship to New York customers only if they established a branch factory, office, or storeroom within the State of New York. *Id.* The Supreme Court struck down the law as violative of the dormant Commerce Clause because although it did not ban direct shipments from out-of-state wineries altogether, requiring them to establish an operation in New York was just an indirect way of subjecting those wineries to cost-prohibitive operating requirements to which local wineries were not similarly subject. *Id.* at 474.

16

So too, here.  HEA 1420, though not a complete ban on out-of-state transmission owners, erects a barrier to the interstate electric transmission market by limiting who can compete for new construction projects in Indiana.  The right of first refusal in favor of Indiana incumbents runs contrary to the Supreme Court's admonition that "States cannot require an out-of-state firm to become a resident in order to compete on equal terms."  *Id.* at 475 (citing *Halliburton Oil Well Cementing Co. v. Reilly*, 373 U.S. 64, 72 (1963)).

IURC and the Intervenors defend HEA 1420 on grounds similar to those rejected in *Granholm*.  They argue that all transmission owners – both in-state and out-of-state – are limited by the right of first refusal because even new Indiana utilities may not connect to an incumbent's existing facility.  But the Supreme Court has consistently held that it is immaterial that some in-state businesses are subject to the proscriptions of a discriminatory statute.  *Dean Milk v. City of Madison*, 340 U.S. 349, 354 n.4 (1951); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); *see Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 508 U.S. 353, 361 (1992).  The Defendants also ask the Court to follow the Eighth Circuit's reasoning in *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020), but for the following reasons, the Court declines to do so.

In *Sieben*, the Eighth Circuit upheld a similar right-of-first-refusal statute enacted by the Minnesota legislature because Minnesota incumbents included entities headquartered in other states.  954 F.3d at 1028.  The court reasoned that "[i]t would be a different matter … if the state were to treat a company in another state differently from Minnesota companies" based on where the company is incorporated or "principally located."  *Id.*  "Minnesota's preference is for electric transmission owners who have existing facilities, and its law applies evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere."  *Id.*

17

Respectfully, the Court finds the Fifth Circuit's reasoning in *Lake* to be more persuasive. In striking down Texas' right-of-first-refusal statute, the Fifth Circuit explained, "if 'place of incorporation alone' were controlling, 'then a state's dormant Commerce Clause liability would turn on the empty formality of where a company's articles of incorporation were filed, rather than where the company's business takes place or where its political influence lies.'" *Lake*, 48 F.4th at 323 (citing *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1259 (11th Cir. 2012)). Furthermore, "[i]n finding dormant Commerce Clause violations, the Supreme Court did not even mention place of incorporation for the wineries in New York, coal mines in Oklahoma, or dairies in Madison, Wisconsin that received an unlawful benefit because of their local presence." *Id.* at 322 (citing *Granholm*, 544 U.S. at 475; *Wyoming v. Oklahoma*, 502 U.S. 437, 457-59 (1992); *Dean Milk*, 340 U.S. at 352). The *Sieben* court does not grapple with *Granholm* or any of the Supreme Court's Commerce Clause jurisprudence affecting similar state statutes. Accordingly, "[f]or the concern about in-state interests being able to obtain favorable treatment over out-of-state interests, local presence, rather than place of incorporation, should matter." *Id.* at 323.

*Regan v. City of Hammond*, a Seventh Circuit decision on which the Defendants also rely, does not change the outcome. In that case, the Hammond municipal code required landlords to either obtain a license from the city or hire a Hammond-licensed contractor to make repairs to their property. *Regan*, 934 F.3d at 702. The ordinance excepted from the license requirement individuals who lived in the property they wished to repair. *Id*. The plaintiffs argued that the ordinance, coupled with the exception, "impermissibly burden[ed] interstate commerce by imposing costs on property owners who, like Regan, do not reside in Hammond which locally-domiciled homeowners do not have to pay." *Id*. The Seventh Circuit disagreed primarily because "occupant homeowners," to whom the exception applied, were not "similarly situated with

landlords," because they are "not in meaningful competition" with one another. *Id.* at 704. "Laws that draw distinctions between entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce Clause." *Id.* (citation omitted).

HEA 1420 is no such law. It draws a straightforward distinction between entities that are direct competitors in the interstate market for electric transmission. Both incumbent and non-incumbent transmission owners compete for business in Indiana and elsewhere throughout the Midwest via MISO's regional transmission planning process. The Intervenor Defendants resist this conclusion on the theory that *some* incumbents operate in defined service areas as vertically integrated utilities and, therefore, do not compete with non-incumbents like LSP. The Court is not persuaded. HEA 1420 accords incumbency status to *any* public utility that owns a transmission line in Indiana, including those independent, transmission-only entities like Republic, who compete with vertically integrated companies such as Intervenor defendants. (Filing No. 58 at 28.) Therefore, HEA 1420 expressly discriminates against interstate commerce and will stand only if it serves a legitimate governmental interest for which there is no non-discriminatory alternative.

HEA 1420 cannot withstand strict scrutiny. Although it serves legitimate governmental interests—promoting transmission reliability, maintaining cost-effective infrastructure, and continuity of service—Indiana already requires "[e]very public utility … to furnish reasonably adequate service and facilities." Ind. Code § 8-1-2-4. Thus, the Defendants' proffered reasons for upholding the statute are insufficient because the state's interests are adequately served by existing, non-discriminatory utility regulations. Therefore, Plaintiffs are likely to succeed on the merits of their dormant Commerce Clause claim.

### B.    Irreparable Harm and Inadequate Remedy at Law

As explained above, LSP asserts it will suffer irreparable harm for which there is no adequate remedy at law because absent an injunction, it will be barred from competing for MISO's Tranche 2.1 projects at the soon-approaching MISO Board meeting.  Courts have repeatedly held that a company is irreparably harmed if it is disadvantaged in—let alone completely barred from— competing for business opportunities.  *See, e.g., Ind. Fine Wine & Spirits v. Cook*, 459 F.Supp.3d 1157, 1170 (S.D. Ind. 2020) (plaintiff established irreparable harm where protectionist law threatened to deprive it of "the opportunity to establish its store in Indiana").  Moreover, "the existence of a continuing constitutional violation constitutes proof of an irreparable harm … and this principle of law applies to violations of the Commerce Clause." *Id.*  Based on the evidence before it, the Court is convinced that absent an injunction, MISO will grant its Tranche 2.1 projects to an incumbent and LSP will have missed out on its opportunity to compete for billions in potential profits.  And because LSP cannot recover monetary damages from the IURC Defendants as state officials, the Court is satisfied that LSP will suffer irreparable harm without an injunction.  *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005).

### C.    Balance of Harms and Public Interest

Having concluded that, absent an injunction, LSP will suffer irreparable harm for which there is no adequate remedy at law, the Court now considers whether the balance of harms and public interest weigh in favor of injunctive relief.  These remaining factors merge when, as here, the government is a defendant.  *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 409 (S.D. Ind. 2021).

LSP asserts that the balance of harms and public interest favor LSP because while consumers will face economic harm in the form of "unjust" and "unreasonable" transmission rates

without an injunction, "no meaningful equities support[] the state's position." (Filing No. 5 at 31.) By contrast, the Defendants assert that an injunction will threaten confusion for MISO stakeholders, undermine the public's interest in lower energy costs, and create fragmentation that will undermine grid reliability. (Filing No. 45 at 31); (Filing No. 60 at 62).

"When a party establishes that a state law is depriving it of its constitutional rights, the balance of harms favors injunctive relief. There is no harm to a government agency when it is prevented from enforcing an unconstitutional statute." *Indiana Fine Wine*, 459 F. Supp. 3d at 1171. The IURC defendants have not presented (and the Court cannot identify) any harm that they will suffer with the issuance of a preliminary injunction in this case. On the other hand, if an injunction is not issued, LSP will lose the opportunity to compete for billions of dollars in new transmission projects and suffer from IURC's violation of the dormant Commerce Clause. Furthermore, the Intervenor Defendants' concern about chaos and fragmentation on the transmission grid is unfounded given that all utilities must provide reliable service, and because the Intervenors have presented no evidence that HEA 1420 was promulgated as a result of such chaos and fragmentation. The Court is further persuaded by LSP's argument that the equities strongly support allowing them to compete since the competitive process would likely take up to a year, and there's no harm to the Defendants as they can still attempt to carry their burden as the litigation goes forward. Therefore, the balance of harms and public interest favor LSP.

## IV.   <u>CONCLUSION</u>

LSP has demonstrated that it is likely to succeed on the merits of its dormant Commerce Clause claim. LSP has standing to pursue its claims in the first instance, and *Ex parte Young* permits its suit against the state officials in their official capacities. In addition, HEA 1420 facially

discriminates against out-of-state economic interests, and it cannot survive strict scrutiny.  Any harm to the Defendants is outweighed by the harm LSP will face absent an injunction.

Accordingly, LSP's Motion for Preliminary Injunction (Filing No. 4) is **GRANTED**. Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the Chair and Commissioners of the Indiana Utility Regulatory Commission, their agents, servants, and employees, and persons acting in concert or participation with them, from enforcing the rights of first refusal of Indiana Code § 8-1-38-9.  LSP need not post a bond because monetary damages are not at issue in this case.

**SO ORDERED**.

Date:   12/6/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Aaron A. Schmoll
LEWIS & KAPPES
aschmoll@lewis-kappes.com

Erin E. Murphy
CLEMENT & MURPHY, PLLC
erin.murphy@clementmurphy.com

James E. Zoccola
LEWIS & KAPPES PC
jzoccola@lewis-kappes.com

Joseph DeMott
CLEMENT & MURPHY, PLLC
joseph.demott@clementmurphy.com

Matthew D. Rowen
CLEMENT & MURPHY, PLLC
matthew.rowen@clementmurphy.com

Paul D. Clement
CLEMENT & MURPHY, PLLC
paul.clement@clementmurphy.com

Thomas R Jones
LEWIS & KAPPES
tjones@lewis-kappes.com

Todd Arthur Richardson
LEWIS & KAPPES PC
trichardson@lewis-kappes.com

Bradley Davis
OFFICE OF THE INDIANA ATTORNEY GENERAL
bradley.davis@atg.in.gov

Jade Poorman
OFFICE OF THE INDIANA ATTORNEY GENERAL
jade.poorman@atg.in.gov

James A. Barta
OFFICE OF THE INDIANA ATTORNEY GENERAL
james.barta@atg.in.gov

Jenna Lorence
OFFICE OF THE INDIANA ATTORNEY GENERAL
jenna.lorence@atg.in.gov

Rebekah Durham
OFFICE OF THE INDIANA ATTORNEY GENERAL
rebekah.durham@atg.in.gov

Kaitlin O'Donnell
TROUTMAN PEPPER
kaitlin.odonnell@troutman.com

Kevin Michael LeRoy
TROUTMAN PEPPER HAMILTON SANDERS LLP
kevin.leroy@troutman.com

Misha Tseytlin
TROUTMAN PEPPER HAMILTON SANDERS, LLP
misha.tseytlin@troutman.com

Sierra Stockley
TROUTMAN PEPPER
sierra.stockley@troutman.com

William R. Derasmo
TROUTMAN PEPPER
william.derasmo@troutman.com

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| LSP TRANSMISSION HOLDINGS II, LLC,     ) | |
| LS POWER MIDCONTINENT, LLC,     ) | |
| CENTRAL TRANSMISSION, LLC,     ) | |
| LS POWER GRID DRS HOLDINGS, LLC,     ) | |
|     ) | |
| Plaintiffs,     ) | |
|     ) | |
| v.     ) | Case No. 1:24-cv-01722-TWP-MG |
|     ) | |
| CHAIRMAN JAMES F. HUSTON Indiana Utility     ) | |
| Regulatory Commission,     ) | |
| COMMISSIONER WESLEY R. BENNETT     ) | |
| Indiana Utility Regulatory Commission,     ) | |
| COMMISSIONER SARAH E. FREEMAN     ) | |
| Indiana Utility Regulatory Commission,     ) | |
| COMMISSIONER DAVID E. VELETA Indiana     ) | |
| Utility Regulatory Commission,     ) | |
| COMMISSIONER DAVID E. ZIEGNER Indiana     ) | |
| Utility Regulatory Commission,     ) | |
|     ) | |
| Defendants.     ) | |
| _____) | |
|     ) | |
| NORTHERN INDIANA PUBLIC SERVICE     ) | |
| COMPANY,     ) | |
| INDIANAPOLIS POWER & LIGHT COMPANY     ) | |
| d/b/a AES Indiana,     ) | |
| SOUTHERN INDIANA GAS AND ELECTRIC     ) | |
| COMPANY d/b/a CenterPoint Energy Indiana     ) | |
| South,     ) | |
| DUKE ENERGY INDIANA, LLC,     ) | |
|     ) | |
| Intervenor Defendants.     ) | |

<u>**PRELIMINARY INJUNCTION**</u>

Pursuant to the Court's Entry on Plaintiffs' Motion for Preliminary Injunction, and in

compliance with Federal Rule of Civil Procedure 65(d)(1)(C), the Chair and Commissioners of the

Indiana Utility Regulatory Commission, their agents, servants, and employees, and persons acting

in concert or participation with them, are preliminarily **enjoined** from enforcing the rights of first

refusal of Indiana Code § 8-1-38-9.  No bond shall be required.

     **SO ORDERED**.

    Date:   _12/6/2024_

                                   Hon. Tanya Walton Pratt, Chief Judge
                                   United States District Court
                                 Southern District of Indiana

DISTRIBUTION:

Aaron A. Schmoll
LEWIS & KAPPES
aschmoll@lewis-kappes.com

Erin E. Murphy
CLEMENT & MURPHY, PLLC
erin.murphy@clementmurphy.com

James E. Zoccola
LEWIS & KAPPES PC
jzoccola@lewis-kappes.com

Joseph DeMott
CLEMENT & MURPHY, PLLC
joseph.demott@clementmurphy.com

Matthew D. Rowen
CLEMENT & MURPHY, PLLC
matthew.rowen@clementmurphy.com

Paul D. Clement
CLEMENT & MURPHY, PLLC
paul.clement@clementmurphy.com

Thomas R Jones
LEWIS & KAPPES
tjones@lewis-kappes.com

Todd Arthur Richardson
LEWIS & KAPPES PC
trichardson@lewis-kappes.com

Bradley Davis
OFFICE OF THE INDIANA ATTORNEY GENERAL
bradley.davis@atg.in.gov

Jade Poorman
OFFICE OF THE INDIANA ATTORNEY GENERAL
jade.poorman@atg.in.gov

James A. Barta
OFFICE OF THE INDIANA ATTORNEY GENERAL
james.barta@atg.in.gov

Jenna Lorence
OFFICE OF THE INDIANA ATTORNEY GENERAL
jenna.lorence@atg.in.gov

Rebekah Durham
OFFICE OF THE INDIANA ATTORNEY GENERAL
rebekah.durham@atg.in.gov

Kaitlin O'Donnell
TROUTMAN PEPPER
kaitlin.odonnell@troutman.com

Kevin Michael LeRoy
TROUTMAN PEPPER HAMILTON SANDERS LLP
kevin.leroy@troutman.com

Misha Tseytlin
TROUTMAN PEPPER HAMILTON SANDERS, LLP
misha.tseytlin@troutman.com

Sierra Stockley
TROUTMAN PEPPER
sierra.stockley@troutman.com

William R. Derasmo
TROUTMAN PEPPER
william.derasmo@troutman.com

# Exhibit C

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

LSP TRANSMISSION HOLDINGS II, LLC, LS
POWER MIDCONTINENT, LLC, CENTRAL
TRANSMISSION, LLC, *and* LS POWER GRID
DRS HOLDINGS, LLC,

      *Plaintiffs,*

*v.*

JAMES F. HUSTON, *Chairman, Indiana
Utility Regulatory Commission*, WESLEY
R. BENNETT, *Commissioner, Indiana
Utility Regulatory Commission*, SARAH E.
FREEMAN, *Commissioner, Indiana Utility
Regulatory Commission*, DAVID E.
VELETA, *Commissioner, Indiana Utility
Regulatory Commissioner*, *and* DAVID E.
ZIEGNER, *Commissioner, Indiana Utility
Regulatory Commission, each in his or
her official capacity*,

      *Defendants,*

*and*

NORTHERN INDIANA PUBLIC SERVICE
COMPANY, INDIANAPOLIS POWER & LIGHT
COMPANY *d/b/a AES Indiana*, SOUTHERN
INDIANA GAS AND ELECTRIC COMPANY
*d/b/a CenterPoint Energy Indiana South*,
*and* DUKE ENERGY INDIANA, LLC,

      *Intervenor-Defendants.*

Case No. 1:24-cv-01722-TWP-MG

## INTERVENOR-DEFENDANTS NORTHERN INDIANA PUBLIC SERVICE COMPANY, INDIANAPOLIS POWER & LIGHT COMPANY D/B/A AES INDIANA, SOUTHERN INDIANA GAS AND ELECTRIC COMPANY D/B/A CENTERPOINT ENERGY INDIANA SOUTH, AND DUKE ENERGY INDIANA, LLC'S NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 1292(a)(1) and Federal Rule of Appellate Procedure 3, notice is hereby given that Intervenor-Defendants Northern Indiana Public Service Company, Indianapolis Power & Light Company d/b/a AES Indiana, Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South, and Duke Energy Indiana, LLC appeal to the U.S. Court of Appeals for the Seventh Circuit the District Court's Entry Granting Plaintiffs' Motion For Preliminary Injunction, entered December 6, 2024, Dkt.70, and Preliminary Injunction Order, also entered December 6, 2024, Dkt.71.

Dated: December 10, 2024.                    Respectfully submitted,

                                             /s/ Misha Tseytlin
WILLIAM R. DERASMO*                          MISHA TSEYTLIN
TROUTMAN PEPPER                              Counsel of Record
HAMILTON SANDERS LLP                         KEVIN M. LEROY
401 9th Street, N.W.                         KAITLIN L. O'DONNELL
Suite 1000                                   SIERRA C. STOCKLEY
Washington, D.C. 20004                       TROUTMAN PEPPER
(202) 274.2886                               HAMILTON SANDERS LLP
william.derasmo@troutman.com                 227 W. Monroe St., Suite 3900
                                             Chicago, Illinois 60606
  *Admitted pro hac vice                     (608) 999-1240 (MT)
                                             (312) 759-1938 (KL)
                                             (302) 777-6541 (KO)
                                             (215) 981-4692 (SS)
                                             (312) 759-1939 (fax)
                                             misha.tseytlin@troutman.com
                                             kevin.leroy@troutman.com
                                             kaitlin.o'donnell@troutman.com
                                             sierra.stockley@troutman.com

                                             Attorneys for Northern Indiana Public
                                             Service Company, Indianapolis Power &
                                             Light Company d/b/a AES Indiana,
                                             Southern Indiana Gas and Electric
                                             Company d/b/a CenterPoint Energy
                                             Indiana South, and Duke Energy
                                             Indiana, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of December, 2024, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

<u>/s/ *Misha Tseytlin*</u>
Misha Tseytlin

# Exhibit D

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA

LSP Transmission Holdings II, LLC, LS Power Midcontinent, LLC, Central Transmission, LLC, *and* LS Power Grid DRS Holdings, LLC,

      *Plaintiffs*,

*v.*

James F. Huston, *Chairman, Indiana Utility Regulatory Commission*, Wesley R. Bennett, *Commissioner, Indiana Utility Regulatory Commission*, Sarah E. Freeman, *Commissioner, Indiana Utility Regulatory Commission*, David E. Veleta, *Commissioner, Indiana Utility Regulatory Commissioner, and* David E. Ziegner, *Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity*,

      *Defendants*,

*and*

Northern Indiana Public Service Company, Indianapolis Power & Light Company *d/b/a AES Indiana*, Southern Indiana Gas and Electric Company *d/b/a CenterPoint Energy Indiana South*, *and* Duke Energy Indiana, LLC,

      *Intervenor-Defendants*.

Case No. 1:24-cv-01722-TWP-MG

**INTERVENOR-DEFENDANTS NORTHERN INDIANA PUBLIC SERVICE COMPANY, INDIANAPOLIS POWER & LIGHT COMPANY D/B/A AES INDIANA, SOUTHERN INDIANA GAS AND ELECTRIC COMPANY D/B/A CENTERPOINT ENERGY INDIANA SOUTH, AND DUKE ENERGY INDIANA, LLC'S DOCKETING STATEMENT**

Intervenor-Defendants Northern Indiana Public Service Company, Indianapolis Power & Light Company d/b/a AES Indiana, Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South, and Duke Energy Indiana, LLC (collectively, "Intervenor Defendants"), by and through their undersigned counsel, hereby submit this Docketing Statement pursuant to Circuit Rule 3(c).

1.   **District Court Jurisdiction:** Plaintiffs LSP Transmission Holdings II, LLC, LS Power Midcontinent, LLC, Central Transmission, LLC, and LS Power Grid DRS Holdings, LLC, filed this action for declaratory and injunctive relief, alleging that House Enrolled Act 1420 of 2023 ("HEA 1420") violates the dormant Commerce Clause of the U.S. Constitution, U.S. Const. art. 1, § 8, cl. 3, and is preempted by the Federal Power Act pursuant to the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI, cl. 2.  Plaintiffs also assert that HEA 1420 violates the Privileges and Immunities Clause of the Indiana Constitution, Ind. Const. art. I, § 23.  On December 2, 2024, Plaintiffs moved for a preliminary injunction on the dormant Commerce Clause claim.  Dkt.4.  Plaintiffs' claim therefore raises a federal question sufficient to confer jurisdiction under 28 U.S.C. § 1331.

2.   **Appellate Court Jurisdiction:** The Court of Appeals has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1) because this is an appeal from a preliminary injunction.  On December 6, 2024, the District Court issued an order granting Plaintiffs' motion for a preliminary injunction, Dkt.70, and preliminarily enjoined the Chair and Commissioners of the Indiana Utility Regulatory Commission ("IURC"), their agents, servants, and employees, and persons acting in concert or participation

with them, from enforcing the rights of first refusal in HEA 1420, Dkt.71.  A timely notice of appeal from the order granting the preliminary injunction and preliminary injunction is being filed contemporaneously with this Docketing Statement on December 10, 2024.  This is not a direct appeal from the decision of a magistrate judge.  No Rule 59(e) motion to alter or amend judgment or any other motion tolling the time for filing a Notice Of Appeal has been filed.

   3. **Ongoing Proceedings in the District Court:** The merits of this case remain pending before the District Court.  Contemporaneously with this Docketing Statement, Intervenor Defendants have filed with the District Court a Motion For Stay Pending Appeal, and, given the exigencies of this case, have requested a decision on that Motion by 2:00 p.m. on Wednesday, December 11, 2024.

   4. **Official Capacity Designations:** The current Chairman of the IURC is James F. Huston.  The current Commissioners of the IURC are Wesley R. Bennett, Sarah E. Freeman, David E. Veleta, and David E. Ziegner.

   5. **Related Appellate Proceedings:** There are no prior or related appellate court proceedings.

Dated: December 10, 2024.

Respectfully submitted,

/s/ Misha Tseytlin

WILLIAM R. DERASMO*                          MISHA TSEYTLIN
TROUTMAN PEPPER                                 Counsel of Record
HAMILTON SANDERS LLP                        KEVIN M. LEROY
401 9th Street, N.W.                               KAITLIN L. O'DONNELL
Suite 1000                                             SIERRA C. STOCKLEY
Washington, D.C. 20004                          TROUTMAN PEPPER
(202) 274.2886                                       HAMILTON SANDERS LLP
william.derasmo@troutman.com             227 W. Monroe St., Suite 3900
                                                            Chicago, Illinois 60606
                                                            (608) 999-1240 (MT)
*Admitted pro hac vice                          (312) 759-1938 (KL)
                                                            (302) 777-6541 (KO)
                                                            (215) 981-4692 (SS)
                                                            (312) 759-1939 (fax)
                                                            misha.tseytlin@troutman.com
                                                            kevin.leroy@troutman.com
                                                            kaitlin.o'donnell@troutman.com
                                                            sierra.stockley@troutman.com

                                                            *Attorneys for the Northern Indiana
                                                            Public Service Company, Indianapolis
                                                            Power & Light Company d/b/a AES
                                                            Indiana, Southern Indiana Gas and
                                                            Electric Company d/b/a CenterPoint
                                                            Energy Indiana South, and Duke
                                                            Energy Indiana, LLC*

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of December, 2024, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

*/s/ Misha Tseytlin*
MISHA TSEYTLIN

# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LSP TRANSMISSION HOLDINGS II, LLC,<br>LS POWER MIDCONTINENT, LLC,<br>CENTRAL TRANSMISSION, LLC,<br>LS POWER GRID DRS HOLDINGS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CHAIRMAN JAMES F. HUSTON Indiana Utility<br>Regulatory Commission,<br>COMMISSIONER WESLEY R. BENNETT<br>Indiana Utility Regulatory Commission,<br>COMMISSIONER SARAH E. FREEMAN<br>Indiana Utility Regulatory Commission,<br>COMMISSIONER DAVID E. VELETA Indiana<br>Utility Regulatory Commission,<br>COMMISSIONER DAVID E. ZIEGNER Indiana<br>Utility Regulatory Commission,<br><br>Defendants.<br>_____<br><br>NORTHERN INDIANA PUBLIC SERVICE<br>COMPANY,<br>INDIANAPOLIS POWER & LIGHT COMPANY<br>d/b/a AES Indiana,<br>SOUTHERN INDIANA GAS AND ELECTRIC<br>COMPANY d/b/a CenterPoint Energy Indiana<br>South,<br>DUKE ENERGY INDIANA, LLC,<br><br>Intervenor Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:24-cv-01722-TWP-MG |

**<u>ENTRY</u>**

     This matter is before the Court on Northern Indiana Public Service Company, Indianapolis

Power & Light Company, Southern Indiana Gas and Electric Company, and Duke Energy Indiana,

LLC's (the "Intervenor Defendants") Emergency Motion for Stay Pending Appeal (Filing No. 77).

In their Emergency Motion, the Intervenor Defendants state that Defendant Chairman and Commissioners of the IURC concur in the relief sought in their Motion, however, the position of Plaintiffs LSP Transmission Holdings II, LLC, LS Power Midcontinent, LLC, Central Transmission, LLC, and LS Power Grid DRS Holdings, LLC, is not noted. Accordingly, the Court is unable to rule on the Motion —filed at 7:42 PM on December 10, 2024—by 2:00 PM on December 11, 2024.

Intervenor Defendants state that if this Court is unable to rule on their Motion for Stay Pending Appeal by no later than Wednesday December 11, 2024, at 2:00 PM, they will seek an emergency stay in the U.S. Court of Appeals for the Seventh Circuit. *Id* at 2. In the event that this matter remains in the district court, the Plaintiffs shall respond no later than **noon on Thursday December 12, 2024**. If Intervenor Defendants seek their emergency stay in the U.S. Court of Appeals for the Seventh Circuit, no response is necessary in the district court.

**IT IS SO ORDERED.**

Date:   12/11/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

James A. Barta
Office of the Indiana Attorney General
james.barta@atg.in.gov

Rebekah Bennett
Office of Indiana Attorney General
rebekah.bennett@atg.in.gov

Paul D. Clement
Clement & Murphy, PLLC
paul.clement@clementmurphy.com

Bradley Davis
Office of IN Attorney General
bradley.davis@atg.in.gov

Joseph DeMott
Clement & Murphy, PLLC
joseph.demott@clementmurphy.com

William R. Derasmo
Troutman Pepper
william.derasmo@troutman.com

Thomas R Jones
Lewis Kappes
tjones@lewis-kappes.com

Kevin Michael LeRoy
Troutman Pepper Hamilton Sanders LLP
kevin.leroy@troutman.com

Jenna Lorence
INDIANA ATTORNEY GENERAL
jenna.lorence@atg.in.gov

Erin E. Murphy
Clement & Murphy, PLLC
erin.murphy@clementmurphy.com

Kaitlin O'Donnell
Troutman Pepper
kaitlin.odonnell@troutman.com

Jade Poorman
Office of Indiana Attorney General
jade.poorman@atg.in.gov

Todd Arthur Richardson
LEWIS & KAPPES PC
trichardson@lewis-kappes.com

Melissa Megan Root
JENNER & BLOCK LLP
mroot@jenner.com

Matthew D. Rowen
Clement & Murphy, PLLC
matthew.rowen@clementmurphy.com

Aaron A. Schmoll
Lewis Kappes
aschmoll@lewis-kappes.com

Sierra Stockley
Troutman Pepper
sierra.stockley@troutman.com

Misha Tseytlin
Troutman Pepper Hamilton Sanders, LLP
misha.tseytlin@troutman.com

James E. Zoccola
LEWIS & KAPPES PC
jzoccola@lewis-kappes.com

# Exhibit F

# Annual MISO Members Meeting

**8:30 a.m. – 8:35 a.m. (CST)**

**December 12, 2024**

**The Woodlands, TX**

**ANNUAL MEETING**

**Agenda**

1. Annual Members Meeting (Timothy Caister)
   A. Roll call and Agenda Review
   B. Election Results

2. Adjourn to MISO Board of Directors Meeting

***************

# MISO Board of Directors Meeting
**8:35 a.m. – 11:00 a.m. (CST)**

**December 12, 2024**

**The Woodlands, TX**

**OPEN SESSION**

**Agenda**

1. Roll Call and Agenda Review (Todd Raba)

2. Chair's Report & Administrative Matters (Todd Raba)
   A. Approval of the Minutes of the September 19, 2024 Board of Directors Meeting ✔
   B. 2025 Board Committee Assignments
   C. Board October Strategy Session Review
   D. Review of Revised Full Board Assessment (Karl Zobrist)

3. Chief Executive Officer's Report (John Bear)

4. Secretary's Report (Timothy Caister)
   A. Non-Transmission Owner Membership Application of Pecos Renewables North America LLC ✔
   B. Non-Transmission Owner Membership Application of Longview Infrastructure Midwest, LLC ✔

5. Standing Committees
   A. Advisory Committee (Advisory Committee Representative)
   B. Transmission Owners Committee (Transmission Owners Representative)
   C. Organization of MISO States (OMS Representative)

✔ Action Item

6. Corporate Reports
   A. Review MISO 2024 Financial Performance (Ross Baker)

7. MISO Strategy Updates
   A. Reliability Imperative Update (Andre Porter)

8. Audit & Finance Committee Report (Phyllis Currie)
   A. Action Regarding 2025 Operating and Investment Budgets ✔

9. System Planning Committee Report (Mark Johnson)
   A. Discussion of MTEP24
   B. Public Comments Regarding MTEP24
   C. Action Regarding MTEP24 Executive Summary and Appendix A ✔

10. Corporate Governance & Strategic Planning Committee Report (Nancy Lange)

11. Human Resources Committee Report (Barbara Krumsiek)

12. Markets Committee Report (Trip Doggett)

13. Technology Committee Report (Theresa Wise)

14. New Business

15. Public Comments

16. Adjourn

✔ Action Item

# Exhibit G

Docusign Envelope ID: 9093835C-206E-4CBE-9278-8EBC39646366

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

LSP Transmission Holdings II, LLC,
LS Power Midcontinent, LLC,
Central Transmission, LLC, *and* LS
Power Grid DRS Holdings, LLC,

      *Plaintiffs,*

*v.*

James F. Huston, *Chairman, Indiana Utility Regulatory Commission*, Wesley R. Bennett, *Commissioner, Indiana Utility Regulatory Commission*, Sarah E. Freeman, *Commissioner, Indiana Utility Regulatory Commission*, David E. Veleta, *Commissioner, Indiana Utility Regulatory Commissioner, and* David E. Ziegner, *Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity*,

      *Defendants.*

Case No. 1:24-cv-01722-TWP-MG

---

## DECLARATION OF ORVILLE COCKING

I, Orville Cocking, declare as follows:

    1.    My name is Orville Cocking. I am the Senior Vice President of Electric Operations of Northern Indiana Public Service Company LLC ("NIPSCO"). I am over the age of 18 years, and I am competent to testify concerning the matters in this declaration. I have personal knowledge of the facts set forth in this declaration, and if called and sworn as a witness, could and would competently testify to them.

2.     I have more than 20 years of experience in electricity generation, transmission, and distribution.  I have been employed at NIPSCO since April 2024. I have a Bachelor of Engineering in Civil Engineering  from Temple University College of Engineering, and a Masters in Business Administration from Fordham Gabelli School of Business.  As Senior Vice President of Electric Operations at NIPSCO, my responsibilities include all planning and operations related to NIPSCO's transmission, distribution, and generation facilities..

3.     NIPSCO is a vertically integrated Indiana limited liability company that is engaged in the generation, transmission, and distribution of energy at the wholesale and retail levels.  It owns and operates generation plants, transmission lines, and distribution lines within its exclusive service territory, which consists of the northern third of Indiana.

4.     NIPSCO is committed to providing customers in Northwest Indiana with safe, reliable, and affordable natural gas and electric service.  It employs about 3,100 people, and serves about 900,000 natural gas customers and 480,000 electric customers across Northwest Indiana.  NIPSCO is Indiana's largest natural gas distribution company, and its second-largest electric distribution company.

5.     Over the one-hundred years that NIPSCO has been serving customers in Northwest Indiana, NIPSCO has constructed a robust integrated transmission system and developed substantial experience with that system.

6. NIPSCO is a public utility regulated by the Indiana Utility Regulatory Commission ("IURC") and the Federal Energy Regulatory Commission ("FERC" or the "Commission").

7. As a FERC-regulated public utility, NIPSCO is required to charge just and reasonable transmission rates. *See* 16 U.S.C. §§ 824d, 824e. The IURC similarly ensures that NIPSCO's transmission rates are just and reasonable. *See* Ind. Code § 8-1-2-4.

8. This declaration is submitted in support of NIPSCO's motion to intervene as a defendant as well as its forthcoming opposition to Plaintiffs' motion for a preliminary injunction in this matter, wherein Plaintiffs challenge the validity of Indiana House Enrolled Act 1420 of 2023 ("HEA 1420").

9. I am familiar with NIPSCO's operations, including transmission, regulatory compliance, and electric markets more generally. Further, I am familiar with HEA 1420 and the significant harm that an order invalidating HEA 1420 would cause to NIPSCO and its electricity customers.

10. Vertically integrated utilities like NIPSCO provide an essential public service: they build high-voltage transmission lines and generate and distribute electricity within their service territory to ensure that residences and businesses enjoy reliable electric service, arguably the most fundamental service in the modern world. The State of Indiana, in turn, heavily regulates public utilities to ensure safe and reliable service for Indiana residents.

11.   The electricity industry is also heavily regulated at the federal level pursuant to FERC regulations and orders, as well as Commission-approved tariffs and agreements.  FERC orders have encouraged participation in regional entities, such as the Midcontinent Independent System Operator, Inc. ("MISO"), and mandated that those regional entities engage in regional transmission planning to ensure continued safe and reliable electric service.

12.   NIPSCO is an electric load-serving entity and transmission-owning member of MISO.

13.   MISO is currently engaging in the regional transmission planning process for Indiana and other States in its region, determining the transmission projects necessary to maintain grid reliability.

14.   As a MISO member, NIPSCO participates in MISO's regional transmission planning process.  NIPSCO must abide by the tariffs and agreements that MISO has filed with FERC to govern its members' construction and operation of electric transmission grids, including the MISO Transmission Owners Agreement.

15.   In 2011, the Commission issued Order No. 1000 which, among other things, required transmission owners to remove right-of-first-refusal provisions from their FERC-jurisdictional tariffs and agreements for projects selected for regional cost allocation.  Notably, Order No. 1000 continued to allow incumbent transmission providers to build new transmission facilities solely within the provider's retail distribution service territory, and so meet its service obligations and/or reliability

needs through projects that are not submitted for regional cost allocation. Moreover, Order No. 1000 does not prevent States from adopting their own ROFR laws.

16.     As a result, MISO amended its Transmission Owners Agreement to remove the right-of-first-refusal provision. The amended agreement nevertheless requires MISO to comply with any applicable state laws or regulations granting a right of first refusal to incumbent utilities.

17.     As part of the 2021 cycle of the MISO Transmission Expansion Plan ("MTEP21"), MISO developed a Long Range Transmission Plan ("LRTP") and, as a result, included in the MTEP21 Appendix A, and recommended Board approval of, an initial set of 18 Transmission Projects ("LRTP Tranche 1). In MTEP21 Appendix A, MISO identified which project segments it believed should be assigned to the relevant incumbent transmission owner and which should be designated as Eligible Projects.

18.     On July 25, 2022, the MISO Board approved LRTP Tranche 1. With respect to one segment of Project 17 ("Hiple to Indiana/Michigan State Border"), MISO did not designate NIPSCO as having the responsibility to construct that segment, and subsequently, on August 24, 2022, posted a notice entitled "LRTP – Tranche 1 Competitive Transmission Projects Schedule of Planned Release Dates for each RFP," including Hiple to Indiana/Michigan State Border as an Eligible Project and establishing an RFP release date of September 13, 2022.

19.     NIPSCO did not submit an application in response to the RFP for Project 17. NIPSCO focused on seeking a legislative solution at the Indiana legislature for

future projects. The Hiple to Indian/Michigan State Border was ultimately awarded to Republic Transmission, which is a subsidiary of the Complainant in the instant case. NIPSCO in no way disputes the award of Project 17 to Republic Transmission.

20. In 2023, Indiana enacted HEA 1420, which provides incumbent utilities, such as NIPSCO, the "right to construct, own, operate, and maintain" certain transmission projects, including any "electric transmission facility that has been approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner." Ind. Code § 8-1-38-9.

21. HEA 1420 provided clarity to Indiana's previous ROFR statute. HEA 1420 is consistent with the ROFRs passed in other states, including Michigan, Minnesota, Montana, Nebraska, Oklahoma, and South Dakota.

22. As one of Indiana's incumbent utilities, NIPSCO has a direct and substantial interest in preserving HEA 1420's transmission project designation framework, which promotes continuity of service, reliable service quality, and cost-effective infrastructure in Indiana.

23. HEA 1420 codifies the right of incumbent public utilities like NIPSCO to own and operate the electricity transmission projects that serve local Indiana communities, by allowing new transmission facilities to be built by the entities that own the existing termination points of the new transmission line.

24. That law works in conjunction with Indiana's existing regime, which extensively regulates rates, standards of service, and other factors to ensure that

6

Indiana's designated utilities provide Indianans with reliable, high-quality service at just and reasonable costs.

25. If the Plaintiffs in this litigation are successful in obtaining a preliminary injunction prohibiting the IURC's Commissioners from enforcing HEA 1420, such action would cause great confusion regarding the status of MISO's current transmission planning process, including a group of highly important projects known as Long Range Transmission Planning Tranche 2.1, or "LRTP" Tranche 2.1.

26. MISO has been planning LRTP Tranche 2.1 since 2022 to address transmission in MISO's Midwest subregion. The LRTP Tranche 2.1 portfolio currently comprises 24 projects, anticipated to total approximately $21.8 billion. This portfolio would include significant transmission projects located in Indiana, including high-capacity, 765kV transmission lines. The MISO Board of Directors is scheduled to vote on the LRTP Tranche 2.1 projects in December 2024.

27. While MISO is not a party to this action, it is MISO—and not the IURC Commissioners—that is responsible for designating the entities responsible to construct LRTP projects, and any order from this Court enjoining HEA 1420 will leave MISO in an untenable situation regarding pending projects. These projects are slated to be voted on for good reason—they are important to the long-term reliability and resiliency of the interstate transmission grid. If the motion for a preliminary injunction is granted, then MISO will be left in a position where, if it approves the project with an incumbent utility designated as the responsible entity

7

to construct it, it would arguably be acting contrary to a federal court injunction, even though it is not a party to that injunction.

28.     Alternatively, if MISO approves the project with a designation that it should be competitively bid, but then later, plaintiffs do not prevail on the merits, the competitive process would need to be unwound in order to honor the statutory rights of incumbent utilities under HEA 1420.

29.     Granting a preliminary injunction could freeze the planning process altogether—the MISO Board may choose to not approve projects in Indiana because of the uncertain situation in which it would be placed.  Given the uncertainty that any preliminary injunction would create regarding how MISO is to allocate Indiana-based transmission projects, MISO could decide to delay any allocation decision until this Court issues a final decision on the merits, including whether to issue a declaration that HEA 1420 is unconstitutional.  That, in turn, would delay this critical infrastructure and undermine grid reliability.

30.     Granting a preliminary injunction would similarly upend Indiana's policy decision to provide public utilities like NIPSCO certain regulatory benefits, including designated service areas, in exchange for regulatory burdens.  HEA 1420 embodies this State's policy choice that the health and safety of its citizens is best served by having the public utilities that own the existing transmission system add to that system.

31.     HEA 1420 requires competitive bidding on the development and construction contracts that would be used to construct projects for lines that are not

upgrades. This ensures the entities with the expertise, knowledge of the existing system, and the relationship with customers and regulatory agencies are able to manage the process from start to finish and own and operate the lines given integration with their system.

32. Indiana's consumers will also suffer. Statutory rights of first refusal enable states like Indiana to regulate fragmentation in transmission ownership, which can undermine reliability and increase costs for consumers. Incumbent utilities have the institutional knowledge and existing local equipment, facilities, and experienced personnel to respond quickly and efficiently to service issues within their designated service areas, including power outages. Having a non-incumbent operate a critical portion of the transmission grid introduces operational challenges during planned and unplanned outages, as NIPSCO will be dependent on the non-incumbent to restore transmission service without having any direct influence. In such scenarios, NIPSCO will be held accountable for lack or delay of restoration even though non-incumbent's inaction would be the driving factor.

33. Indiana's incumbent utilities are fully regulated by the IURC. NIPSCO has an obligation to provide safe, adequate, and reliable service at just and reasonable rates. HEA 1420 strikes a balance between stakeholder interests by requiring competitive bidding on the development and construction of projects. In other words, the utility must solicit bids for consideration, which we do all the time on projects. This ensures the work is cost competitive.

34.   HEA 1420 is not just about which company gets to build the transmission; it is also about which company operates and maintains the transmission facilities that are built.  HEA 1420 recognizes that the incumbent utilities like NIPSCO have crews in close proximity to the transmission assets.  In the event of a disaster, NIPSCO has crews ready to respond and has mutual assistance agreements in place to ensure that there are crews in place for the restoration.  Conversely, having out-of-state entities responding in such events represents a risk to this level of responsiveness, given that these entities often are not based in the same state.

35.   NIPSCO could, moreover, be deprived of its statutory right of first refusal if this Court enjoins HEA 1420, resulting in significant financial harm.  The transmission projects that MISO has identified in LRTP Tranche 2.1 represent billions of dollars of potential capital investment in the Midwest.  Under HEA 1420, and the MISO tariff's accommodation of that law, MISO would choose NIPSCO to construct the portion of these critical transmission projects that connect to the system that NIPSCO owns.

36.   If this Court were to issue a final decision declaring that HEA 1420 is unconstitutional, NIPSCO will suffer additional harm.  NIPSCO will be permanently deprived of its statutory right of first refusal, such that it will no longer be able to guarantee its ability to construct and operate new interstate transmission lines within its service territory.  That, in turn, will result in substantial financial harm to NIPSCO.

Docusign Envelope ID: 9093835C-206E-4CBE-9278-8EBC39646366

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2024.

Signed by:

Orville O. Cocking

Orville Cocking
Senior Vice President
Northern Indiana Public Service
Company LLC

# Exhibit H

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

LSP Transmission Holdings II, LLC,
LS Power Midcontinent, LLC,
Central Transmission, LLC, *and* LS
Power Grid DRS Holdings, LLC,

      *Plaintiffs,*

*v.*

James F. Huston, *Chairman, Indiana
Utility Regulatory Commission*, Wesley
R. Bennett, *Commissioner, Indiana
Utility Regulatory Commission*, Sarah
E. Freeman, *Commissioner, Indiana
Utility Regulatory Commission*, David
E. Veleta, *Commissioner, Indiana
Utility Regulatory Commissioner, and*
David E. Ziegner, *Commissioner,
Indiana Utility Regulatory Commission,
each in his or her official capacity*,

      *Defendants.*

Case No. 1:24-cv-01722-TWP-MG

## DECLARATION OF STAN PINEGAR

I, Stan Pinegar, declare as follows:

    1.    My name is Stan Pinegar. I am the President of Duke Energy Indiana,

LLC ("Duke Energy Indiana" or "Company"). I am over the age of 18 years, and I

am competent to testify concerning the matters in this declaration. I have personal

knowledge of the facts set forth in this declaration, and if called upon and sworn as

a witness, could and would competently testify to them.

2.    I hold a Bachelor of Arts degree from Indiana University and a Juris Doctor (J.D.) degree from the Indiana University McKinney School of Law in Indianapolis. I have been admitted to the Indiana Bar since 1990. I have over 20 years of experience in the energy industry. I joined Duke Energy Indiana as Vice President of Government Affairs in 2012 and maintained that role until being appointed President of Duke Energy Indiana in November of 2018. In addition to responsibilities associated with being the State President of Duke Energy Indiana, I oversee our regulatory, governmental, and community affairs teams. In addition, I have overall responsibility for Duke Energy Indiana's utility operations including operating and maintaining our existing system and for developing and advancing our business strategies, including integrated resource planning, grid modernization, and transmission planning.

3.    Duke Energy Indiana is the largest electric utility in Indiana with operations headquartered in Plainfield, Indiana. Duke Energy Indiana is a wholly-owned subsidiary of Duke Energy Indiana Holdco, LLC. GIC, an investment firm, owns 19.9% minority interest in Duke Energy Indiana's holding company. The Company has been in business for over 110 years, and today serves approximately 900,000 customers located in 69 Indiana counties. The Company also provides power to wholesale customers, selling electricity to other electric utilities that in turn supply electric utility service to numerous customers in areas not served by the Company, and supplies steam service to one customer from its Cayuga

Docusign Envelope ID: A02632CC-A56D-4F6A-919D-B5D7F49EC334

Generating Station and to Purdue University via a combined heat and power facility.

4. Duke Energy Indiana and its affiliates have approximately 2,500 employees located in Indiana and numerous facilities throughout the state, including over 37,000 miles of transmission and distribution lines, nine baseload generating and peaking plants, one hydro facility, one utility scale solar plant, and several smaller solar plants and battery storage projects.

5. Duke Energy Indiana is a vertically integrated Indiana company that is engaged in the generation, transmission, and distribution of energy at the wholesale and retail levels. Vertically integrated utilities like Duke Energy Indiana provide an essential public service: they build high-voltage transmission lines and generate and distribute electricity within their service territory to ensure that residences and businesses enjoy reliable electric service, arguably the most fundamental service in the modern world. The State of Indiana, in turn, heavily regulates public utilities to ensure safe and reliable service for Indiana residents.

6. Duke Energy Indiana's transmission system is jointly owned with Wabash Valley Power Association, Inc. d/b/a Wabash Valley Power Alliance and Indiana Municipal Power Agency and is part of an interconnected electric transmission system under the functional control of the Midcontinent Independent System Operator, Inc. ("MISO"), which safely, efficiently, and reliably transports power to customers across all or parts of 15 states and one Canadian province.

7. This joint transmission system consists of over 5,200 miles of

transmission lines and approximately 500 distribution and transmission substations, which are interconnected with a variety of transmission and distribution circuits. It consists of 727 circuit miles of 345 kV, 654 circuit miles of 230 kV, 1,393 circuit miles of 138 kV, and 2,502 circuit miles of 69 kV owned specifically by Duke Energy Indiana. The transmission system also consists of 481 substations owned by Duke Energy Indiana, which are interconnected with a variety of transmission and distribution circuits. The transmission system, particularly at voltages greater than 100 kV, acts to transfer power from sources to loads, including the distribution system.

8.     Duke Energy Indiana has a committed, highly respected team of nine community relations managers who work closely with customers, local officials, and community leaders in their specific regions. These single-points-of-contact provide communities a go-to person for any concerns or communication needs the communities have, such as during extreme weather events. Their value to customers and communities the Company serves was most apparent during the mid-summer 2023 storms. Their effective engagement with community leaders, emergency responders, media, and coordination with the Company's operational personnel, was instrumental in the recovery effort that resulted in only one customer complaint filed with the Indiana Utility Regulatory Commission ("IURC") despite multiple days of storms and restoration work.

9.     Duke Energy Indiana also has 39 operations facilities spread throughout the state where customer work orders are fulfilled, transmission and

distribution line personnel work, materials and supplies are housed, and outage restoration work is scheduled. This vast Indiana presence is the kind of support the State of Indiana relies upon to ensure the health and safety of its citizens when transmission outages occur.

10.     Over its 110 years of operations in Indiana, Duke Energy Indiana has developed substantial experience with owning and operating the transmission system. The system operates as designed, and provides safe, reliable, and efficient service for the connected customers, including the various distribution systems. Considerable capital has been invested, and is continuing to be invested, into the transmission system as set forth in the Company's Transmission, Distribution, and Storage System Improvement Charge ("TDSIC") plans, which were approved by the IURC in Cause No. 44720 ("TDSIC Plan") and Cause No. 45647 ("TDSIC 2.0 Plan"). These improvements consist of investments such as new substation equipment, rebuilt lines, and steel poles.

11.     Duke Energy Indiana also seeks to control costs on a continuing basis from transmission project identification to project execution. Consistently managing project scope and properly scheduling work to maximize outage opportunities also contribute to more efficient use of capital and O&M dollars. In addition to competitively bidding nearly all work that is performed externally, Duke Energy Indiana has notably expanded the number of companies that are on the approved competitive bidders list as well as increased the number of vendors to order materials through. These efforts have combined to create a very competitive

Docusign Envelope ID: A02632CC-A56D-4F6A-919D-B5D7F49EC334

environment that is resulting in cost control.

12.   Duke Energy Indiana is a public utility regulated by the IURC and the Federal Energy Regulatory Commission ("FERC" or the "Commission").

13.   As a FERC-regulated public utility, Duke Energy Indiana is required to charge just and reasonable transmission rates. *See* 16 U.S.C. §§ 824d, 824e. The IURC similarly ensures that Duke Energy Indiana's transmission rates are just and reasonable. *See* Ind. Code § 8-1-2-4.

14.   This declaration is submitted in support of Duke Energy Indiana's motion to intervene as a defendant as well as its forthcoming opposition to Plaintiffs' motion for a preliminary injunction in this matter, wherein Plaintiffs challenge the validity of Indiana House Enrolled Act 1420 of 2023 ("HEA 1420").

15. I am familiar with Duke Energy Indiana's operations, including transmission, regulatory compliance, and electric markets more generally. Further, I am familiar with HEA 1420 and the significant harm that an order invalidating HEA 1420 would cause to Duke Energy Indiana and its electricity customers.

16.   The electricity industry is heavily regulated at the federal level pursuant to FERC regulations and orders, as well as Commission-approved tariffs and agreements. FERC orders have encouraged participation in regional entities, such as MISO, and mandated that those regional entities engage in regional transmission planning to ensure continued safe and reliable electric service.

17.   Duke Energy Indiana is an electric load-serving entity and transmission-owning member of MISO.

Docusign Envelope ID: A02632CC-A56D-4F6A-919D-B5D7F49EC334

18. MISO is currently engaging in the regional transmission planning process for Indiana and other States in its region, determining the transmission projects necessary to maintain grid reliability.

19. As a MISO member, Duke Energy Indiana participates in MISO's regional transmission planning process. Duke Energy Indiana must abide by the tariffs and agreements that MISO has filed with FERC to govern its members' construction and operation of electric transmission grids, including the MISO Transmission Owners Agreement.

20. In 2011, the Commission issued Order No. 1000 which, among other things, required transmission owners to remove right-of-first-refusal provisions from their FERC-jurisdictional tariffs and agreements for projects selected for regional cost allocation. Notably, Order No. 1000 continued to allow incumbent transmission providers to build new transmission facilities solely within the provider's retail distribution service territory, and to meet their service obligations and/or reliability needs through projects that are not submitted for regional cost allocation. Moreover, Order No. 1000 does not prevent States from adopting their own ROFR laws.

21. As a result, MISO amended its Transmission Owners Agreement to remove the right-of-first-refusal provision. The amended agreement nevertheless requires MISO to comply with any applicable state laws or regulations granting a right of first refusal to incumbent utilities.

22. In 2023, Indiana enacted HEA 1420, which provides incumbent utilities, such as Duke Energy Indiana, the "right to construct, own, operate, and maintain" certain transmission projects, including any "electric transmission facility that has been approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner." Ind. Code § 8-1-38-9.

23. As one of Indiana's incumbent utilities, Duke Energy Indiana has a direct and substantial interest in preserving HEA 1420's transmission project designation framework, which promotes continuity of service, reliable service quality, and cost-effective infrastructure in Indiana.

24. HEA 1420 codifies the right of incumbent public utilities like Duke Energy Indiana to own and operate the electricity transmission projects that serve local Indiana communities, by allowing new transmission facilities to be built by the entities that own the existing termination points of the new transmission line.

25. That law works in conjunction with Indiana's existing regime, which extensively regulates rates, standards of service, and other factors to ensure that Indiana's designated utilities provide Hoosiers with reliable, high-quality service at just and reasonable costs.

26. If the Plaintiffs in this litigation are successful in obtaining a preliminary injunction prohibiting the IURC's Commissioners from enforcing HEA 1420, such action would cause great confusion regarding the status of MISO's current transmission planning process, bringing transmission development in

Indiana to a standstill, including a group of highly important projects known as Long Range Transmission Planning Tranche 2.1, or "LRTP" Tranche 2.1.

27. MISO has been planning LRTP Tranche 2.1 since 2022 to address transmission in MISO's Midwest subregion. The LRTP Tranche 2.1 portfolio currently comprises 24 projects, anticipated to total approximately $21.8 billion. This portfolio would include significant transmission projects located in Indiana, including high-capacity, 765kV transmission lines and 345kV circuits and substations. The MISO Board of Directors is expected to vote on the LRTP Tranche 2.1 projects in December 2024.

28. While MISO is not a party to this action, it is MISO—and not the Commissioners—that is responsible for designating the entities responsible to construct LRTP projects, and any order from this Court enjoining HEA 1420 will leave MISO in an untenable situation regarding pending projects. These projects are slated to be voted on for good reason—they are important to the long-term reliability and resiliency of the interstate transmission grid. If the motion for a preliminary injunction is granted, then MISO will be left in a position where, if it approves the project with an incumbent utility designated as the responsible entity to construct it, it would arguably be acting contrary to a federal court injunction, even though it is not a party to that injunction.

29. Alternatively, if MISO approves the project with a designation that it should be competitively bid, but then later, plaintiffs do not prevail on the merits, the competitive process would need to be unwound in order to honor the statutory

Docusign Envelope ID: A02632CC-A56D-4F6A-919D-B5D7F49EC334

rights of incumbent utilities under HEA 1420, causing additional delay on implementing the benefits of LRTP Tranche 2.1.

30.  Granting a preliminary injunction could freeze the planning process altogether—the MISO board may choose to not approve projects in Indiana because of the uncertain situation in which it would be placed. Given the uncertainty that any preliminary injunction would create regarding how MISO is to allocate Indiana-based transmission projects, MISO could decide to delay any allocation decision until this Court issues a final decision on the merits, including whether to issue a declaration that HEA 1420 is unconstitutional. That, in turn, would delay this critical infrastructure and undermine grid reliability and other material benefits that have been determined to accrue for Indiana customers in MISO's business review of the LRTP Tranche 2.1 projects.

31.  Granting a preliminary injunction would similarly upend Indiana's policy decision to provide public utilities like Duke Energy Indiana certain regulatory benefits, including designated service areas, in exchange for regulatory burdens. HEA 1420 embodies this State's policy choice that the health and safety of its citizens is best served by having the public utilities that own the existing transmission system add to that system.

32.  Indiana state policy requires the balancing of the Five Pillars of energy policy— reliability, affordability, resiliency, stability, and environmental sustainability. Ind. Code § 8-1-2-0.6. HEA 1420 strikes the appropriate balance for the citizens of the state by ensuring that reliability, stability, resiliency, and

10

environmental sustainability is served by public utilities within the state constructing, owning, operating, and maintaining critical transmission infrastructure needed for the reliability of the grid as cleaner energy resources are added. HEA 1420 also provides for the critical pillar of affordability by requiring such Indiana public utilities to use competitively bid engineering, procurement, or construction contracts, and ensures that the state of Indiana maintains the jurisdiction to regulate the public utilities making these critical infrastructure investments.

33. Indiana's consumers would also suffer under an injunction prohibiting the IURC's Commissioners from enforcing HEA 1420. Statutory rights of first refusal enable states like Indiana to regulate fragmentation in transmission ownership, which fragmentation could serve to complicate outage restoration and increase outage restoration times, particularly during extreme weather events, and increase transmission outage costs, ultimately undermining reliability and increasing costs for consumers. Incumbent utilities have the institutional knowledge and existing local equipment, facilities, and experienced personnel to respond quickly and efficiently to service issues within their designated service areas, including power outages.

34. One of the primary benefits of the MISO LRTP portfolio is that it provides the means to avoid other incremental transmission investments on the utilities systems. Transmission owners are obligated by FERC to study and resolve reliability issues on the transmission system. LRTP projects likely will require

Docusign Envelope ID: A02632CC-A56D-4F6A-919D-B5D7F49EC334

multiple years to execute. Delayed LRTP approval and/or execution may result in the need for separate, additional transmission owner reliability projects to address reliability issues, rather than resolving reliability in a more holistic, cost-effective way through the LRTP portfolio. If MISO were to designate Indiana projects for competitive bidding, there would be considerable delay in bringing these projects online while MISO goes through a competitive bidding process for each and every project in the LRTP Tranche 2.1 plan. HEA 1420 sets the stage for quicker implementation of the plan by streamlining that process to ensure that public utilities in Indiana with facilities interconnecting to their systems may immediately begin the critical planning work needed to bring these projects online.

35. Further fragmentation in the ownership and operation of the transmission system which could occur through competitive bidding could increase the level of operations coordination and communication needed day to day, and may serve to complicate and slow regional system restoration efforts following extreme weather events.

36. Duke Energy Indiana could, moreover, be deprived of its statutory right of first refusal if this Court enjoins the IURC Commissioners from enforcing HEA 1420, resulting in significant financial harm. The transmission projects that MISO has identified in LRTP Tranche 2.1 represent billions of dollars of potential capital investment in the Midwest. Under HEA 1420, and the MISO tariff's accommodation of that law, MISO would choose Duke Energy Indiana to construct the portion of

Docusign Envelope ID: A02632CC-A56D-4F6A-919D-B5D7F49EC334

these critical transmission projects that connect to the system that Duke Energy Indiana owns.

37.   If this Court were to issue a final decision declaring that HEA 1420 is unconstitutional, Duke Energy Indiana will suffer additional harm. Duke Energy Indiana will be permanently deprived of its statutory right of first refusal, such that it will no longer be able to guarantee its ability to construct and operate new interstate transmission lines within its service territory. That, in turn, will result in substantial financial harm to Duke Energy Indiana.

38.   Granting a preliminary injunction will also hinder economic development activity in Indiana, including within Duke Energy Indiana's service territory. Many new investments have occurred in Indiana over the past two years and many more are expected. These new customers expect and need expedited build-out of the transmission system to serve their large energy needs. Halting HEA 1420 would frustrate these efforts and cause Indiana, Hoosier taxpayers, and Duke Energy Indiana to lose out on these new investments and customers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2024.

Signed by:

*Stan Pinegar*

5C51B0A35F164A6

Stan Pinegar, President
Duke Energy Indiana

# Exhibit I

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

LSP Transmission Holdings II, LLC,
LS Power Midcontinent, LLC,
Central Transmission, LLC, *and* LS
Power Grid DRS Holdings, LLC,

      *Plaintiffs,*

*v.*

James F. Huston, *Chairman, Indiana*
*Utility Regulatory Commission*, Wesley
R. Bennett, *Commissioner, Indiana*
*Utility Regulatory Commission*, Sarah
E. Freeman, *Commissioner, Indiana*
*Utility Regulatory Commission*, David
E. Veleta, *Commissioner, Indiana*
*Utility Regulatory Commissioner, and*
David E. Ziegner, *Commissioner,*
*Indiana Utility Regulatory Commission,*
*each in his or her official capacity,*

      *Defendants.*

Case No. 1:24-cv-01722-TWP-MG

---

## DECLARATION OF AMERICO MELARA

---

I, Americo Melara, declare as follows:

1.    My name is Americo Melara. As Chief Operations Officer of Transmission and Distribution Operations of Indianapolis Power & Light Company d/b/a AES Indiana ("AES Indiana"), I am over the age of 18 years, and I am competent to testify concerning the matters in this declaration. I have personal knowledge of the facts set forth in this declaration, and if called and sworn as a witness, could and would competently testify to them.

2.     I have more than 19 years of experience in electricity generation, transmission, and distribution.  I have been employed at AES Indiana since 2005.  I have an Electrical Engineering degree, a master's in electrical engineering and a master's in business administration.  In my experience at AES, I have held roles that require improvement in business processes, capital allocation priorities, and revenue management.   Prior to the current COO role, I was responsible for the global Performance and Asset Management for AES, with oversight of business operations reliability, performance, NERC compliance, engineering, project management, business process transformation and software implementations across 13 countries where AES operates.   As Chief Operations Officer at AES Indiana, my responsibilities include end-to-end business operations from project development, engineering and design, capital allocation, asset and reliability management, project management, construction of Transmission, Distribution, and Substations, service connections, meter reading, line clearance, and 24-7 operations.

3.     AES Indiana is a vertically integrated Indiana corporation that is engaged in the generation, transmission, and distribution of energy at the wholesale and retail levels.  It owns and operates generation plants, transmission lines, and distribution lines within its exclusive service territory, which consists of the City of Indianapolis, Indiana, and portions of the following Indiana counties: Boone, Hamilton, Hancock, Hendricks, Johnson, Marion, Morgan, Owen, Putnam, and Shelby counties.  It also owns generation and transmission lines outside of its exclusive service territory.  These generators are interconnected via company-owned

transmission lines to the company's distribution system to provide reliable retail service. AES Indiana is committed to providing Hoosiers with safe, reliable, and affordable electric service. It employs about 1,300 people, and serves about 520,000 customers across central Indiana.

4. Over the 98 years that AES Indiana has been serving Hoosiers, AES Indiana has constructed a robust integrated transmission system and developed substantial experience with that system. Today, AES Indiana owns and maintains approximately 458 miles of 345,000 volts (345 kV) lines, 408 miles of 138,000 volts (138 kV) lines, and associated substations. There is a 345 kV ring around Marion County with multiple 345 kV lines that interconnect into the ring at four different locations. Inside of the 345 kV ring is a 138 kV ring/grid. These two rings are connected through 345 kV to 138 kV auto-transformers at six locations. This allows power to flow from the 345 kV transmission system to the 138 kV system. The customers within the AES Indiana service territory are connected via distribution facilities to the 138 kV system. This design has resulted in a highly flexible system with robust switching capabilities that allows for load to be served from 7 tie points, on average.

5. AES Indiana has direct transmission ties to several other Indiana utilities.

6. AES Indiana is a public utility regulated by the Indiana Utility Regulatory Commission ("IURC") and the Federal Energy Regulatory Commission ("FERC" or the "Commission").

7. As a FERC-regulated public utility, AES Indiana is required to charge just and reasonable transmission rates. *See* 16 U.S.C. §§ 824d, 824e. The IURC similarly ensures that AES Indiana's transmission rates are just and reasonable. *See* Ind. Code § 8-1-2-4.

8. This declaration is submitted in support of AES Indiana's motion to intervene as a defendant as well as its forthcoming opposition to Plaintiffs' motion for a preliminary injunction in this matter, wherein Plaintiffs challenge the validity of Indiana House Enrolled Act 1420 of 2023 ("HEA 1420").

9. I am familiar with AES Indiana's operations, including transmission, regulatory compliance, and electric markets more generally. Further, I am familiar with HEA 1420 and the significant harm that an order invalidating HEA 1420 would cause to AES Indiana and its electricity customers.

10. Vertically integrated utilities like AES Indiana provide an essential public service: they build high-voltage transmission lines and generate and distribute electricity within their service territory to ensure that residences and businesses enjoy reliable electric service—arguably the most fundamental service in the modern world. The State of Indiana, in turn, heavily regulates public utilities to ensure safe and reliable service for Indiana residents.

11. The electricity industry is also heavily regulated at the federal level pursuant to FERC regulations and orders, as well as Commission-approved tariffs and agreements. FERC orders have encouraged participation in regional entities, such as the Midcontinent Independent System Operator, Inc. ("MISO"), and

mandated that those regional entities engage in regional transmission planning to ensure continued safe and reliable electric service.

12.     AES Indiana is an electric load-serving entity and transmission-owning member of MISO.

13.     MISO is currently engaging in the regional transmission planning process for Indiana and other States in its region to determine the transmission projects necessary to maintain grid reliability.

14.     As a MISO member, AES Indiana participates in MISO's regional transmission planning process.    AES Indiana must abide by the tariffs and agreements that MISO has filed with FERC to govern its members' construction and operation of electric transmission grids, including the MISO Transmission Owners Agreement.

15.     In 2011, the Commission issued Order No. 1000 which, among other things, required transmission owners to remove right-of-first-refusal provisions from their FERC-jurisdictional tariffs and agreements for projects selected for regional cost allocation.  Notably, Order No. 1000 continued to allow incumbent transmission providers to build new transmission facilities solely within the provider's retail distribution service territory, and so meet their service obligations and/or reliability needs through projects that are not submitted for regional cost allocation.  Moreover, Order No. 1000 does not prevent States from adopting their own ROFR laws.

16.     As a result, MISO amended its Transmission Owners Agreement to remove the right-of-first-refusal provision.  The amended agreement nevertheless

requires MISO to comply with any applicable state laws or regulations granting a right of first refusal to incumbent utilities.

17. In 2023, Indiana enacted HEA 1420, which provides incumbent utilities, such as AES Indiana, the "right to construct, own, operate, and maintain" certain transmission projects, including any "electric transmission facility that has been approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner." Ind. Code § 8-1-38-9.

18. As one of Indiana's incumbent utilities, AES Indiana has a direct and substantial interest in preserving HEA 1420's transmission project designation framework, which promotes continuity of service, reliable service quality, and cost-effective infrastructure in Indiana.

19. HEA 1420 codifies the right of incumbent public utilities like AES Indiana to own and operate the electricity transmission projects that serve local Indiana communities, by allowing new transmission facilities to be built by the entities that own the existing termination points of the new transmission line.

20. That law works in conjunction with Indiana's existing regime, which extensively regulates rates, standards of service, and other factors to ensure that Indiana's designated utilities provide Hoosiers with reliable, high-quality service at just and reasonable costs.

21. If the Plaintiffs in this litigation are successful in obtaining a preliminary injunction prohibiting the IURC's Commissioners from enforcing HEA

1420, such action would cause great confusion regarding the status of MISO's current transmission planning process, including a group of highly important projects known as Long Range Transmission Planning Tranche 2.1, or "LRTP" Tranche 2.1.

22.    MISO has been planning LRTP Tranche 2.1 since 2022 to address transmission in MISO's Midwest subregion.  The LRTP Tranche 2.1 portfolio currently comprises 24 projects, anticipated to total approximately $21.8 billion. This portfolio would include significant transmission projects located in Indiana, including high-capacity, 765kV transmission lines.  The MISO Board of Directors is scheduled to vote on the LRTP Tranche 2.1 projects in December 2024.

23.    While MISO is not a party to this action, it is MISO—and not the IURC Commissioners—that is responsible for designating the entities responsible to construct LRTP projects, and any order from this Court enjoining HEA 1420 will leave MISO in an untenable situation regarding pending projects.  These projects are slated to be voted on for good reason—they are important to the long-term reliability and resiliency of the interstate transmission grid.  If the motion for a preliminary injunction is granted, then MISO will be left in a position where, if it approves the project with an incumbent utility designated as the responsible entity to construct it, it would arguably be acting contrary to a federal court injunction, even though it is not a party to that injunction.

24.    Alternatively, if MISO approves the project with a designation that it should be competitively bid, but then later, plaintiffs do not prevail on the merits,

the competitive process would need to be unwound in order to honor the statutory rights of incumbent utilities under HEA 1420.

25. Granting a preliminary injunction could freeze the planning process altogether—the MISO board may choose to not approve projects in Indiana because of the uncertain situation in which it would be placed. Given the uncertainty that any preliminary injunction would create regarding how MISO is to allocate Indiana-based transmission projects, MISO could decide to delay any allocation decision until this Court issues a final decision on the merits, including whether to issue a declaration that HEA 1420 is unconstitutional. That, in turn, would delay this critical infrastructure and undermine grid reliability.

26. Granting a preliminary injunction would similarly upend Indiana's policy decision to provide public utilities like AES Indiana certain regulatory benefits, including designated service areas, in exchange for regulatory burdens. HEA 1420 embodies this State's policy choice that the health and safety of its citizens is best served by having the public utilities that own the existing transmission system add to that system.

27. Indiana's consumers will also suffer. Statutory rights of first refusal enable states like Indiana to regulate fragmentation in transmission ownership, which can undermine reliability and increase costs for consumers. Incumbent utilities have the institutional knowledge and existing local equipment, facilities, and experienced personnel to respond quickly and efficiently to service issues within their designated service areas, including power outages. Some of the proposed LRTP

projects involve the AES Indiana Petersburg Generating Station. Though the plant is outside of the company's retail service territory, the company owns generation and transmission assets associated with the plant in Pike County. The plant is interconnected via the transmission system to other generating facilities in southern Indiana. These existing interconnecting transmission facilities are sometimes located within retail service territories of other utility companies and sometimes outside, but the ownership by other vertically integrated electric utilities provides key stability and direct lines of communication for coordination during sensitive system conditions. Adding additional owners to the system could inject confusion and chaos into critical moments.

28.     AES Indiana could, moreover, be deprived of its statutory right of first refusal if this Court enjoins HEA 1420, resulting in significant financial harm. The transmission projects that MISO has identified in LRTP Tranche 2.1 represent billions of dollars of potential capital investment in the Midwest. Under HEA 1420, and the MISO tariff's accommodation of that law, MISO could choose AES Indiana to construct the portion of these critical transmission projects that connect to the system that AES Indiana owns. Even though the projects are outside of the company's retail service territory, the projects may meet the right of first refusal definition, since the new assets would connect to existing assets owned by the company.

29.     If this Court were to issue a final decision declaring that HEA 1420 is unconstitutional, AES Indiana will suffer additional harm. AES Indiana will be

permanently deprived of its statutory right of first refusal, such that it will no longer be able to guarantee its ability to construct and operate new interstate transmission lines within its service territory. That, in turn, will result in substantial financial harm to AES Indiana.

I declare under penalty of perjury that the foregoing is true and correct

Executed on November 4, 2024.

_____
Americo Melara
AES Indiana, Chief Operating Officer

# Exhibit J

| | |
|---|---|
| LSP Transmission Holdings II, LLC, LS Power Midcontinent, LLC, Central Transmission, LLC, *and* LS Power Grid DRS Holdings, LLC, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> James F. Huston, *Chairman, Indiana Utility Regulatory Commission*, Wesley R. Bennett, *Commissioner, Indiana Utility Regulatory Commission*, Sarah E. Freeman, *Commissioner, Indiana Utility Regulatory Commission*, David E. Veleta, *Commissioner, Indiana Utility Regulatory Commissioner, and* David E. Ziegner, *Commissioner, Indiana Utility Regulatory Commission, each in his or her official capacity,* <br><br> *Defendants.* | Case No. 1:24-cv-01722-TWP-MG |

## DECLARATION OF F. SHANE BRADFORD

I, F. Shane Bradford, declare as follows:

1.    My name is F. Shane Bradford. I am the Vice President Indiana Electric of CenterPoint Energy, Inc., which is the ultimate parent company of Southern Indiana Gas and Electric Company d/b/a CenterPoint Energy Indiana South ("SIGECO"). I am over the age of 18 years, and I am competent to testify concerning the matters in this declaration. I have personal knowledge of the facts set forth in

this declaration, and if called and sworn as a witness, could and would competently testify to them.

2. I have more than 32 years of experience in electricity generation, transmission, and distribution. I have been employed by CenterPoint Energy, Inc. or its predecessors since 2004. I have a Bachelor of Science degree in Civil Engineering from the University of Dayton and a Master of Business Administration degree from Indiana State University. As Vice President Indiana Electric, I am responsible for all areas and aspects of SIGECO's electric utility operations, including execution and oversight of operation and maintenance (O&M) and capital budgets, transmission and distribution operations, engineering, generation, and renewable energy projects. I also oversee power generation operations, which includes market settlements and wholesale power marketing.

3. SIGECO is a vertically integrated Indiana corporation that is engaged in the generation, transmission, and distribution of energy at the wholesale and retail levels. It owns and operates electric generation plants, transmission lines, and distribution lines within its exclusive service territory, which is located in Southwest Indiana. SIGECO also provides natural gas utility service to customers in the same area.

4. SIGECO is committed to providing its customers with safe, reliable, and affordable natural gas and electric service. It employs about 336 people in its electric operations (in addition to natural gas operations employees and support personnel

employed by other CenterPoint Energy, Inc. subsidiaries). SIGECO serves about 150,000 electric customers across Southwestern Indiana.

5. Over the 112 years that SIGECO has been serving Hoosiers, SIGECO has constructed a robust integrated transmission system and developed substantial experience with that system.

6. SIGECO is a public utility regulated by the Indiana Utility Regulatory Commission ("IURC") and the Federal Energy Regulatory Commission ("FERC" or the "Commission").

7. As a FERC-regulated public utility, SIGECO is required to charge just and reasonable transmission rates. *See* 16 U.S.C. §§ 824d, 824e. The IURC similarly ensures that SIGECO's transmission rates are just and reasonable. *See* Ind. Code § 8-1-2-4.

8. This declaration is submitted in support of SIGECO's motion to intervene as a defendant as well as its forthcoming opposition to Plaintiffs' motion for a preliminary injunction in this matter, wherein Plaintiffs challenge the validity of Indiana House Enrolled Act 1420 of 2023 ("HEA 1420").

9. I am familiar with SIGECO's operations, including transmission, regulatory compliance, and electric markets more generally. Further, I am familiar with HEA 1420 and the significant harm that an order invalidating HEA 1420 would cause to SIGECO and its electricity customers.

10. Vertically integrated utilities like SIGECO provide an essential public service: they build high-voltage transmission lines and generate and distribute

electricity within their service territory to ensure that residences and businesses enjoy reliable electric service, arguably the most fundamental service in the modern world. The State of Indiana, in turn, heavily regulates public utilities to ensure safe and reliable service for Indiana residents.

11.   The electricity industry is also heavily regulated at the federal level pursuant to FERC regulations and orders, as well as Commission-approved tariffs and agreements. FERC orders have encouraged participation in regional entities, such as the Midcontinent Independent System Operator, Inc. ("MISO"), and mandated that those regional entities engage in regional transmission planning to ensure continued safe and reliable electric service.

12.   SIGECO is an electric load-serving entity and transmission-owning member of MISO.

13.   MISO is currently engaging in the regional transmission planning process for Indiana and other States in its region, determining the transmission projects necessary to maintain grid reliability.

14.   As a MISO member, SIGECO participates in MISO's regional transmission planning process. SIGECO must abide by the tariffs and agreements that MISO has filed with FERC to govern its members' construction and operation of electric transmission grids, including the MISO Transmission Owners Agreement.

15.   In 2011, the Commission issued Order No. 1000 which, among other things, required transmission owners to remove right-of-first-refusal provisions from their FERC-jurisdictional tariffs and agreements for projects selected for regional

cost allocation. Notably, Order No. 1000 continued to allow incumbent transmission providers to build new transmission facilities solely within the provider's retail distribution service territory, and so meet its service obligations and/or reliability needs through projects that are not submitted for regional cost allocation. Moreover, Order No. 1000 does not prevent States from adopting their own ROFR laws.

16.     As a result, MISO amended its Transmission Owners Agreement to remove the right-of-first-refusal provision. The amended agreement nevertheless requires MISO to comply with any applicable state laws or regulations granting a right of first refusal to incumbent utilities.

17.     In 2023, Indiana enacted HEA 1420, which provides incumbent utilities, such as SIGECO, the "right to construct, own, operate, and maintain" certain transmission projects, including any "electric transmission facility that has been approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner." Ind. Code § 8-1-38-9.

18.     As one of Indiana's incumbent utilities, SIGECO has a direct and substantial interest in preserving HEA 1420's transmission project designation framework, which promotes continuity of service, reliable service quality, and cost-effective infrastructure in Indiana.

19.     HEA 1420 codifies the right of incumbent public utilities like SIGECO to own and operate the electricity transmission projects that serve local Indiana

communities, by allowing new transmission facilities to be built by the entities that own the existing termination points of the new transmission line.

20. That law works in conjunction with Indiana's existing regime, which extensively regulates rates, standards of service, and other factors to ensure that Indiana's designated utilities provide Indianans with reliable, high-quality service at just and reasonable costs.

21. If the Plaintiffs in this litigation are successful in obtaining a preliminary injunction prohibiting the IURC's Commissioners from enforcing HEA 1420, such action would cause great confusion regarding the status of MISO's current transmission planning process, including a group of highly important projects known as Long Range Transmission Planning Tranche 2, or "LRTP" Tranche 2.

22. MISO has been planning LRTP Tranche 2 since 2022 to address transmission in MISO's Midwest subregion. The LRTP Tranche 2 portfolio currently comprises 24 projects, anticipated to total approximately $21.8 billion. This portfolio would include significant transmission projects located in Indiana, including high capacity, 765kV transmission lines. The MISO Board of Directors is scheduled to vote on the LRTP Tranche 2 projects in December 2024.

23. While MISO is not a party to this action, it is MISO—and not the Commissioners—that is responsible for designating the entities responsible to construct LRTP projects, and any order from this Court enjoining HEA 1420 will leave MISO in untenable situation regarding pending projects. These projects are

slated to be voted on for good reason—they are important to the long-term reliability and resiliency of the interstate transmission grid. If the motion for a preliminary injunction is granted, then MISO will be left in a position where, if it approves the project with an incumbent utility designated as the responsible entity to construct it, it would arguably be acting contrary to a federal court injunction, even though it is not a party to that injunction.

24. Alternatively, if MISO approves the project with a designation that it should be competitively bid, but then later, plaintiffs do not prevail on the merits, the competitive process will need to be unwound in order to honor the statutory rights of incumbent utilities under HEA 1420.

25. Granting a preliminary injunction could freeze the planning process altogether—the MISO board may choose to not approve projects in Indiana because of the uncertain situation in which it would be placed. Given the uncertainty that any preliminary injunction would create regarding how MISO is to allocate Indiana-based transmission projects, MISO could delay any allocation decision until this Court issues a final decision on the merits, including whether to issue a declaration that HEA 1420 is unconstitutional. That, in turn, would delay this critical infrastructure and undermine grid reliability.

26. Granting a preliminary injunction would similarly upend Indiana's policy decision to provide public utilities like SIGECO certain regulatory benefits, including designated service areas, in exchange for regulatory burdens. HEA 1420 embodies this State's policy choice that the health and safety of its citizens is best

served by having the public utilities that own the existing transmission system add to that system.

27.    Indiana's consumers will also suffer. Statutory rights of first refusal enable states like Indiana to regulate fragmentation in transmission ownership, which can undermine reliability and increase costs for consumers. Incumbent utilities have the institutional knowledge and existing local equipment, facilities, and experienced personnel to respond quickly and efficiently to service issues within their designated service areas, including power outages. Having a non-incumbent operate a critical portion of the transmission grid introduces operational challenges during planned and unplanned outages because SIGECO would be dependent on the non-incumbent to restore transmission service without having any direct influence. In such scenarios, SIGECO could be held accountable for lack or delay of restoration even though the non-incumbent's inaction would be the driving factor.

28.    Indiana's incumbent utilities are fully regulated by the IURC. SIGECO has an obligation to provide safe, adequate, and reliable service at just and reasonable rates. HEA 1420 strikes a balance between stakeholder interests by requiring competitive bidding on the development and construction of projects. In other words, the incumbent utility must solicit bids for transmission construction projects, as it does for other large-scale projects. This ensures that the work is cost competitive.

29.    HEA 1420 not only addresses which company gets to construct transmission projects, it also addresses which company operates and maintains the

transmission facilities that are built. HEA 1420 recognizes that the incumbent utilities like SIGECO have crews in close proximity to the transmission assets. In the event of a disaster, SIGECO has local, experienced crews ready to respond and has mutual assistance agreements in place to ensure that there are a sufficient number of crews to accomplish restoration in a timely manner. Having out-of-state, non-incumbent companies responsible for restoration presents a risk to this level of responsiveness.

30.     SIGECO could, moreover, be deprived of its statutory right of first refusal if this Court enjoins HEA 1420, resulting in significant financial harm. The transmission projects that MISO has identified in LRTP Tranche 2 represent billions of dollars of potential capital investment in the Midwest. Under HEA 1420, and the MISO tariff's accommodation of that law, MISO would choose SIGECO to construct the portion of these critical transmission projects that connect to the system that SIGECO owns.

31.     If this Court were to issue a final decision declaring that HEA 1420 is unconstitutional, SIGECO will suffer additional harm. SIGECO will be permanently deprived of its statutory right of first refusal, such that it will no longer be able to guarantee its ability to construct and operate new interstate transmission lines within its service territory. That, in turn, will result in substantial financial harm to SIGECO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2024.

F. Shane Bradford
Southern Indiana Gas and Electric Company
d/b/a CenterPoint Energy Indiana South