# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

LSP TRANSMISSION HOLDINGS II, LLC, *et al.*,

*Plaintiffs-Appellees*,

v.

JAMES F. HUSTON, Chairman, Indiana Utility Regulatory Commission, *et al.*,

*Defendants-Appellants*,

v.

NORTHERN INDIANA PUBLIC SERVICE COMPANY, *et al.*,

*Intervenor Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of Indiana

**OPPOSITION TO INTERVENOR DEFENDANTS-APPELLANTS'
REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY**

TODD A. RICHARDSON
JAMES E. ZOCCOLA
THOMAS JONES
LEWIS KAPPES
One American Square
Suite 2500
Indianapolis, IN 46282
(317) 639-1210
trichardson@lewis-kappes.com

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

December 11, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 4

I.    Factual Background ................................................................................ 4

II.   Procedural History ............................................................................... 6

ARGUMENT ...................................................................................................... 7

I.    The Balance Of Harms Tilts Heavily In Favor Of Leaving The
Injunction In Place ................................................................................ 8

II.   Plaintiffs-Appellees' High Likelihood Of Success On The Merits
Also Weighs Heavily In Favor Of Leaving The District Court's
Injunction In Place .............................................................................. 12

      A.   HEA1420 Discriminates Against Interstate Commerce in
Multiple Ways, Triggering Strict Judicial Scrutiny .......................... 12

           1.   HEA1420 discriminates against interstate commerce
on its face ............................................................................ 13

           2.   HEA1420 also discriminates against interstate
commerce in its effects, as it uniformly benefits in-state
interests at the expense of out-of-state interests ..................... 17

           3.   HEA1420 was enacted for the avowedly
discriminatory purpose of promoting in-state economic
interests at the expense of out-of-state interests ..................... 19

           4.   Incumbents' efforts to avoid Commerce Clause
scrutiny fail ......................................................................... 20

      B.   HEA1420 Discriminates Against Interstate Commerce in
Multiple Ways, Triggering Strict Judicial Scrutiny .......................... 23

CONCLUSION ................................................................................................. 24

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Colon Health Ctrs. of Am., LLC v. Hazel,*
  813 F.3d 145 (4th Cir. 2016) ............................................................... 16

*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.,*
  703 F.3d 1230 (11th Cir. 2012) .......................................................... 15

*Gen. Motors v. Tracy,*
  519 U.S. 278 (1997) ...................................................................... 3, 22

*Granholm v. Heald,*
  544 U.S. 460 (2005) ............................................................................ 3

*Lewis v. BT Inv. Managers, Inc.,*
  447 U.S. 27 (1980) ............................................................................. 14

*LSP Transmission Holdings, LLC v. Sieben,*
  954 F.3d 1018 (8th Cir. 2020) ....................................................... 14, 22

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023) ........................................................................... 17

*NextEra Energy Cap. Holdings, Inc. v. Jackson,*
  2024 WL 4660920 (W.D. Tex. Oct. 28, 2024) ...................................... 3

*NextEra Energy Cap. Holdings, Inc. v. Lake,*
  48 F.4th 306 (5th Cir. 2022) ......................... 3, 9, 13, 14, 18, 20, 21, 22

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................. 8

*Norfolk Southern Corp. v. Oberly,*
  822 F.2d 388 (3d Cir. 1987) ............................................................... 16

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) ........................................................................... 23

*Regan v. City of Hammond,*
  934 F.3d 700 (7th Cir. 2019) ............................................................. 17

*United Haulers Ass'n, Inc.*
  *v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
  550 U.S. 330 (2007)............................................................15

*United States v. Texas*,
  144 S.Ct. 797 (2024)................................................. 7, 8, 10

*Walgreen Co. v. Rullan*,
  405 F.3d 50 (1st Cir. 2005) ...............................................15

## Statutes

16 U.S.C. §824(b)(1)................................................................23

Ind. Code §8-1-2-4..................................................................11

Ind. Code §8-1-38-2.................................... 11, 13, 14, 17, 21, 22

Ind. Code §8-1-38-7...........................................................11, 21

Ind. Code §8-1-38-9.................................................... 13, 21

Ind. Code §8-1-38-9(a) ......................................................... 5, 21

Ind. Code §8-1-38-9(c) ......................................................... 6, 23

## Regulations

*Transmission Planning and Cost Allocation by Transmission Owning
  and Operating Public Utilities*, 136 FERC ¶61,051 (July 21, 2011) ........ 4, 9, 10

*Midcontinent Independent System Operator, Inc.*,
  172 FERC ¶61,095 (July 28, 2020) ...................................11

## Other Authority

*Hearing on HEA 1420 Before S. Utils. Comm.*, 2023 Leg.
  (Ind. Apr. 13, 2023), https://tinyurl.com/yc56r2az ............................................19

# INTRODUCTION

Indiana House Enrolled Act 1420 ("HEA1420") expressly reserves lucrative business opportunities in interstate markets for entities with an existing physical presence in Indiana, to the detriment of all out-of-state competitors. That is not disputable, or even disputed. Defendants openly acknowledge that a small group of powerful "Indiana-based" companies lobbied for a "legislative solution" to growing out-of-state competition (from Plaintiffs-Appellees and their affiliates, among others) and were rewarded with HEA1420, which "guarantee[s]" them exclusive opportunities "to construct and operate new interstate transmission lines" worth "billions of dollars." Dkt.51 at 10; Mot.Ex.G ¶¶19, 35-36. The district court correctly saw HEA1420 for what it is—a textbook example of protectionism and unconstitutional discrimination against interstate commerce—and entered a preliminary injunction against its enforcement. Now the incumbent firms that stood to gain from HEA1420, including Intervenor-Defendants-Appellants Duke Energy Indiana, LLC; Northern Indiana Public Service Company LLC ("NIPSCO"); Indianapolis Power & Light Company; and Southern Indiana Gas and Electric Company (collectively, "Incumbents"), ask this Court to undo the district court's decision on an extremely truncated timeline. There is no reason to indulge Incumbents' extraordinary, eleventh-hour request—and every reason not to.

The whole premise of Incumbents' "emergency" filing is bogus. To be sure, if the injunction remains in place tomorrow (December 12), then the Midcontinent Independent System Operator ("MISO") Board will open for competitive bidding new interstate-transmission projects in Indiana. But that is all that will happen: MISO will merely start a monthslong process under which qualified providers submit competitive bids. On the flip side, if this Court *grants* Incumbents' motion and stays the injunction, then MISO will have no choice but to follow HEA1420's protectionist mandate and award the new projects to Incumbents. *That* is why the district court granted the preliminary injunction Plaintiffs-Appellees timely sought. And it is why Incumbents have toed so close to the line in their so-called "emergency" filing: If Incumbents can convince this Court to stay the preliminary injunction for December 12 alone, then they will "win" billions of dollars' worth of projects without even trying. And given MISO's stated position that awards to incumbents pursuant to state right-of-first-refusal laws can never be unwound, those "wins" will likely hold even if, on further analysis, this Court ultimately concurs with the decision the district court reached (after thorough briefing and a 90-minute oral argument) that HEA1420 is flatly unconstitutional.

That is reason enough to deny the motion. But there is more. Incumbents' arguments on the merits are no better now than they were when the district court resoundingly rejected them. Like the nearly identical Texas right-of-first-refusal law

that a federal court permanently enjoined last month (in a decision that Texas elected not even to appeal), *see NextEra Energy Cap. Holdings, Inc. v. Jackson*, 2024 WL 4660920, at \*17 (W.D. Tex. Oct. 28, 2024); *see also NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 326 (5th Cir. 2022), HEA1420 discriminates against interstate commerce by reserving business opportunities to firms that have an established physical presence in the state, at the expense of out-of-state firms that would otherwise compete for them. Incumbents almost entirely ignore the now-invalidated Texas law and the *NextEra* litigation. That is telling: A law like HEA1420 that is designed to (and does) shield in-state firms from out-of-state competition unquestionably triggers strict scrutiny. *See Granholm v. Heald*, 544 U.S. 460, 476 (2005). Incumbents do not even try to argue that HEA1420 could pass that stringent test. (Nor could they.) They instead boldly claim that *General Motors v. Tracy*, 519 U.S. 278 (1997), or the Federal Power Act ("FPA"), gives them a get-out-of-Commerce-Clause-free card. But not even the outlier Eighth Circuit decision they trumpet adopted those sweeping theories.

What the district court concluded in enjoining HEA1420 is eminently correct: HEA1420 is state protectionism at its worst, and is overwhelmingly likely to be invalidated in the final analysis. But if this Court stays that injunction now, then any such final analysis will likely prove pointless. Incumbents' motion should be denied.

# BACKGROUND

## I.    Factual Background

Over the past 30 years, the Federal Energy Regulatory Commission ("FERC") has enacted a series of reforms to promote the development of competitive markets. Historically, many "regional transmission organizations" ("RTOs") and "independent system operators" ("ISOs")—the federally regulated entities authorized to operate multistate transmission grids—had FERC-approved agreements and tariffs through which incumbent utilities gave themselves a right to construct any new transmission facilities in their service areas.    In July 2011, however, FERC issued its landmark Order No. 1000, which required RTOs and ISOs to remove such "federal" (i.e., federally sanctioned) rights of first refusal from their agreements and tariffs.    *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 136 FERC ¶61,051 (July 21, 2011).    In compliance with Order No. 1000, RTOs and ISOs created competitive bidding processes to select developers for new interstate-transmission projects.

In the wake of Order No. 1000, Plaintiffs-Appellees' subsidiaries and affiliates have successfully competed for several new RTO- and ISO-approved projects.    In December 2016, for example, Republic Transmission, LLC ("Republic")—which had no prior presence in Indiana—was selected over ten other bidders for the first competitive transmission project in MISO: a 31-mile, 345 kV transmission line

between southern Indiana and western Kentucky. Dkt.5-1 ¶6. Republic completed that project in June 2020—more than six months ahead of schedule. In May 2023, Republic won another competitive MISO transmission project in Indiana, known as the Hiple to Indiana/Michigan State Border project. Dkt.5-1 ¶6.

Incumbent utilities did not take Order No. 1000's competitive transmission mandate lying down. Instead of attempting to compete for new work, however, the incumbents "focused on seeking a legislative solution at the Indiana legislature for future projects." Mot.Ex.G ¶19. Indiana legislators delivered for their fellow "Hoosiers" by enacting HEA1420, which insulates Hoosier incumbents from virtually all out-of-state competition for billions of dollars' worth of future projects that are part of an interstate grid and the costs of which are borne by citizens of multiple states, not just Indiana.

Under HEA1420, "[a]n incumbent electric transmission owner has the right to construct, own, operate, and maintain" any "electric transmission facility that has been approved for construction through a regional transmission organization planning process"—i.e., by an ISO managing the *inter*state grid—whenever the new project "connects to an electric transmission facility owned by the incumbent." Ind. Code §8-1-38-9(a). An incumbent may take advantage of this right of first refusal by giving notice that it is exercising its (anticompetitive) right to the Indiana Utility Regulatory Commission, which then oversees the project until completion. Only if

the incumbent "gives notice of [its] intent not to construct the approved electric transmission facility" may the relevant ISO award the project through the competitive process described in its FERC-approved tariff. *Id.* §8-1-38-9(c).

## II. Procedural History

While HEA1420 has posed a looming threat to Plaintiffs-Appellees' efforts to compete for interstate-transmission projects ever since its July 2023 enactment, that threat only recently grew imminent. In July 2024, Plaintiffs-Appellees learned that MISO was planning several new interstate projects in Indiana through Tranche 2.1 of its Long Range Transmission Planning ("LRTP"). Dkt.45-3 at 5. And on September 24, 2024, Plaintiffs-Appellees learned that MISO had published a map of the "final" portfolio for Tranche 2.1, which was the first public MISO document to identify the start- and end-points of the future projects. Dkt.45-3 at 5.

Just eight days later, Plaintiffs-Appellees sued, challenging the constitutionality of HEA1420. Plaintiffs-Appellees moved for a preliminary injunction that would allow them to compete for Tranche 2.1 projects (and others) during the pendency of the litigation. The Commissioners and Incumbents took more than a month to file their responses. The district court heard oral argument on November 18 and agreed to issue a decision on Plaintiffs-Appellees' preliminary injunction motion before the MISO Board's upcoming meeting. Dkt.64 at 56.

On December 6, the district court issued a preliminary injunction barring enforcement of HEA1420, accompanied by a well-reasoned opinion explaining that HEA1420 likely violates the Commerce Clause and that Plaintiffs-Appellees will suffer irreparable harm—including loss of "the opportunity to compete for billions of dollars in new transmission projects"—unless HEA1420 is enjoined when the MISO Board approves those new projects. Dist.Ct.Op.21.

More than four days passed. Then, at 7:42PM EST on December 10, Intervenors moved the district court for a stay of the preliminary injunction pending appeal (without providing prior notice to Plaintiffs-Appellees or requesting their position). Dkt.77. Finally, at 4:03PM EST this afternoon (December 11), Intervenors asked this Court to enter an administrative stay by no later than 8:30AM tomorrow. Plaintiffs-Appellees vigorously oppose this eleventh-hour request.

## ARGUMENT

To resolve a motion for an administrative stay, this Court must make "a first-blush judgment about the relative consequences of staying" a district court's injunction "versus allowing it to [remain] in[] effect." *United States v. Texas*, 144 S.Ct. 797, 798 (2024) (Barrett, J., concurring). The core inquiry is whether the consequences of erroneously leaving the injunction in place "would be worse than those of erroneously lifting the injunction." *Id.* at 799. In deciding whether a stay is warranted, it is also appropriate to consider each party's likelihood of success on

the merits.  *Id.*; *see also Nken v. Holder*, 556 U.S. 418, 434 (2009).  All relevant considerations weigh strongly in favor of denying Incumbents' motion.

## I.  The Balance Of Harms Tilts Heavily In Favor Of Leaving The Injunction In Place.

1. Staying the district court's injunction would gravely and irreparably harm Plaintiffs-Appellees.  Unless the preliminary injunction is in effect tomorrow morning—when the MISO Board is slated to approve the Tranche 2.1 portfolio—MISO will rely on HEA1420 to award all new Indiana projects to Incumbents, without allowing out-of-state companies (like Plaintiffs-Appellees) to compete for them.  *See* Dist.Ct.Op.12-13, 20; Dkt.5-1 ¶8.  To make matters worse, MISO has made clear that once it awards a project pursuant to a state right-of-first-refusal law, it will resist any effort to alter that decision—even if a court subsequently declares the relevant law unconstitutional.  Dkt.58-1 at 12-13, 20-21, 28-29.  Consequently, if this Court enters an immediate administrative stay, then Plaintiffs-Appellees "will lose the opportunity to compete for billions of dollars in new transmission projects." Dist.Ct.Op.21.  That unquestionably constitutes irreparable harm, as Plaintiffs-Appellees will have no way to recapture those lost opportunities or recover monetary compensation through this litigation, even if they ultimately prevail.  Dist.Ct.Op.20. On top of that, Plaintiffs-Appellees will suffer irreparable harm in the form of an ongoing violation of their constitutional rights.  Dist.Ct.Op.20; *see infra* Part II.

On the other side of the ledger, leaving the injunction in place while this appeal moves forward would cause little (if any) harm. If HEA1420 remains enjoined tomorrow morning, then MISO will not automatically award the projects to anyone—and will not award anything tomorrow—and will instead initiate a competitive bidding process that "would likely take up to a year." Dist.Ct.Op.21; *see* Dkt.5-1 ¶9. Incumbents will have ample time to litigate the constitutionality of HEA1420 during that time. And if HEA1420 is ultimately upheld, MISO could simply stop the competitive bidding process for Indiana projects and award them to Incumbents at that point. In all events, the district court's injunction does not *block* Incumbents from obtaining these new business opportunities (although lifting it would bar Plaintiffs-Appellees); it just requires Incumbents to compete for new projects on a level playing field with other MISO-approved transmission providers.

The public interest also cuts against Incumbents' last-minute request. For one thing, basic economic principles dictate that lifting the injunction—and thus reinstating Incumbents' "exclusive right" to build more than *a billion dollars' worth* of new transmission lines—would almost certainly "raise[] prices in the interstate market." *NextEra*, 48 F.4th at 324 n.9. After all, FERC has concluded that by eliminating competition, rights of first refusal tend to result in utility rates "that are unjust and unreasonable." 136 FERC ¶61,051, ¶7; *see also id.* ¶¶231, 285. What is more, neither the state nor the public has any interest in the enforcement of an

unconstitutional law. Dist.Ct.Op.21; *see infra* Part II. Accordingly, the negative "consequences … of erroneously lifting the injunction" far outweigh any potential harms that could result from leaving the injunction in place. *Cf. Texas*, 144 S.Ct. at 799 (Barrett, J., concurring).

2. Incumbents' counterarguments lack merit. Incumbents do not—and cannot—meaningfully dispute the district court's conclusion that granting the requested stay would irreparably harm Plaintiffs-Appellees by depriving them of *more than $1 billion* in new business opportunities. Dist.Ct.Op.20-21. So they simply ignore that inconvenient reality. *See* Mot.17-20. Incumbents instead attempt to conjure up countervailing harms associated with denying the requested stay, but those purported harms are speculative (at best) and come nowhere close to outweighing the harms to Plaintiffs-Appellees and the public.

First, Incumbents claim that opening the projects to competitive bidding would "threaten[] grid reliability," supposedly because incumbent utilities (i.e., they) are categorically better at "build[ing], operat[ing], and maintain[ing]" electric transmission facilities than new market entrants. Mot.17-18. That is flat wrong: As FERC has explained, *non*-incumbent transmission companies often provide "more efficient or cost-effective solution[s] to regional transmission needs" than incumbents. 136 FERC ¶61,051, ¶7. And here, the proof is in the pudding: The last time a project in Indiana was open to competitive bidding, it went to a non-

incumbent—namely, Republic. *See supra* p.5. Moreover, when a non-incumbent wins a bid for a new MISO-approved project, it must become certified as an Indiana public utility and meet all necessary reliability and safety protocols to build and operate transmission lines in the state. *See* Ind. Code §§8-1-2-4, 8-1-38-2, -7. In all events, any safety and reliability concerns are irrelevant to the question facing this Court—whether to grant an administrative stay *by tomorrow*—because the purported harms are *years* in the future.

Incumbents' assertion that an administrative stay is justified by potential "uncertainty" and "delays," Mot.18-20, is weaker still. The Tranche 2.1 projects have already taken over two years to plan and are not slated for completion until *2032*. *See* Dkt.78-4 at 11-13. While these massive projects are important to the long-term strength and efficiency of the MISO grid, they are a far cry from Immediate Need Reliability Projects, *cf. Midcontinent Independent System Operator, Inc.*, 172 FERC ¶61,095, ¶¶52-64 (July 28, 2020)—and construction will not begin on any of them *for years*. Whatever modest delay might be caused by leaving the injunction in place (and allowing the competitive bidding process to begin) as this litigation moves forward plainly does not threaten "harm to the electric grid" or "the State's economic development." *Contra* Mot.20.

Denying an administrative stay likewise poses no threat to Incumbents' "ability to appeal the district court's preliminary injunction." *Contra* Mot.18. As

explained, nothing prevents Incumbents from continuing to litigate the constitutionality of HEA1420 while the competitive bidding process gets underway. And even leaving aside the Tranche 2.1 projects, Incumbents would self-evidently have standing to appeal the preliminary injunction based on other, future MISO initiatives to which HEA1420 (if upheld) would apply. Nor do Incumbents have any legitimate "expectation interests" in obtaining the Tranche 2.1 projects without facing competition. *Contra* Mot.19. That Incumbents "have operated in the State for about a century or longer," Mot.19, does not create any reasonable expectation of obtaining future, *interstate*-transmission projects—although it does underscore that HEA1420 unconstitutionally discriminates in favor of powerful in-state interests.

For all these reasons, the negative consequences of staying the injunction—and thus insulating over $1 billion in new electric transmission projects from competition—far outweigh any potential upside. That is ample reason to deny Incumbents' eleventh-hour motion.

## II. Plaintiffs-Appellees' High Likelihood Of Success On The Merits Also Weighs Heavily In Favor Of Leaving The District Court's Injunction In Place.

### A. HEA1420 Discriminates Against Interstate Commerce in Multiple Ways, Triggering Strict Judicial Scrutiny.

HEA1420 directly (and undisputedly) regulates interstate commerce, as it applies *only* to interstate electric transmission projects that have been approved by a

federally regulated RTO/ISO and will form part of the multi-state transmission grid. And, as the district court correctly held, the text of HEA1420 "expressly discriminates against interstate commerce," triggering strict judicial scrutiny. Dist.Ct.Op.15, 19. Indeed, HEA1420 triggers strict scrutiny three times over, as it also discriminates in its effect and in its purpose.

1.    **HEA1420 discriminates against interstate commerce on its face.**

HEA1420 facially discriminates against out-of-state entities like Plaintiffs-Appellees and their affiliates by effectively prohibiting them from building transmission lines in Indiana. The statute contains restrictive in-state presence requirements, explicitly limiting new transmission development to "incumbent transmission owner[s]"—that is, "public utilit[ies]" that already "own[], operate[], and maintain[]" "electric transmission facilit[ies] in whole or in part *in Indiana*." Ind. Code §8-1-38-2 (emphasis added). In other words, HEA1420 bestows special, exclusive benefits on those who already own transmission facilities in Indiana, to the detriment of all potential out-of-state competitors. *See id.* §8-1-38-9. By granting such benefits to those with an existing physical presence in Indiana, HEA1420 "expressly discriminates against interstate commerce"—as the district court held, and Fifth Circuit recently held when faced with a nearly identical Texas law. Dist.Ct.Op.19; *see NextEra*, 48 F.4th at 325.

Incumbents' counterarguments fall flat. Relying heavily on the Eighth Circuit's outlier decision in *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020), Incumbents assert that because HEA1420's definition of incumbency does not turn on where a company is "incorporated," "headquartered," or has its "principal place of business," the law "does not distinguish between in-state and out-of-state commercial actors." Mot.12. Nonsense. Indiana has granted special privileges to firms that already "own[], operate[], and maintain[]" a "facility … in Indiana." Ind. Code §8-1-38-2. That is discrimination, full stop. As the Supreme Court has long held, "discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism" that triggers the rule of virtual per se invalidity. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980). And as the Fifth Circuit explained in *NextEra*, *Sieben*'s focus on where a company "is incorporated or headquartered[] is irreconcilable with Supreme Court dormant Commerce Clause jurisprudence addressing physical-presence requirements." 48 F.4th at 323. Numerous Supreme Court cases finding facial discrimination in favor of "in-state interests" do not even mention where the favored companies were incorporated or headquartered. *Id.* at 322 (citing cases).

The Fifth Circuit is not alone. "Most circuits have rejected the idea that a law survives Commerce Clause scrutiny if many of the favored interests are incorporated elsewhere." *Id.* at 323; *see also, e.g., Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*,

703 F.3d 1230, 1259 (11th Cir. 2012) (rejecting a formalistic approach to determining whether a company should be considered "in-state" or "out-of-state," and concluding that the Commerce Clause instead demands a "functional approach" that focuses on "where [a] company's business takes place or where its political influence lies"); *Walgreen Co. v. Rullan*, 405 F.3d 50, 55-58 (1st Cir. 2005) (similar).

These courts' focus on in-state presence makes eminent sense. After all, a statute limiting commercial opportunities to companies that already employ Indiana workers or already pay Indiana taxes would be an obvious Commerce Clause violation, even if some of the favored "incumbents" were headquartered elsewhere. The result is no different when incumbent status turns on whether someone already owns transmission facilities in Indiana. Indeed, one of the animating concerns of the Commerce Clause is that "when 'the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.'" *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007). Favoring entities that operate in state but are headquartered "out-of-state" raises all the same concerns. This case illustrates as much: While some Incumbents have out-of-state parent corporations, that does not diminish their political influence in Indiana—as evidenced by their ability to obtain a "legislative solution" to the competition ushered in by FERC Order No. 1000. Mot.Ex.G ¶19.

Other than *Sieben*, none of Defendants' proffered cases holds otherwise. *Colon Health Centers of America, LLC v Hazel*, 813 F.3d 145 (4th Cir. 2016), did not purport to declare any blanket rule that "incumbency" is not a "proxy for in-state status." *Contra* Mot.12-13. The case involved a facially *neutral* statute that required any healthcare operation—incumbent or not—to demonstrate a need for its services before it could build a new facility. 813 F.3d at 149, 152. It is a highly "fact-intensive" decision involving expert testimony about the statute's *actual effects*, *id.* at 151; it does not remotely suggest that *facial* discrimination exists only when a law draws lines based headquarters or place of incorporation, rather than in-state presence. As explained, the Supreme Court has repeatedly held otherwise.

*Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987) (cited at Mot.11-12), is even farther afield. That case also involved a concededly facially neutral law, which banned "offshore gas, liquid, or solid bulk product transfer facilities" in the Delaware coastal zone. *Id.* at 391. The plaintiffs alleged that the law's two exceptions—a "grandfather clause" for facilities "in operation on June 28, 1971," and a separate exception for the Port of Wilmington—were evidence that the law was motivated by protectionism. *Id.* at 391, 403-04. The Third Circuit rejected that argument, concluding that the grandfather clause was meant to protect reliance interests and the Port exception "concentrate[d] development in an already developed area." *Id.* at 404. That case thus provides no support for Incumbents'

position; after all, a facially neutral grandfather clause allowing incumbents to continue their established activities is a far cry from a right-of-first-refusal law reserving billions of dollars' worth of *new* business for in-state entities.

> **2.   HEA1420 also discriminates against interstate commerce in its effects, as it uniformly benefits in-state interests at the expense of out-of-state interests.**

Even if HEA1420 somehow could be considered facially neutral, it would still trigger strict scrutiny.  The Supreme Court has repeatedly "condemn[ed] state laws that 'although neutral on their face … were enacted at the instance of, and primarily benefit,' in-state interests."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 379 n.2 (2023).  HEA1420 is just such a law:  It will divert billions of dollars of investment to a select group of Indiana-based firms, to the detriment of potential out-of-state competitors and out-of-state consumers alike.  *See* Ind. Code §8-1-38-2.  If that does not "bear more heavily on interstate than local commerce," *Regan v. City of Hammond*, 934 F.3d 700, 703 (7th Cir. 2019), it is hard to imagine what would.

HEA1420's discriminatory effects flow directly and inexorably from its facially discriminatory terms:  By granting special privileges to those who already "own[], operate[], and maintain[]" "electric transmission facilit[ies] in whole or in part in Indiana," Ind. Code §8-1-38-2, the statute diverts billions of dollars of investment to a select group of in-state incumbents—at the direct expense of consumers across state lines.  Put differently, the natural consequence of HEA1420's

textual in-state presence requirement is that the beneficiaries of HEA1420 *will all be* in-state actors in the relevant sense. *See NextEra*, 48 F.4th at 322-25 (so concluding as to similar Texas statute). After all, the only entities that benefit from HEA1420 are ones that have local facilities, local employees, and distinct access to local governments and state legislators. HEA1420 is thus no different from a requirement that, to obtain some valuable benefit, a company own in-state property or conduct a qualifying amount of in-state business. That is textbook discrimination.

Incumbents' filings confirm that HEA1420 will benefit a small cadre of companies that are the epitome of powerful in-state interests. By their own account, Incumbents include "the largest electric utility in Indiana" (Duke Energy Indiana), Mot.Ex.H ¶3, as well as "Indiana's … second-largest electric distribution company" (NIPSCO), Mot.Ex.G ¶4. These companies have a massive physical presence in the state; Duke Energy Indiana alone has "over 37,000 miles of transmission and distribution lines" in Indiana, as well as "39 operations facilities spread throughout the state." Mot.Ex.H ¶¶4, 9. Incumbents collectively own approximately 600 transmission substations—the "termination points" where most new transmission projects begin or end, *see* Dkt.3 ¶54; *see also* Mot.Ex.G ¶23; Dkt.58 at 17 n.3—in Indiana. It is therefore no surprise that each Intervenor owns electric transmission facilities to which proposed MISO projects will connect, and hence is "guarantee[d]"

substantial business opportunities—without competition—thanks to HEA1420. *See* Mot.Ex.G ¶¶35-36; Mot.Ex.H ¶¶36-37; Mot.Ex.I ¶¶27-29; Mot.Ex.J ¶¶30-31.

### 3. HEA1420 was enacted for the avowedly discriminatory purpose of promoting in-state economic interests at the expense of out-of-state interests.

HEA1420 was also passed for the express purpose of protecting in-state firms against competition from out of state. The sponsor of HEA1420, Rep. Edmond Soliday, repeatedly explained that the law gives new transmission projects to "Hoosiers we know" as opposed to companies from "somewhere else," like "Florida." *Hearing on HEA 1420 Before S. Utils. Comm.*, 2023 Leg. 2:35:50-36:15 (Ind. Apr. 13, 2023), https://tinyurl.com/yc56r2az; *see also, e.g.*, *id.* at 26:40-55 (Sen. Yoder: "[HEA]1420 is just giving a priority to players that we know, correct?" Rep. Soliday: "Yes."). Other legislators explained that they were voting in favor of the law because they would rather have "folks from Indiana" build and own transmission lines, instead of people "from who knows where," because they surmised that in-state entities would be "more likely to have individuals from Indiana… working … on these lines." *Id.* at 2:52:30-57 (Sen. Byrne).

It also is telling that HEA1420 was passed shortly after MISO began awarding competitive transmission projects in Indiana to transmission developers with no previous in-state presence—most notably, Republic. In December 2016, Republic was selected to build the very first new project that MISO competitively awarded in

Indiana under FERC Order No. 1000.  Dkt.5-1 ¶6.  Similarly, in May 2023, Republic was selected to construct the Hiple to Indiana/Michigan State Border project, which was first new project that MISO competitively awarded in Indiana through Tranche 1 of its LRTP initiative.  Dkt.5-1 ¶6.  That very month, Governor Holcomb signed HEA1420 into law, thus barring this type of competition going forward.

In sum, both the legislative debate on HEA1420 and the circumstances surrounding its enactment underscore what is already evident from the plain text: HEA1420, like the nearly identical Texas law in *NextEra*, embodies exactly the kind of "protectionism that the Commerce Clause guards against."  48 F.4th at 326.

### 4.     Incumbents' efforts to avoid Commerce Clause scrutiny fail.

a. Invoking *Tracy*, Incumbents insist that in-state incumbents (such as themselves) and their would-be competitors (such as Plaintiffs-Appellees) are not "'similarly situated' for purposes of a claim of facial discrimination under the Commerce Clause."  Mot.10-11.  While Incumbents briefly asserted this argument below, the Commissioners did not advance it, and the district court did not address it—presumably because they recognized that it is meritless.

As the Fifth Circuit correctly recognized when rejecting the same argument in *NextEra*, 48 F.4th at 318-20, *Tracy* does not shield from Commerce Clause scrutiny laws (like HEA1420) that discriminate between competitors based on in-state presence.  The tax exemption in *Tracy* "operated in two different retail markets."  *Id.*

at 319.  The alleged discrimination was thus not between true competitors.  In stark contrast, HEA1420 addresses only "a single market"—interstate transmission—"that is undoubtedly competitive." *Id.* at 319-20.  Indeed, we know it is competitive because what spurred Indiana to enact HEA1420 was (out-of-state) Republic's win the last time there was competitive bidding.  There is thus no conceivable argument that HEA1420 "predominan[tly]" applies in a "noncompetitive, captive market," *id.* at 319; HEA1420 does not apply in any captive market at all.  *See* Ind. Code §8-1-38-9(a).  In short, there is no "*Tracy* issue" here.  *NextEra*, 48 F.4th at 319.

Furthermore, and further unlike in *Tracy*, Indiana is not treating two *different* kinds of sales or services differently.  Both new entrants and incumbents must be certified as "public utilities" under Indiana law, *see* Ind. Code §§8-1-38-2, -7, so they are all subject to the same obligations, standards and requirements.  HEA1420 indisputably targets a single product: electric transmission facilities approved by a federally regulated "regional transmission organization" such as MISO.  Ind. Code §8-1-38-9.  And all entities that complete the rigorous process to become a MISO-qualified developer are "similarly situated" for purposes of bidding on MISO-approved transmission projects, regardless of whether they are "a vertically integrated utility" or "a transmission-only company." *NextEra*, 48 F.4th at 320.

Incumbents nonetheless contend that, by virtue of their status as vertically integrated public utilities, they are not similarly situated to Plaintiffs-Appellees in

*any* market.  Mot.13.  That position is "irreconcilable with the longstanding principle, reiterated in *Tracy*, that there is no 'public utilities exception' to the dormant Commerce Clause," *NextEra*, 48 F.4th at 320, which is why no court—not even the Eighth Circuit, *see Sieben*, 954 F.3d at 1027—has adopted it.  In all events, it is not the case that *all* "incumbent electric transmission owner[s]" under HEA1420 are vertically integrated public utilities that "generate and distribute electricity within state-designated service territories."  *Contra* Mot.13.  HEA1420 accords "incumbency" status to *any* entity that owns a transmission line in Indiana, even if it is an independent, transmission-only company like Republic.  *See* Ind. Code §8-1-38-2; Dkt.45 at 17.  Indiana's right-of-first-refusal regime is thus nothing like the tax exemption in *Tracy*, which treated two *different* kinds of sales or services differently.  *See* 519 U.S. at 282-83.  Neither *Tracy* nor any other decision insulates from Commerce Clause scrutiny a state law like HEA1420 that precludes out-of-state companies from competing with in-state companies in an interstate market.

b. In a last-ditch effort to avoid strict scrutiny, Incumbents assert that the FPA's savings clause, 16 U.S.C. §824(b)(1), "authorize[s] States to enact [right-of-first-refusal] laws like HEA 1420."  Mot.16.  That is another non-starter.  Section 824(b)(1) provides that the federal government has jurisdiction over "the transmission of electric energy in *inter*state commerce," while the states retain jurisdiction over "the transmission of electric energy in *intra*state commerce."  16

22

U.S.C. §824(b)(1) (emphasis added). Congress thus has not authorized states to regulate interstate-transmission lines *at all*—much less "clearly expressed" any intention to let them to enact laws that discriminate in favor of in-state interests with respect to interstate transmission. To the contrary, the FPA expressly *precludes* states from enacting laws that, like HEA1420, overtly attempt to regulate transmission lines "approved for construction through a regional transmission organization planning process"—i.e., lines approved by a *federally* regulated ISO/RTO managing the *inter*state grid. Ind. Code §8-1-38-9(c). To the best of Plaintiffs-Appellees' knowledge, no court has ever accepted the remarkable claim that the FPA authorizes states to discriminate against interstate commerce. This Court should not be the first.

## B. HEA1420 Discriminates Against Interstate Commerce in Multiple Ways, Triggering Strict Judicial Scrutiny.

"HEA 1420 cannot withstand strict scrutiny." Dist.Ct.Op.19. Even assuming *arguendo* that it furthers some legitimate interest, any such interest could readily be achieved through other, nondiscriminatory alternatives. Dist.Ct.Op.19. Incumbents do not challenge the district court's conclusion on this point (which both they and the Commissioners conceded below). *See* Mot.14-15. They argue only that HEA1420 could survive the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). But those arguments are irrelevant because strict scrutiny applies—and confirms that HEA1420 is unconstitutional.

# CONCLUSION

This Court should deny Incumbents' motion.

Respectfully submitted,

s/Erin E. Murphy

TODD A. RICHARDSON
JAMES E. ZOCCOLA
THOMAS JONES
LEWIS KAPPES
One American Square
Suite 2500
Indianapolis, IN 46282
(317) 639-1210
trichardson@lewis-kappes.com

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

December 11, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(1)(E)(2) because it contains 5,190 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

December 11, 2024

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy