# In the United States Court of Appeals
## FOR THE SEVENTH CIRCUIT

LSP TRANSMISSION HOLDINGS II, LLC, ET AL.,
*Plaintiffs-Appellees,*

*v.*

JAMES F. HUSTON, Chairman, Indiana Utility
Regulatory Commission, *et al.,*
*Defendants-Appellants,*

*v.*

NORTHERN INDIANA PUBLIC SERVICE COMPANY, *et al.,*
*Intervenor Defendants-Appellants.*

On Appeal From The United States District Court
For The Southern District of Indiana
Case No. 1:24-cv-01722
The Honorable District Judge Tanya Walton Pratt, Presiding

**BRIEF OF *AMICI CURIAE* WISCONSIN UTILITIES ASSOCIATION, IOWA UTILITY ASSOCIATION, AND SOUTH DAKOTA ELECTRIC UTILITY COMPANIES IN SUPPORT OF INTERVENOR DEFENDANTS-APPELLANTS' MOTION FOR STAY**

RYAN J. WALSH
 *Counsel of Record*
EIMER STAHL LLP
10 East Doty Street
Suite 621
Madison, WI 53703
(608) 620-8346
(312) 692-1718 (fax)
rwalsh@eimerstahl.com

*Counsel for* Amici Curiae

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-3248

Short Caption: LSP Tranmission Holdings II, LLC, et al. v. James F. Huston, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Wisconsin Utilities Association, Iowa Utility Association, South Dakota Electric Utility Companies

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Eimer Stahl LLP

(3)      If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and
      n/a

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
      n/a

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
 n/a

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
 n/a

Attorney's Signature: /s/ Ryan J. Walsh          Date: 12/16/2024

Attorney's Printed Name:  Ryan J. Walsh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✓]  **No** [ ]

Address:  10 East Doty Street, Suite 621

   Madison, WI 53703

Phone Number: 608-620-8346          Fax Number:  312-692-1718

E-Mail Address: rwalsh@eimerstahl.com

rev. 12/19 AK

## TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI CURIAE*.............................................................. 1

INTRODUCTION............................................................................................................... 2

ARGUMENT........................................................................................................................ 4

    I.   THE DORMANT COMMERCE CLAUSE CANNOT VOID A STATE STATUTE
         WHOSE ADOPTION FEDERAL LAW EXPRESSLY PERMITS ........................................... 4

       A. Under This Court's Holding in *Star*, the "Combination" of the Federal
          Power Act "and the Absence of Overt Discrimination" in the Indiana
          Statute "Defeats Any Constitutional Challenge to the State's
          Legislation" .............................................................................................. 4

       B. Separately, as This Court Already Has Held, FERC's Orders and
          MISO's FERC-Approved Tariff Lawfully and Explicitly *Permit* State
          ROFR Statutes—A Fact That Independently Precludes Scrutiny of
          Such Laws under the Dormant Commerce Clause .......................................... 5

    II.  INCUMBENT OWNERS AND NON-INCUMBENT DEVELOPERS ARE NOT
         SIMILARLY SITUATED, BECAUSE, UNDER MISO'S RULES, ONLY
         INCUMBENTS WILL HAVE IN-STATE OPERATING COSTS THAT CAN BE
         SPREAD ACROSS A MULTI-STATE REGION—REDUCING THE TOTAL COST
         BURDEN OTHERWISE BILLED TO IN-STATE CUSTOMERS....................................... 10

    III. THE DISTRICT COURT'S LOGIC—FORBIDDING THE CONFERRING OF A
         BENEFIT UPON AN INCUMBENT THAT IS NOT AVAILABLE TO A
         NONINCUMBENT—CASTS INTO DOUBT NUMEROUS OTHER FEATURES OF
         THE FEDERAL-STATE UTILITY REGULATORY FRAMEWORK...................................... 16

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

*Allstate Ins. Co. v. Abbott*,
495 F.3d 151 (5th Cir. 2007)........................................................................11

*Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*,
461 U.S. 375 (1983)........................................................................................5

*Cal. Energy Comm'n v. Dep't of Energy*,
585 F.3d 1143 (9th Cir. 2009)........................................................................1

*Clay Lacy Aviation v. City of Los Angeles*,
No. cv 00-9255, 2001 WL 1941734 (C.D. Cal. July 27)................................6

*Elec. Power Supply Ass'n v. Star*,
904 F.3d 518 (7th Cir. 2018)......................................................................2, 5

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)........................................................................................6

*FirstEnergy Serv. Co. v. FERC*,
758 F.3d 346 (D.C. Cir. 2014)......................................................................12

*General Motors Corporation v. Tracy*,
519 U.S. 278 (1997).................................................................................11, 20

*LSP Transmission Holdings, LLC v. Sieben*,
954 F.3d 1018 (8th Cir. 2020)........................................................................9

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982).........................................................................4, 6, 7, 10

*MISO Transmission Owners v. FERC*,
819 F.3d 329 (7th Cir. 2016)................................................................*passim*

*PacifiCorp v. Watson*,
No. 3:23-cv-6155, 2024 WL 3415937 (W.D. Wash. July 15)........................5

*Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*,
514 F.3d 651 (7th Cir. 2008)..........................................................................1

*S. Union Co. v. Missouri Pub. Serv. Comm'n*,
289 F.3d 503 (8th Cir. 2002)........................................................................11

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)......................................................................8, 9

*S.-Cent. Timber Dev., Inc. v. Wunnicke*,
   467 U.S. 82 (1984) ........................................................................................ 6

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
   588 U.S. 504 (2019) ..................................................................................... 4

*Travis v. Reno*,
   163 F.3d 1000 (7th Cir. 1998) ................................................................. 11

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
   550 U.S. 330 (2007) ................................................................................. 16

*White v. Mass. Council of Constr. Emp'rs., Inc.*,
   460 U.S. 204 (1983) .......................................................................*passim*

*Wis. Cent. Ltd. v. Pub. Serv. Comm'n of Wis.*,
   95 F.3d 1359 (7th Cir. 1996) ..................................................................... 1

REGULATIONS

FERC, *Order Accepting Tariff Revisions Subject to Condition*,
   189 FERC ¶ 61,145 (Nov. 26, 2024) ........................................................ 19

FERC, *Order Accepting Tariff Revisions*, 180 FERC ¶ 61,040 (July 26, 2022) .......... 18

FERC, *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, 76 Fed. Reg. 49,842 (Aug. 11, 2011) .......................................*passim*

FERC, *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utilities*, 139 FERC ¶ 61,132 (2012) ....................................... 7, 17

OTHER AUTHORITIES

Ethan Howland, *FERC OKs MISO plan to give certain transmission projects to incumbent utilities without competitive bidding*, UTILITY DIVE (July 28, 2022) .... 18

MISO Tariff, Attachment O .......................................................................... 13

MISO Tariff, Attachment FF .............................................................. 7, 10, 12, 13

MISO Tariff, Attachment MM .................................................................. 12, 13

MISO Tariff, Attachment XX ........................................................................ 12

National Association of Regulatory Utility Commissioners, *Guidelines for Cost Allocations and Affiliate Transactions* .............................................................. 12

# IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are three state utility associations. The Wisconsin Utilities Association promotes laws and participates in cases affecting investor-owned utilities that concern, but are not limited to, issues of taxation, environment, and regulatory power. The South Dakota Electric Utility Companies is a non-profit organization whose investor-owned utility members serve gas and electric customers in South Dakota. The Iowa Utility Association (IUA) works to secure Iowa's energy future by improving the common business interests and operating conditions of Iowa's investor-owned electric, natural gas, and transmission utilities. The IUA works with its member companies—investor-owned electric, natural gas, and transmission utilities—to develop, coordinate, and promote sound public policy.

State utility associations often participate as *amici* in important litigation in federal courts involving questions of state and federal regulatory authority, including in matters pending before this circuit. *See, e.g., Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 514 F.3d 651 (7th Cir. 2008); *Wis. Cent. Ltd. v. Pub. Serv. Comm'n of Wis.*, 95 F.3d 1359 (7th Cir. 1996); *Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143 (9th Cir. 2009).

---

[1] *Amici* and the undersigned certify, pursuant to Federal Rule of Appellate Procedure 29(a)(2), that all parties have consented to the filing of this brief and, pursuant to Rule 29(a)(4)(E), that no party's counsel has authored this brief in whole or in part, no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than the *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

**INTRODUCTION**

Although "[t]he commerce power belongs to Congress," and this Court treats "silence by Congress as preventing discriminatory state legislation," "Congress has not been silent about electricity." *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 525 (7th Cir. 2018). Quite the contrary. It has been loud and clear. It has spoken, first, through the Federal Power Act, preserving the States' considerable police powers over the regulation of local transmission, even when doing so has an "interstate effect." *Id.* That is reason alone to uphold Indiana's right-of-first-refusal ("ROFR") statute, since it distinguishes *not* between in-state and out-of-state companies but between incumbent and nonincumbent owners. After all, as this Court has held, "[t]he combination" of the Federal Power Act "and the absence of overt discrimination" in the statute "defeats any constitutional challenge to the state's legislation." *Id.*

Yet the Act was not Congress's last word. It has spoken also through its lawful delegations of powers and responsibilities to the Federal Energy Regulatory Commission ("FERC"), which, "directed by Congress," has "affirmatively permit[ted] the type of [alleged] parochial favoritism expressed" in Indiana's law. *White v. Mass. Council of Constr. Emp'rs., Inc.*, 460 U.S. 204, 213 (1983). In particular, the Commissioners have affirmed—at least three times—their decision "to honor rights of first refusal created by state and local law." *MISO Transmission Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016). LS Power, the lead plaintiff here and before this Court in *MISO*, argued in 2016 that FERC could not and should not have done this. But it lost. Its attempted "intrusion on the traditional role of the States" failed. *Id.* (citation omitted).

Undeterred and recharged, LS Power returns to this circuit to contend that the Dormant Commerce Clause supplies the remedy that eluded it eight years ago: a declaration that ROFR statutes—now on the books in a dozen states—are unlawful. Yet its new theory is no better than the first. For one thing, the Dormant Commerce Clause is not even implicated here, not only because State ROFRs have been repeatedly and explicitly blessed by federal law but also because, even if they had not, incumbents and nonincumbents are not similarly situated. An incumbent, unlike a nonincumbent, will always have an existing base of in-state customers. This matters because, under the federally approved cost-allocation rules of the Midcontinent Independent System Operator ("MISO"), utilities doing multi-state projects can pass on their system-wide operating costs to ratepayers throughout a multi-state region—costs that otherwise would be borne entirely by their existing customers. This means that because a nonincumbent lacks existing in-state customers, while an incumbent has many, an incumbent tapped to build a multi-state project will always be able to reduce the relative financial burden on in-state ratepayers (by spreading its fixed costs regionally), but a nonincumbent will not. It also means that a multi-state project done by an incumbent will often yield greater net savings to in-state ratepayers even where the nonincumbent could do the project more "cheaply."

Finally, LS Power's anti-"protectionist" logic proves too much. By its lights, many other aspects of our utility regulatory framework also would be illegitimate, including federally conferred ROFRs for incumbents seeking to build local lines, upgrade systems, and complete "baseline reliability" projects. That can't be right.

<center>**ARGUMENT**</center>

I.   **THE DORMANT COMMERCE CLAUSE CANNOT VOID A STATE STATUTE WHOSE ADOPTION FEDERAL LAW EXPRESSLY PERMITS**

"Dormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 524 (2019). Courts therefore "engage in [ ] review" under this doctrine only "when Congress has not acted or purported to act." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154 (1982). It follows that, because Congress may and often does act by lawfully granting powers and duties to administrative agencies, it can immunize a state action from Dormant Commerce Clause scrutiny not only be regulating "the matter" directly by statute but also indirectly, as the Supreme Court has twice held, through proper exercises of delegated authority by federal regulators.

Here, Congress has acted not only directly but indirectly, saving State ROFRs from Dormant Commerce Clause scrutiny in at least two, independently sufficient respects.

A.   **Under This Court's Holding in *Star*, the "Combination" of the Federal Power Act "and the Absence of Overt Discrimination" in the Indiana Statute "Defeats Any Constitutional Challenge to the State's Legislation"**

First, as the Intervenor Defendants explain, Congress has "regulate[d] the matter at issue" in the Federal Power Act. *Tenn. Wine & Spirits Retailers*, 588 U.S. at 524. To begin, it has spoken definitively through Section 824(b)(1) of that Act, which preserves one of the States' "most important" and "traditional[ ] . . . police power[s]": the "regulation of utilities." *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S.

<center>- 4 -</center>

375, 377 (1983); *see* Memorandum of Law in Support of Emergency Mot. for Stay, Dkt. 78 at 16 (explaining further). As this Court held in the analogous *Electric Power Supply Association v. Star* case, the "combination of [16 U.S.C.] § 824(b)(1) and the absence of overt discrimination" in the state statute "defeats any constitutional challenge to the state's legislation." 904 F.3d at 525. The *Pike* balancing test is simply not implicated. *Id.* (holding that, because the Act expressly permits States to "regulate local generation," the *Pike* balancing test "does not apply to a state's regulation of electric capacity or a cross-subsidy between carbon-emitting generation and carbon-free generation"); *see also PacifiCorp v. Watson*, No. 3:23-cv-6155, 2024 WL 3415937, at *11 & n.3 (W.D. Wash. July 15) (applying this holding).

### B. Separately, as This Court Already Has Held, FERC's Orders and MISO's FERC-Approved Tariff Lawfully and Explicitly *Permit* State ROFR Statutes—A Fact That Independently Precludes Scrutiny of Such Laws under the Dormant Commerce Clause

If § 824(b)(1) of the Federal Power Act were not enough, Congress has spoken even more explicitly through FERC. This matters because, as the Supreme Court has held at least twice, the congressional-consent exception to the Dormant Commerce Clause embraces not only *direct* but also *indirect* congressional acts, in the form of clearly authorized federal regulatory action. Hence, in *White v. Massachusetts Council of Construction Employers*, the Court held that a Boston municipal order requiring City-funded construction projects to use "work force[s] consisting of at least half *bona fide* residents of Boston" did not trigger Dormant Commerce Clause scrutiny because, among other reasons, "the federal regulations" governing such programs "affirmatively permit the type of parochial favoritism expressed in the order," which meant

that the local rule was "specifically authorized by Congress." 460 U.S. at 206, 213; *see also Clay Lacy Aviation v. City of Los Angeles*, No. cv 00-9255, 2001 WL 1941734, at *1–2 (C.D. Cal. July 27) (suggesting that *White* governs where the challenged state act "fall[s] within the [federal] regulation").[2] Likewise, in *Merrion v. Jicarilla Apache Tribe*, the Supreme Court upheld an Indian tribe's tax scheme against a Dormant Commerce Clause challenge specifically because it had received "the requisite approval" by the Department of Interior, "fulfill[ing] the administrative process established by Congress to monitor such exercises of tribal authority." 455 U.S. at 154–56.

*White* and *Merrion* control here. To begin, Congress has "delegate[d] responsibility to FERC to regulate the interstate wholesale market for electricity—both wholesale rates and the panoply of rules and practices affecting them." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016). And, discharging that responsibility, FERC has definitively and repeatedly declared that ROFRs "*may [still] exist* under state or local laws or regulations" and that FERC has not "eliminate[d]" them, even while the federal ROFR, for the most part, has been abolished. *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, 76 Fed. Reg. 49,842, 49,886 (Aug. 11, 2011) (Order 1000) (emphasis added); *see also Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utilities*, 139 FERC ¶ 61,132, 61,971 (2012) (Order 1000-A) (confirming that a ROFR "based on a state or

---

[2] The Supreme Court later affirmed *White*, although it expressed doubt that *White* could be read to permit federal agencies to "implicit[ly]" (as opposed to explicitly) immunize a state law from Dormant Commerce Clause scrutiny. *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). Here, however, FERC's several approvals of State ROFRs have been quite explicit, so *Wunnicke*'s gloss on *White* is neither here nor there.

local law or regulation *would still exist* under state or local law even if removed from the Commission-jurisdictional tariff or agreement, and nothing in Order No. 1000 changes that law or regulation" (emphasis added)).[3] FERC likewise has expressly adopted State ROFRs—even *federalized* them, LS Power previously has argued (*infra* at p. 9–10)—by ratifying MISO's Tariff, which mandates that incumbents "be assigned any transmission project within the scope, and in accordance with the terms, of any Applicable Laws and Regulations granting [ ] a right of first refusal." MISO Tariff, Attachment FF, § VIII.A.1; *see MISO Transmission Owners*, 819 F.3d at 336 (indicating that FERC has approved MISO Tariff). Thus here, as in *White*, federal rules "affirmatively permit the type of [alleged] parochial favoritism expressed" in the challenged state law. 460 U.S. at 213. And here, as in *Merrion*, States have received "the requisite approval" (if they ever needed it) by federal regulators charged "by Congress to monitor" and regulate regional markets for the transmission of electricity. 455 U.S. at 154–56. Indiana's ROFR statute is therefore not subject to Dormant Commerce Clause review and fully comports with Article I, Section 8 of the U.S. Constitution.

Importantly, whether FERC could or should have blessed State ROFRs was hotly contested not only in the rulemaking proceeding but also before the D.C. Circuit and this Court. But the challenges all failed—including a prominent one led by Plaintiff

---

[3] A tariff, in the utility-regulatory context, is a "compilation of all effective rate schedules of a particular company or utility. Tariffs include General Terms and Conditions along with a copy of each form of service agreement." FERC, *Glossary*, available at https://www.ferc.gov/about/what-ferc/about/glossary.

LS Power. And in none of those cases did the challengers argue that FERC's orders were unlawful because they licensed violations of the Dormant Commerce Clause without clear congressional approval.

Order 1000 was first tested in the D.C. Circuit. Displeased that FERC had abolished (for the most part) the federal ROFR, many utilities and associations argued that the agency had exceeded its powers and had "interfere[d] with the States' traditional authority to deny or approve transmission facility siting and construction." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76 (D.C. Cir. 2014). But the court disagreed. Noting that the rule had "take[n] great pains to avoid intrusion on the traditional role of the States," the D.C. Circuit held that FERC had lawfully preserved the States' "control over the siting and approval of transmission facilities," including their authority to adopt ROFR statutes—with which "developers *must* [ ] *comply*." *Id.* at 76 (emphasis added). No one seemed to question that State ROFR laws could and would remain in force, having been so clearly endorsed by the agency.

Faced with a challenge not only to Order 1000 but also to FERC's approval of MISO's tariff, this Court in *MISO Transmission Owners* went even further. There, LS Power "complain[ed] about FERC's having decided [in Order 1000] to allow MISO to include in its tariff a provision that allows it to honor rights of first refusal created by state and local law." 819 F.3d at 336. Yet this Court saw no problem. Underscoring that FERC had disclaimed any intent to "limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities," the Court recognized that FERC had "avoid[ed] intrusion on the traditional role of the

- 8 -

States." *Id.* (quoting *S.C. Pub. Serv. Auth.*, 762 F.3d at 76). And this, the panel held, "*was a proper goal*"—notwithstanding that LS Power had "cited state laws that might interfere with regional transmission development," including the same Minnesota ROFR law that LS Power would later fail to invalidate under its new theory. *Id.* (emphasis added); *see LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020) (upholding Minnesota ROFR statute). In all, this Court concluded that, while "FERC has not given MISO unlimited discretion to invoke state law when determining whether a non-incumbent is entitled to propose a project," it is entirely appropriate for FERC to demand compliance with State ROFR laws, as it did in Orders 1000 and 1000-A as well as in its approval of MISO's tariff. 819 F.3d at 336–37.

Although LS Power might reply that FERC has not *approved* of State ROFRs but has simply expressed no view, its story in 2016 was quite different. In fact, it told this Court that, by approving the language reproduced below in MISO's tariff, FERC had ratified state ROFRs as a matter of federal law and therefore had "impermissibly create[d] a *federal* right of first refusal in violation of" Order 1000:

> **State or Local Rights of First Refusal.** The Transmission Provider shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner. *The Transmission Owner will be assigned any transmission project within the scope, and in accordance with the terms, of any Applicable Laws and Regulations granting such a right of first refusal.* These Applicable Laws and Regulations include, but are not limited to, those granting a right of first refusal to the incumbent Transmission Owner(s) or governing the use of existing developed and undeveloped right of way held by an incumbent utility.

*LSP Transmission Holdings v. FERC*, No. 15-1316, Dkt. 40 at 18 (Nov. 19, 2015) (quoting MISO Tariff, Attachment FF, § VIII.A.1) (first emphasis added; other em-

phases added by LS Power). In sum, the argument went, FERC had improperly "federal[ized]" state ROFRs. *Id.* at 23. But this Court sided with FERC, acknowledging that, by approving the tariff, FERC had properly "allow[ed] a state law to give an incumbent transmission company a right of first refusal." 819 F.3d at 336–37.

Whether or not LS Power is still smarting over *MISO*, its recognition then of FERC's unequivocal approval—indeed, "federalization"—of State ROFRs is hard to square with its new idea that, all along, State ROFRs have been invalid under federal law. More to it, LS Power's earlier brief demonstrates that, at least until the theory behind the recent constitutional challenges was thought up, seemingly everyone understood what FERC had done. There could be no mistaking it: The Commissioners had "affirmatively permit[ed]" and "approv[ed]" State ROFRs, despite the arguments of some, including the lead Plaintiff here, that it could and should not do so. *White*, 460 U.S. at 213; *Merrion*, 455 U.S. at 155. This fact alone should doom Plaintiffs' case.

## II. INCUMBENT OWNERS AND NON-INCUMBENT DEVELOPERS ARE NOT SIMILARLY SITUATED, BECAUSE, UNDER MISO'S RULES, ONLY INCUMBENTS WILL HAVE IN-STATE OPERATING COSTS THAT CAN BE SPREAD ACROSS A MULTI-STATE REGION—REDUCING THE TOTAL COST BURDEN OTHERWISE BILLED TO IN-STATE CUSTOMERS

*General Motors Corporation v. Tracy* holds that, in a Dormant Commerce Clause case, a court must first ask the "threshold question" whether the alleged disparately treated entities "are indeed similarly situated." 519 U.S. 278, 299 (1997); *see also Travis v. Reno*, 163 F.3d 1000, 1006 (7th Cir. 1998). Here, given MISO cost-allocation rules, an incumbent transmission owner will almost always be able to do a regional project that will result in lower net costs for their existing base of in-state customers than could a non-incumbent developer—even where the non-incumbent could build

the project more "cheaply." The two, therefore, are not similarly situated, and States have every right to treat them accordingly by adopting FERC-sanctioned ROFR laws. LS Power's challenge, therefore, fails to launch. *See Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 162 (5th Cir. 2007) ("The dormant Commerce Clause is no obstacle to [ ] regulation" against competition thought to be "harmful to [the state's] consumers."); *S. Union Co. v. Missouri Pub. Serv. Comm'n*, 289 F.3d 503, 509 (8th Cir. 2002) (noting, in Dormant Commerce Clause context, that States have legitimate interest in protecting their utility ratepayers).

To grasp this decisive point, a high-level understanding of MISO's cost-sharing rules is necessary. When allocating expenses associated with new transmission projects, MISO follows a structured process. First, it considers whether the project provides regional benefits (affecting multiple jurisdictions) or local benefits (affecting a single jurisdiction or a limited area), deploying different cost-allocation formulas for each project type.[4] If the project will yield regional benefits, then the project owner can spread the costs of building the facility across the region.[5] More importantly, the

---

[4] *See* MISO Tariff, Attachment FF Sec. II; *see also FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 349 (D.C. Cir. 2014) (describing MISO's federally approved Tariff Attachment FF, titled "Transmission Expansion Planning Protocol").

[5] *See* MISO Tariff, Attachment FF Sec. III.A.2.g.ii and MISO Tariff, Attachment XX (Map of MVP Cost Allocation Subregion Boundaries). MVPs, in whole or in part, are potentially subject to MISO's competitive process depending on multiple factors, including whether the state where the project is located has a ROFR law. *See* MISO Tariff, Attachment FF Secs. VIII.A & VIII.A.1.

owner can also spread its fixed costs—that is, its existing operational costs—across the region up to a particular percentage set by MISO's formula.[6]

Allocating fixed costs is especially important for the owner's existing customers, because a percentage of the fixed costs that they previously bore will now be spread throughout the region.[7] It is in this way that incumbents are differently situated than nonincumbents: For an incumbent, many if not all of the existing customers are in the state, and so the State's ratepayers are the ones who will reap the benefits of the reallocation. For a non-incumbent, none of the owner's existing customers is in the state, so the State's ratepayers will receive no benefit from this cost savings. This means that, under realistic assumptions, even if a non-incumbent could build a project at a lower incremental cost, the reduction in percentage of operational costs passed on to in-state ratepayers when an incumbent builds will often exceed the project-cost savings produced by the nonincumbent's doing the work more "cheaply."

To illustrate, suppose that both the Badger Company, an incumbent Wisconsin utility, and the Hoosier Company, a non-incumbent Indiana developer, both seek to construct and operate in Wisconsin a 200-mile transmission line designated by MISO as a Multi-Value Project (MVP)[8] benefitting the Midwest region. Under MISO's rules,

---

[6] *See* MISO Tariff, Attachment MM Sec. 3; *see also* National Association of Regulatory Utility Commissioners, *Guidelines for Cost Allocations and Affiliate Transactions*, available at https://pubs.naruc.org/pub/539BF2CD-2354-D714-51C4-0D70A5A95C65 (defining terms).

[7] *See* MISO Tariff, Attachment MM Sec. 3.

[8] *See* MISO Tariff, Attachment FF Sec. II.C.

the companies' costs to build the line would be allocated across transmission customers throughout the Midwest MISO region.[9] Both companies' fixed costs also would be spread throughout the region in the formula-determined percentage allocable to the new project.[10] So if, for example, the 200-mile line would constitute 10 percent of Badger's asset base, then, under the formula, approximately 10 percent of Badger's fixed costs—which would have been fully covered by Badger's existing customers *before* the new project—would instead be spread throughout the multi-state region, of which Badger's existing customers are only one part. Critically, those fixed-cost savings will benefit in-state customers only if Badger is chosen for the project, because only Badger has existing Wisconsin customers paying fixed costs that could then be allocated regionally. So, even if Hoosier could build the line more cheaply, the net cost savings for in-state customers if Badger builds will likely more than make up for it.

To illustrate further, let us assume that Badger's construction costs would be $600 million, while Hoosier's would be $480 million. Let us further assume that, for both companies, the fixed costs that can be allocated to the project are 10 percent. These assumptions and others for the hypothetical project are set forth in the table below:

---

[9] *See* MISO Tariff, Attachment FF Sec. III.A.2.g.ii and Attachment XX (Map of MVP Cost Allocation Subregion Boundaries). MVPs, in whole or in part, are potentially subject to MISO's competitive process depending on multiple factors, including whether the state where the project is located has a ROFR law. *See* MISO Tariff, Attachment FF Secs. VIII.A and VIII.A.1.

[10] For fixed costs, the incumbent and nonincumbent alike would need to compute a share of their existing operations and maintenance ("O&M") expenses and submit those numbers to MISO on a worksheet (called Attachment MM) that is used to calculate the overall charge for the regional (MVP) project. *See* MISO Tariff, Attachment MM, §3(a)(iii); *see also* MISO Tariff, Attachment O, Generic Formula Rate Template, at Part 3.

| Project Assumptions | Scenario 1 | Scenario 2 |
|---|---|---|
| Developer | The Badger Company | The Hoosier Company |
| Miles of new line | 200 | 200 |
| Construction cost per mile | $3M | $2.4M |
| **Overall construction costs** | **$600M** | **$480M** |
| Annual Direct O&M per mile | $3k | $2.4k |
| Annual Fixed Cost allocated to project | $7M | n/a |
| Annual depreciation rate | 2.5% | 2.5% |
| Annual return rate | 8% | 8% |
| Eligible for regional cost sharing (MVP) | Yes | Yes |
| Existing in-state customers | Yes | No |
| Allocated Badger customer share of costs | 13.1% | 13.1% |

Using these same assumptions, the following table projects the revenue and cost effects in the first year of operating the transmission line for Badger and then for Hoosier, as well as the resulting rate impact on Badger's existing customers under either scenario.

| Revenue, Cost, and Rate Impacts | Scenario 1 | Scenario 2 |
|---|---|---|
| Developer | The Badger Company | The Hoosier Company |
| Depreciation charges | $15M | $12M |
| Return on capital | $48M | $38.4M |
| Direct O&M charges | $600k | $480k |
| Allocated fixed O&M charges | $7M | n/a |
| Total revenue requirement | $70.6M | $50.88 |
| Allocated Badger customer share of costs (13.1%) | $9.25M | $6.67M |
| Reduction of Badger customers' existing rates for fixed costs allocated to the project | $7M | n/a |
| **Net cost to Badger customers** | **$2.25M** | **$6.67M** |

As the final row demonstrates, because Badger, unlike Hoosier, can allocate existing fixed costs from its Wisconsin operations to the project, Badger's existing customer base in Wisconsin will benefit from lower *net* costs if Badger builds. In other words, Badger's customers will pay for only 13.1 percent of the project's costs but will receive 100 percent of the benefit of the fixed-cost allocation to the project. For Wisconsin ratepayers, this fixed-cost allocation benefit significantly outweighs the potential sticker-price savings that would result from Hoosier's building the project more "cheaply," as it could under the assumed facts above.

For these reasons (and others), incumbents and nonincumbents are not similarly situated. In MISO states, under the realistic assumptions set forth above, assigning regional projects to incumbents will result in lower bottom-line electricity bills for in-

state ratepayers than would awarding nonincumbents the right to build the same projects even for 20 percent less. That is because, by definition, incumbents will always have a greater-than-zero number of existing in-state customers, whereas nonincumbents will always have none. In sum, the amount of fixed costs that an incumbent can spread outside Wisconsin for regional projects exceeds the amount that the incumbent's in-state customers would pay for these projects, resulting in a net benefit to incumbent ratepayers—a benefit that any state in the region, by adopting a ROFR law, could similarly obtain. It follows that because the alleged "objects of the disparate treatment" here are not, "for the relevant purposes, similarly situated," their supposed "disparate treatment" does not constitute "discrimination" triggering heightened scrutiny under the Commerce Clause. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 348 (2007) (Scalia, J., concurring in part) (citation omitted).

### III. THE DISTRICT COURT'S LOGIC—FORBIDDING THE CONFERRING OF A BENEFIT UPON AN INCUMBENT THAT IS NOT AVAILABLE TO A NONINCUMBENT—CASTS INTO DOUBT NUMEROUS OTHER FEATURES OF THE FEDERAL-STATE UTILITY REGULATORY FRAMEWORK

Plaintiffs and the district court conclude that the statute here unconstitutionally distinguishes between "incumbent and non-incumbent transmission owners compet[ing] for business in Indiana" and disadvantages the latter. Op. 19. By that logic, several other basic features of the federally overseen state-utility regulatory framework, in Indiana and across the country, would also be suspect, despite their solid statutory and regulatory foundation. This suggests that something in the theory is amiss. The "fairness" current running through LS Power's arguments—that energy

law cannot "benefit[] in-state interests at the expense of out-of-state interests" (Opp. 17)—simply blows too many fuses.

In the first place, "it is important to emphasize," as FERC has done, that federally secured rights of first refusal still exist. Order 1000-A 139 FERC at ¶ 61,966. Although Order 1000 eliminated federal ROFRs for certain regional projects, it *retained* federal ROFRs "for local transmission facilities or upgrades to an incumbent transmission provider's own transmission facilities, and did not alter an incumbent transmission provider's use and control of an existing right of way." *Id.* (describing Order 1000); *see also id.* at 61,967 (rejecting the arguments of "some commenters [who] supported eliminating all federal rights of first refusal"). In other words, despite the dire consequences for consumers that LS Power predicts, federal law codifies and secures incumbent ROFRs for several important kinds of projects.[11]

Hence, even though a nonincumbent could very well build and operate a local project more "cheaply" than an incumbent because, for example, the nonincumbent can acquire raw materials at lower cost through its out-of-state suppliers, "nothing in Order No. 1000 prevents an incumbent . . . from choosing to meet a reliability need or service obligation by building new transmission facilities . . . located solely within its retail distribution service territory or footprint and that is not submitted for regional cost allocation." *Id.* at ¶ 61,913; *see also id.* at ¶¶ 61,971, 61,972 (stating that

---

[11] LS Power might respond that, here, the difference between federal ROFRs and State ROFRs is that only States are subject to Dormant Commerce Clause scrutiny; the federal government is not. True enough. But this distinction only bolsters the argument in Part I, since the federal government has just as clearly and explicitly blessed State ROFRs as it has federal ROFRs for upgrades, local facilities, and baseline reliability projects.

Order 1000 "permits" exercise of a ROFR in this circumstance). Likewise, a nonincumbent developer could argue—even show—that it is able to upgrade a transmission tower with cheaper labor than what is available to the incumbent and therefore at lower cost. Yet, as the Commissioners also have "emphasized," its rules *preserve* the "right of an incumbent transmission provider to build, own and recover costs for upgrades to its own transmission facilities, such as in the case of tower change outs or reconductoring"—*even when* the "upgrade has been selected in the regional transmission plan for purposes of cost allocation." Order 1000, 76 Fed. Reg. 49842-01, 49896.

LS Power's theory likewise clashes with FERC's "80-20" rule, which amends MISO's tariff "to provide that, if 80% or more of the total cost of a transmission project" otherwise subject to open bidding "constitutes an upgrade to existing transmission facilities, such a project will be assigned to the incumbent transmission owner(s) and will not be subject to the Competitive Transmission Process." FERC, *Order Accepting Tariff Revisions*, 180 FERC ¶ 61,040, 61,162 (July 26, 2022).[12] Under Plaintiffs' rigid view, a difference between 79.9 percent upgrade and 80 percent upgrade should be immaterial. In *neither* case should the incumbent have a ROFR. Yet federal regulators have seen fit to directly confer one in the latter scenario and to permit

---

[12] *See also* Ethan Howland, *FERC OKs MISO plan to give certain transmission projects to incumbent utilities without competitive bidding*, UTILITY DIVE (July 28, 2022), https://www.utilitydive.com/news/ferc-miso-transmission-upgrades-incumbent-utilities-competition/628266/.

States to confer one in the former. LS Power does not and cannot explain why this is acceptable.[13]

Plaintiffs' simplistic campaign against utility "protectionism" would likewise call into question the propriety of federal ROFRs for "baseline reliability projects"—a category of ROFRs that, indeed, LS Power already has asked this Court (unsuccessfully) to invalidate, at least where such projects, like regional MVPs, "span two or more pricing zones." *MISO Transmission Owners*, 819 F.3d at 335. These projects are meant "to solve problems of reliability in electrical transmission." *Id.* And while securing ROFRs for these projects marked a "departure from [Order 1000's] emphasis on promoting competition," this Court explained that avoiding time-intensive bids and related litigation and furthering "quick resolution of reliability problems" amply justified the exemption. *Id.*

The same interests justifying these discrete federal ROFRs likewise support the adoption of state ROFRs like Indiana's. To be sure, state ROFRs—in combination with other laws—disparately affect nonincumbents in a sense, but they do so in precisely the same way that federal ROFRs disparately burden nonincumbents who are blocked from competing over local lines, upgrades, "80-20"-rule qualifying lines, baseline reliability projects, and conductor-only installations. If these other facets of well-settled utility law impermissibly "insulat[e] . . . new electric transmission projects

---

[13] In yet another blow to LS Power's crusade against incumbents, FERC has recently clarified that within MISO such utilities also have a federal ROFR to build conductor-only installation projects. *See* FERC, *Order Accepting Tariff Revisions Subject to Condition*, 189 FERC ¶ 61,145 (Nov. 26, 2024).

from competition," as Plaintiffs say is the effect of Indiana's ROFR (Opp. 12) and would have to concede would also be the effect of the other ROFRs, then it would seem that the more appropriate audience for Plaintiffs' policy objections is FERC. Or, better yet, Congress. In the meantime, "[p]rudence [ ] counsels against running the risk of weakening or destroying a regulatory scheme of public service and protection recognized by Congress despite its noncompetitive, monopolistic character." *Tracy*, 519 U.S. at 309. And "[s]till less is that risk justifiable in light of Congress's own power and institutional competence to decide upon and effectuate any desirable changes" to the scheme. *Id*. Plaintiffs' claim fails.

## CONCLUSION

This Court should grant the motion to stay enforcement of the district court's preliminary injunction.

Dated: December 16, 2024

<div style="margin-left:40%">

Respectfully Submitted,

*/s/ Ryan J. Walsh*
Ryan J. Walsh
 *Counsel of Record*
Eimer Stahl LLP
10 East Doty Street
Suite 621
Madison, WI 53703
(608) 620-8346
(312) 692-1718 (fax)
rwalsh@eimerstahl.com

*Counsel for* Amici Curiae
*Wisconsin Utilities Association,*
*Iowa Utility Association, and*
*South Dakota Electric Utility Companies*

</div>

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This Brief complies with the type-volume limitation of Circuit Rule 29 because it contains 5,266 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

This Brief complies with all typeface requirements of Federal Rules of Appellate Procedure and 32(a)(5)–(6) and Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word version 2024 in 12-point Century Schoolbook in the body of the brief and 11-point Century Schoolbook in footnotes.

Dated December 16, 2024

/s/ Ryan J. Walsh
RYAN J. WALSH

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of December, 2024, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: December 16, 2024

/s/ Ryan J. Walsh

RYAN J. WALSH