Nos. 24-3248 & 24-3249

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

LSP TRANSMISSION HOLDINGS II, LLC, *et al.,*

*Plaintiffs-Appellees,*

v.

JAMES F. HUSTON, Chairman, Indiana Utility Regulatory Commission, *et al.*,

*Defendants-Appellants,*

v.

NORTHERN INDIANA PUBLIC SERVICE COMPANY, *et al.*,

*Intervenor Defendants-
Appellants.*

_____

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:24-cv-01722-TWP-MKK
Tanya Walton Pratt, Chief District Court Judge

_____

### *AMICUS* BRIEF OF COMMONWEALTH EDISON COMPANY
### OF INDIANA, INC. IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

_____

Melissa M. Root
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350

Ian Heath Gershengorn
Zachary C. Schauf
  *Counsel of Record*
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
zschauf@jenner.com

*Counsel for Commonwealth Edison Company of Indiana, Inc.*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. No. 24-3248; 24-3249

Short Caption: LSP Transmission Holdings II, LLC v. N. Ind. Pub. Serv. Co.; LSP Transmission Holdings II, LLC v. Huston

      To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

      The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[X]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Commonwealth Edison Company of Indiana, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    Jenner & Block LLP

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and
        Commonwealth Edison Company; Exelon Energy Delivery Company, LLC; Exelon Corporation

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
        BlackRock, Inc. owns more than 10% of Exelon Corporation's stock.

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2: N/A

Attorney's Signature /s/ Zachary C. Schauf    Date: January 8, 2025 (new)

Attorney's Printed Name: Zachary C. Schauf

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes**   X

                                                          **No**

Address: 1099 New York Avenue NW, Suite 900, Washington, DC 20001

Phone Number: (202) 639-6000    Fax Number: (202) 639-6066 (new)

E-Mail Address: zschauf@jenner.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. No. 24-3248; 24-3249

Short Caption: LSP Transmission Holdings II, LLC v. N. Ind. Pub. Serv. Co.; LSP Transmission Holdings II, LLC v. Huston

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[X]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Commonwealth Edison Company of Indiana, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP

(3)    If the party or amicus is a corporation:

i)    Identify all of its parent corporations, if any; and
Commonwealth Edison Company; Exelon Energy Delivery Company, LLC; Exelon Corporation

ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
BlackRock, Inc. owns more than 10% of Exelon Corporation's stock.

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2: N/A

Attorney's Signature /s/ Ian Heath Gershengorn                    Date:  January 8, 2025 (new)

Attorney's Printed Name: Ian Heath Gershengorn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes**

|  | No | X |
|---|---|---|

Address: 1099 New York Avenue NW, Suite 900, Washington, DC 20001

Phone Number: (202) 639-6869                    Fax Number:   (202) 639-6066  (new)

E-Mail Address: igershengorn@jenner.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. <u>No. 24-3248; 24-3249</u>

Short Caption: <u>LSP Transmission Holdings II, LLC v. N. Ind. Pub. Serv. Co.; LSP Transmission Holdings II, LLC v. Huston</u>

       To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

       The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[X]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Commonwealth Edison Company of Indiana, Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Jenner & Block LLP</u>

(3)    If the party or amicus is a corporation:

    i)    Identify all of its parent corporations, if any; and
        <u>Commonwealth Edison Company; Exelon Energy Delivery Company, LLC; Exelon Corporation</u>

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
        <u>BlackRock, Inc. owns more than 10% of Exelon Corporation's stock.</u>

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: <u>N/A</u>

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2: <u>N/A</u>

Attorney's Signature <u>/s/ Melissa Root</u>    Date: <u>January 8, 2025 (new)</u>

Attorney's Printed Name: <u>Melissa Root</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes**

                      **No**    X

Address: <u>353 North Clark Street, Chicago, IL 60654</u>

Phone Number: <u>(312) 840-7255</u>    Fax Number: <u>(312) 527-0484 (new)</u>

E-Mail Address: <u>mroot@jenner.com</u>

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No. No. 24-3248; 24-3249

Short Caption: LSP Transmission Holdings II, LLC v. N. Ind. Pub. Serv. Co.; LSP Transmission Holdings II, LLC v. Huston

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[X]**   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Commonwealth Edison Company of Indiana, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

Jenner & Block LLP

(3)    If the party or amicus is a corporation:

   i)    Identify all of its parent corporations, if any; and
        Commonwealth Edison Company; Exelon Energy Delivery Company, LLC; Exelon Corporation

   ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:
        BlackRock, Inc. owns more than 10% of Exelon Corporation's stock.

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2: N/A

Attorney's Signature /s/ Arjun R. Ramamurti                    Date: January 8, 2025 (new)

Attorney's Printed Name: Arjun R. Ramamurti

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes**

                                                                 **No**        X

Address: 1099 New York Avenue NW, Suite 900, Washington, DC 20001

Phone Number: (202) 639-3852                    Fax Number:   (202) 639-6066  (new)

E-Mail Address: aramamurti@jenner.com

**TABLE OF CONTENTS**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ..................................................... i

TABLE OF AUTHORITIES ........................................................................................ vi

IDENTITY AND INTEREST OF *AMICUS CURIAE* ................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................. 3

BACKGROUND ............................................................................................................ 6

ARGUMENT ............................................................................................................... 10

I.      HEA 1420 DOES NOT FACIALLY DISCRIMINATE AGAINST
        INTERSTATE COMMERCE. ......................................................................... 11

        A.      Utilities That Own Interconnected Transmission Infrastructure Are
                Not Similarly Situated to Developers That Do Not. .............................. 11

        B.      HEA 1420's Preference for Owners of Connecting Facilities Is Not
                the Same as Favoring In-State Economic Interests ............................... 15

II.     CAUTION IS WARRANTED BEFORE INVOKING THE DORMANT
        COMMERCE CLAUSE TO DIVEST STATES OF THEIR AUTHORITY
        TO ENFORCE TRANSMISSION RIGHTS OF FIRST REFUSAL. ................ 20

CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

**CASES**

*American Municipal Power, Inc. v. FERC*, 86 F.4th 922 (D.C. Cir. 2023) .............................. 10

*Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375 (1983) ......................................................................................... 3, 20

*Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028 (2022) ......... 10, 12, 23

*Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024), *on rehearing*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024) .......................................... 10, 23

*Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024) .................................. 10, 23

*Colon Health Centers of America, L.L.C. v. Hazel*, 813 F.3d 145 (4th Cir. 2016) ................. 9, 12

*Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542 (2015) ..................................... 16

*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008) ..................................... 4, 13

*Driftless Area Land Conservancy v. Rural Utilities Service*, 74 F.4th 489 (7th Cir. 2023) ....................................................................................................... 21

*FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016) ...................................................... 6

*Geduldig v. Aiello*, 417 U.S. 484 (1974), *superseded by statute as stated in Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) .................................. 17

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ............................. 4, 6, 11, 14, 18, 21, 22

*Granholm v. Heald*, 544 U.S. 460 (2005) ........................................................................ 18, 19

*Lebamoff Enterprises, Inc. v. Rauner*, 909 F.3d 847 (7th Cir. 2018) ........................................ 19

*Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27 (1980) ............................................... 18, 19

*LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020) ............................ 16

*MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016) .................................. 8, 22

*Munn v. Illinois*, 94 U.S. 113 (1876) ........................................................................................ 6

*National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ........................... 11, 16, 18, 20

*NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 485 (2023) ...................................................................... 17, 19

*Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987) ............................... 12

*Piedmont Environmental Council v. FERC*, 558 F.3d 304 (4th Cir. 2009) .................... 7

*Promoting Wholesale Competition Through Open-Access Non-discriminatory Transmission Services by Public Utilities*, Order No. 888, 75 FERC ¶ 61,080 (1996) ........................................................................................................................ 7

*Public Utility Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927), *abrogated by Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375 (1983) .................................................... 7

*Regan v. City of Hammond*, 934 F.3d 700 (7th Cir. 2019) ........................ 4-5, 11, 14, 17, 18, 21

*Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285 (1999) ................... 7

*South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ...................... 3

*South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018) .................................................. 11

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504 (2019) .............................. 20

*Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011), *aff'd sub nom. South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ........................................................................................................ 7, 8, 13, 22

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007) .................................................................................... 11, 14, 21

*Verified Joint Petition of Commonwealth Edison Company of Indiana, Inc.*, No. 45335, 2020 WL 2618184 (I.U.R.C. May 20, 2020) ............................................. 15

*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) ....................................... 18

## STATUTES AND RULES

16 U.S.C. § 824 *et seq.* ............................................................................................ 7

16 U.S.C. § 824(b)(1) ............................................................................................... 7

Ind. Code § 8-1-38-9(a) .......................................................................................... 15

Ind. Code § 8-1-38-9(a)(1) ....................................................................................... 2

Fed. R. App. P. 29(a) ................................................................................................ 1

Concentric Energy Advisors, *Competitive Transmission: Experience To-Date Shows Order No. 1000 Solicitations Fail to Show Benefits* (Aug. 2022), https://ceadvisors.com/wp-content/uploads/2022/08/Competitive-Transmission-Experience-To-Date-Shows-Order-No.-1000-Solicitations-Fail-to-Show-Benefits.pdf ................................................................................................ 12

EPA, *Power Market Structure*, https://www.epa.gov/green-power-markets/power-market-structure (last updated Dec. 26, 2024) .................................................... 8

Paul L. Joskow, *Competition for Electric Transmission Projects in the U.S.: FERC Order 1000*¸ MIT Ctr. for Energy & Env't Pol'y Rsch. (Mar. 2019), https://ceepr.mit.edu/wp-content/uploads/2021/09/2019-004.pdf ......................... 9

MISO Tarriff, Attachment FF ..................................................................... 8, 9, 14

National Conference of State Legislatures, *Brief: Right of First Refusal for Electric Transmission* (updated Dec. 9, 2024), https://www.ncsl.org/energy/right-of-first-refusal-for-electric-transmission ........................................................... 9, 12

U.S. Dep't of Energy, *Study Overview: National Transmission Needs Study*, https://www.energy.gov/gdo/national-transmission-needs-study (last visited Jan. 8, 2025) ....................................................................................................... 9

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Commonwealth Edison Company of Indiana, Inc. ("ComEd Indiana") is a corporation organized under the laws of Indiana and a public utility regulated by both the Indiana Utility Regulatory Commission ("IURC") and the Federal Energy Regulatory Commission ("FERC"). *See* App.Dkt. 34-2 ¶ 2 ("Quiniones Decl."). ComEd Indiana owns, operates, and maintains electric transmission facilities within Indiana. *Id.* Those facilities include transmission lines operating at both 345kV and 138kV, as well as a transmission substation operating at both voltages. *Id.* ¶ 3. ComEd Indiana is a transmission owner signatory to the Consolidated Transmission Owners Agreement for PJM Interconnection LLC ("PJM"), a regional transmission organization ("RTO") that engages in transmission planning under FERC-established rules. *Id.* ¶ 2. ComEd Indiana is a wholly owned subsidiary of Commonwealth Edison Company ("ComEd"), an Illinois corporation engaged in the transmission and distribution of electric energy that owns, operates, and maintains transmission facilities in Illinois. *Id.* ComEd Indiana's facilities are physically interconnected at the Illinois-Indiana state line with transmission facilities owned by ComEd and are interconnected within Indiana to transmission facilities owned by Northern Indiana Public Service Company. *Id.* ¶ 3.

ComEd Indiana has a direct interest in this litigation and its outcome. ComEd Indiana is an "incumbent electric transmission owner" under HEA 1420, *id.* ¶ 5, and HEA 1420 confers on ComEd Indiana a right of first refusal ("ROFR") to construct, own, operate, and maintain certain

---

[1] ComEd Indiana construes this Court's order of December 26, 2024, which denied ComEd Indiana's motion to intervene but "invite[d] ComEd Indiana" to file an *amicus curiae* brief, as providing leave to file this brief for purposes of Federal Rule of Appellate Procedure 29(a)(2). *See* App.Dkt. 39. No party or party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief. No person other than ComEd Indiana or its counsel has contributed money intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

new facilities that interconnect with its existing facilities. Ind. Code § 8-1-38-9(a)(1); *see* Quiniones Decl. ¶ 5.

ComEd Indiana also has an interest in this litigation because ComEd Indiana illustrates that HEA 1420's facility-specific preference does not discriminate against out-of-state economic interests. Although ComEd Indiana owns Indiana transmission facilities and receives HEA 1420's preference for projects connecting to those facilities, ComEd Indiana serves no Indiana retail customers and its facilities do not connect to facilities owned by any such Indiana customers. And the benefits of those facilities are regional and flow out of state, especially to Illinois. Yet if a new project connects to ComEd Indiana's facilities, ComEd Indiana receives a preference over other companies no matter how strong those companies' Indiana ties.

Finally, ComEd Indiana has an interest in defending States' authority to enact rights of first refusal. States are assessing how best to carry out their role in ensuring that transmission infrastructure is built quickly, safely, and reliably. FERC has expressly provided space for States to do so, including by preserving States' authority to enact their own ROFR statutes. And, although FERC did eliminate some federal rights of first refusal, it has already begun to retreat from that stance, too. ComEd Indiana has an interest in ensuring that courts do not misapply the dormant Commerce Clause to restrict States' ability to determine how best to ensure that transmission infrastructure is built quickly, safely, and reliably and to federalize a policy that the Constitution, federal law, and FERC decisions properly leave to the States.

Because likelihood of success on the merits may be relevant to the pending Motion for Reconsideration of Order Granting a Stay Pending Appeal, App.Dkt. 40-1, ComEd Indiana submits this brief consistent with the deadline for responses to that motion, App.Dkt. 43.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court has long recognized the authority to regulate utilities as "one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). Since the 19th century, States have exercised that authority to govern the siting and construction of transmission facilities, including who may build such facilities. When Congress in 1935 enacted the Federal Power Act ("FPA"), it preserved that authority. For decades, State ROFRs persisted, nearly universally. And when FERC in 2011 experimented with permitting competitive bidding for a specific subset of new projects, it took "great pains to avoid intrusion on [States'] traditional role." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76 (D.C. Cir. 2014). FERC thus expressly protected States' authority to enforce their own ROFRs and emphasized that "nothing in" its order displaced that authority. *Id.* (quotation marks omitted). Under that authority, Indiana enacted HEA 1420—a facility-specific ROFR providing a preference to the entity that owns, operates, and maintains the facility to which a new regional transmission project connects. The question here is whether the Commerce Clause divests States of the authority that both Congress and FERC have protected and prohibits even narrow, facility-specific ROFRs like Indiana's. The answer is no.

This country is engaged in a debate about whether and when ROFRs are optimal policy. Opponents say eliminating ROFRs encourages competition, lowers costs, and increases innovation and efficiency. Defenders say it is not so simple: Competitive bidding can add a year or more to project timelines, delaying needed infrastructure with added process. And existing facility owners—already familiar with their areas, systems, and regulators—may be able to build better, more reliably, and more in harmony with stakeholders, even as competitive developers may fail to deliver promised savings. A dozen States, acting under their FPA-protected authority, have enacted ROFRs. Meanwhile, FERC has preserved federal ROFRs for the large majority of

projects, created a new federal ROFR just last year, and has, if anything, signaled that it may retreat even farther from its experiment with eliminating some federal ROFRs—due to the risk that this step has discouraged development of desperately needed transmission facilities.

The district court erred by holding that the Constitution dictates the outcome of this policy debate and eliminates States' ability to choose policy options that Congress and FERC have preserved. HEA 1420's facility-specific preference favors only the owner of existing transmission facilities to which a new project will connect (no matter whether that owner or those facilities serve in- or out-of-state interests) and disfavors all others (no matter their Indiana ties). HEA 1420 thus does not trigger the "virtually *per se*" invalidity attaching to facially discriminatory laws. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quotation omitted). The district court's contrary conclusion rested on two mistakes.[2]

*First*, the district court misapplied the doctrines governing when state laws trigger strict Commerce Clause scrutiny—doctrines crafted by the Supreme Court to guard against the Clause becoming a vehicle for imposing a particular economic policy as a constitutional mandate. The Clause prohibits only protectionist laws that discriminate against interstate commerce and treat "similarly situated" entities differently. *General Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). But HEA 1420 does not treat similarly situated companies differently. It grants a preference to existing owners to build new projects connecting to their facilities. And existing owners of connecting facilities differ in significant ways from other companies. While reasonable minds may differ on whether these differences render ROFRs wise policy, these "material distinctions"

---

[2] Because the district court rested its preliminary injunction on a facial discrimination theory, ComEd Indiana limits its arguments to that issue.

establish that HEA 1420 is not facially discriminatory. *Regan v. City of Hammond*, 934 F.3d 700, 704 (7th Cir. 2019).

The district court confused HEA 1420 with laws that violate the dormant Commerce Clause by favoring "local presence" or mandating "differential treatment of in-state and out-of-state economic interests." Dist.Dkt. 70 ("Op.") 16-18. But again, HEA 1420 does not draw those distinctions. On the one side, HEA 1420 favors entities whose existing facilities connect to a new project—including existing transmission owners like ComEd Indiana that serve non-Indiana customers and non-Indiana economic interests. Quiniones Decl. ¶ 4. No matter how strong another company's ties to Indiana, that company will not receive a preference in building new lines that connect to ComEd Indiana's facilities. Indeed, of the entities receiving a preference under HEA 1420, eight are headquartered outside of Indiana or are subsidiaries of entities headquartered outside of Indiana—underscoring that when Indiana grants these entities a preference, the financial benefits flow substantially out of state. On the other side, HEA 1420 disfavors all entities that do not own the facilities to which a new project connects. That disfavored group includes even utilities that are headquartered in, employ all their workers in, and direct all their benefits to Indiana.

The district court mistook HEA 1420 as facially discriminatory in part because it fixated on the fact that HEA 1420's facility-specific preference *correlates* in some respect with having infrastructure in the ground in Indiana. But that is just because transmission infrastructure is physical. That incidental feature of this particular product does not justify constitutionalizing a policy question that States would otherwise be free to resolve. For that reason, this case differs from cases invalidating gratuitous local-presence requirements, like laws requiring interstate wine shippers to open in-state offices before they could serve in-state customers. Those cases concerned

services that did not physically have to occur within the State, so the local-presence requirements at issue there operated merely as a tool for discriminating against similarly situated entities.

*Second*, even if preferences involving in-state physical infrastructure raised contestable questions, the district court erred by stretching the dormant Commerce Clause to invalidate state ROFRs. Regulation of utilities, as explained, is a core state power. And while States and the federal government have recently experimented with limited forms of competition, the Supreme Court has held that courts must not lightly invoke the Commerce Clause to thwart States' efforts to decide for themselves what parts of their utility systems to open to competition. *Tracy*, 519 U.S. at 304. Indeed, caution is especially warranted here. The decision below bars States from enforcing ROFRs in a "market" for transmission construction that FERC itself created, even though FERC: (1) made clear that it did not intend its own limited allowance of competition to displace state ROFRs; (2) preserved federal ROFRs for the large majority of projects; and (3) more recently still, created a new federal ROFR for certain projects. This is a strange result, and the district court erred by holding that the judge-made dormant Commerce Clause requires it. Particularly given surging demand for new transmission, this Court should not hold that the Commerce Clause prevents FERC and States from making reasonable policy determinations about how best to ensure that new projects are constructed quickly, safely, and reliably.

## BACKGROUND

Because the parties have described the relevant background at length, ComEd Indiana focuses on the facts most relevant to its arguments.

For 150 years, state regulation of industries deemed to be in the public interest has been recognized to be a valid exercise of States' police powers. *See Munn v. Illinois*, 94 U.S. 113, 125-26 (1876). At the dawn of the electricity industry, "state and local agencies oversaw nearly all generation, transmission, and distribution." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260,

265-66 (2016). But after the Supreme Court held that States could not regulate interstate sales of electricity, *see Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89-90 (1927), Congress enacted the FPA to fill the gap, 16 U.S.C. § 824 *et seq.* The FPA gave a federal agency (now FERC) authority over "the transmission of electric energy in interstate commerce," and the "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). But Congress limited federal regulation "to those matters which are not subject to regulation by the States," *id.*, and expressly preserved States' jurisdiction over facilities used for "the generation of electric energy," "local distribution," and "transmission of electric energy in intrastate commerce." *Id.* In addition, "[S]tates have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont Env't Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009). FERC itself thus recognizes the "longstanding state authority over certain matters that are relevant to transmission planning and expansion, such as matters relevant to siting, permitting, and construction." *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 at P 107 (2011) ("Order No. 1000"), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

Although both federal and state governments continue to rely overwhelmingly on comprehensive regulation, in recent decades FERC and some States have experimented with limited competition in aspects of the electricity system. For example, FERC encouraged the creation of RTOs and independent system operators with "open access tariffs" that facilitated competition in wholesale electricity sales. *Promoting Wholesale Competition Through Open-Access Non-discriminatory Transmission Services by Public Utilities*, Order No. 888, 75 FERC ¶ 61,080 (1996); *Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285

(1999). But even as FERC fostered such competition and supported regional grid planning, it left regulation of the building of transmission lines to States and approved federal tariffs providing that the right to build new transmission projects would belong to incumbents. *MISO Transmission Owners v. FERC*, 819 F.3d 329, 332 (7th Cir. 2016). Meanwhile, some States restructured vertically integrated monopolies and permitted customers to purchase electricity from competitive retail suppliers. *E.g.*, EPA, *Power Market Structure*, https://www.epa.gov/green-power-markets/power-market-structure (last updated Dec. 26, 2024).

In 2011, FERC took an experimental step towards allowing competition for a limited subset of transmission development projects. Although federal tariffs had long contained their own ROFRs independent of any State ROFRs, FERC in Order No. 1000 required the elimination of those provisions for some regional projects, while preserving federal ROFRs for the large majority of projects, including local projects, upgrades to an incumbent's facilities, and reliability projects. Order No. 1000, 136 FERC ¶ 61,051 at PP 318-319. FERC also created a new "framework" for competitive solicitation to guide RTOs as they accommodated the limited competition FERC had authorized. *Id.* at PP 322-340. But even in the sphere where FERC eliminated federal ROFRs, it allowed States to take a different course, "acknowledg[ing] that there may be restrictions on the construction of transmission facilities by nonincumbent transmission providers under rules or regulations enforced by other jurisdictions," and emphasizing that "[n]othing in" Order No. 1000 would "limit, preempt, or otherwise affect state or local laws or regulations" on that topic. *Id.* at P 287; *see id.* at PP 107, 227, 253 n.231.

Consistent with the FPA and Order No. 1000, the FERC-approved tariff of the Midwest Independent System Operator ("MISO") continues to exempt from competitive bidding projects that are subject to state ROFRs. MISO Tariff, Attachment FF § VIII.A.1. MISO's tariff also

continues to exempt from competition projects that constitute a rebuild or upgrade of an existing facility and projects that are planned to address an immediate reliability need. *Id.* § VIII.A.2 ("Upgrades to Existing Transmission Facilities"); *id.* § VIII.A.3 ("Immediate Need Reliability Projects"); *see id.* § VIII.A.

In the space Congress and FERC have preserved for States, there is an ongoing debate over how best to balance competition and regulation in transmission development—one more skirmish in "[t]he battle between laissez fairists and regulators," which is "as old as the hills," *Colon Health Centers of America, L.L.C. v. Hazel*, 813 F.3d 145, 158 (4th Cir. 2016). This debate takes place against the backdrop of a "pressing need for additional transmission infrastructure," U.S. Dep't of Energy, *Study Overview: National Transmission Needs Study*, https://www.energy.gov/gdo/national-transmission-needs-study (last visited Jan. 8, 2025), and amidst concerns that competitive processes are "complex, expensive, and time-consuming," Paul L. Joskow, *Competition for Electric Transmission Projects in the U.S.: FERC Order 1000*, MIT Ctr. for Energy & Env't Pol'y Rsch. at 51 (Mar. 2019), https://ceepr.mit.edu/wp-content/uploads/2021/09/2019-004.pdf. Both sides press serious arguments, presenting "competing economic theories and sets of data" and urging different "political valuations of the public interests at stake." *Colon*, 813 F.3d at 158.

After considering that debate, legislatures in a dozen States, including Indiana, have enacted their own ROFRs. *See* National Conference of State Legislatures, *Brief: Right of First Refusal for Electric Transmission* (updated Dec. 9, 2024), https://www.ncsl.org/energy/right-of-first-refusal-for-electric-transmission ("NCSL *ROFR Brief*"). Other States have made different choices. Meanwhile, FERC has signaled a retreat from its already limited experimentation with removing federal ROFRs. In 2022, FERC suggested it may "revisit" its decision to abandon a

federal ROFR given the disappointing results of permitting limited competition for new regional transmission projects in Order No. 1000 and the possibility that "Order No. 1000 nonincumbent transmission developer reforms may in fact be inadvertently *discouraging* investment in and development of regional transmission facilities." *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028 at P 350 (2022). Then, in May 2024, FERC created a new federal ROFR for building "right-sized replacement transmission facilit[ies]." *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 at P 1703 (2024) ("Order No. 1920"), *on rehearing*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024). And less than two months ago, FERC emphasized the policy benefits of a ROFR approach in that context, explaining that the "federal right of first refusal for [such] facilities will provide transmission providers with certainty that they will not lose the opportunity to invest in any in-kind replacement transmission facility that is then selected as a right-sized replacement transmission facility, and this, in turn, will encourage transmission providers to provide their best in-kind replacement estimates." *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920-A, 189 FERC ¶ 61,126 at P 822 (2024) ("Order No. 1920-A"); *cf. Am. Mun. Power, Inc. v. FERC*, 86 F.4th 922, 932 (D.C. Cir. 2023) (upholding FERC's decision to reserve to incumbent transmission owners the authority to plan for end-of-life needs as to existing facilities).

## ARGUMENT

This Court should reject the challengers' attempt to use the dormant Commerce Clause to compel a result they could not achieve via the legislative and administrative processes. Indiana does not discriminate against interstate commerce by determining that new transmission projects are best built by the company that owns the infrastructure to which those projects connect. And

invoking the federal Constitution to eliminate this traditional state authority would be particularly misguided because the relevant federal law—the FPA, FERC's orders, and FERC-approved tariffs—all protect States' authority to enforce ROFRs.

## I. HEA 1420 DOES NOT FACIALLY DISCRIMINATE AGAINST INTERSTATE COMMERCE.

The distinction Indiana drew in HEA 1420—between (on the one hand) incumbent owners of existing facilities to which a new project will connect and (on the other) all other companies—does not facially discriminate against interstate commerce. It reflects a reasonable policy decision that new transmission infrastructure is best built by incumbent owners that already own the connecting infrastructure and that the State already regulates. For two reasons, the district court erred by concluding otherwise. First, such incumbents are not "similarly situated" to others who do not own the connecting infrastructure. Second, HEA 1420's facility-specific preference is not an impermissible in-state preference.

### A. Utilities That Own Interconnected Transmission Infrastructure Are Not Similarly Situated to Developers That Do Not.

The Commerce Clause's "dormant" aspect is a judicial creation that requires "[r]eading between the Constitution's lines." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023). The Supreme Court has therefore properly guarded against the use of this judge-made doctrine to "prohibit the States from exercising their lawful sovereign powers." *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 183 (2018). A "threshold question" in any dormant Commerce Clause case, as in any "discrimination" case, is whether the law treats "similarly situated" entities differently—or instead treats *different* entities differently. *Tracy*, 519 U.S. at 298-99. Although no rigid formula determines whether entities are similarly situated, the Court has asked whether a law's distinctions reflect "legitimate goals unrelated to protectionism." *United Haulers Ass'n v.*

*Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007). This Court similarly has asked whether those distinctions are "material." *Regan*, 934 F.3d at 704.

When it comes to building new transmission lines connecting to an existing system, owners of that existing system are different, and materially so, from others. To begin, the existing owner can generally start building faster, because competitive bidding processes—required to accommodate competition from other developers—often take more than a year. *E.g.*, Concentric Energy Advisors, *Competitive Transmission: Experience To-Date Shows Order No. 1000 Solicitations Fail to Show Benefits* 33 tbl.7 (Aug. 2022), https://ceadvisors.com/wp-content/uploads/2022/08/Competitive-Transmission-Experience-To-Date-Shows-Order-No.-1000-Solicitations-Fail-to-Show-Benefits.pdf. Indeed, FERC has observed that such competitive bidding may "be inadvertently *discouraging* investment in and development of regional transmission facilities." *Building for the Future*, 179 FERC ¶ 61,028 at P 350. Further, existing owners are familiar with their own systems and service areas in a way new entrants cannot be. *See* NCSL *ROFR Brief.* Finally, regulators and stakeholders typically have deep knowledge of and familiarity with such incumbents—and often, significant leverage over entities they already regulate. *Id.* For all these reasons, many legislators and policymakers have reasonably concluded that owners of connecting facilities are not interchangeable with other developers and that such owners can build new facilities that connect with their existing systems better, more reliably, and more in harmony with stakeholders.

The Commerce Clause does not require States to treat these materially different entities the same. To the extent HEA 1420 confers a type of incumbency preference, "incumbency is not the focus of the dormant Commerce Clause," and "incumbency bias in this context is not a surrogate for the 'negative [] impact [on] interstate commerce' with which the dormant Commerce Clause

is concerned." *Colon*, 813 F.3d at 154 (citation omitted); *see Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 403-04, 404 n.23 (3d Cir. 1987) (similar as to "grandfather clauses"). That principle applies here. Indeed, HEA 1420 does not enact a broad preference giving all incumbent utilities a preference anywhere in Indiana. It provides only a facility-specific preference for the owners of connecting facilities. And those owners differ from others for all the reasons described above. This narrow preference is thus, if anything, even more unobjectionable than the incumbent preference upheld in *Colon*.

The district court gave two reasons for resisting this conclusion, but neither is correct. First, it observed that HEA 1420 provides a ROFR not just to "vertically integrated companies" but also to "transmission-only entities like Republic." Op.19. But while distinguishing between vertically integrated utilities and other companies is one nondiscriminatory line States may draw, it is not the only such line. Here, Indiana has drawn a nondiscriminatory line between existing owners of connecting facilities, whether vertically integrated or not, and all other developers—and those two groups differ in all the ways detailed above. *Supra*, at 12; *cf. Davis*, 553 U.S. at 342-43, 343 n.13 (substantial similarity analysis is a "fundamental element of dormant Commerce Clause jurisprudence" and requires attention be paid to the "proper characterization of the various entities acting in the market").

Second, the district court reasoned that incumbents and newcomers "are direct competitors in the interstate market for electric transmission"—referencing the competitive transmission solicitations administered by MISO and PJM. Op.19. But the district court erred, at the outset, because its invocation of an idealized "interstate market for electric transmission," *id.*, ignores how far transmission development is from an ordinary competitive market. New-entrant developers historically did not compete with incumbent transmission owners; they do so now only because

FERC allowed those developers to compete in a limited sphere. Order No. 1000, 136 FERC ¶ 61,051 at PP 322-340. Even today, FERC and MISO have kept the market for new transmission projects closed to competition for most projects. MISO Tariff, Attachment FF §§ VIII.A.2, VIII.A.3. And even where FERC and MISO have accommodated competitive developers, they have done so expressly subject to States' authority to adopt ROFRs. *Id.* § VIII.A.1. Because there is no freestanding competitive market in which the challengers are entitled to participate on equal terms, the district court erred in hypothesizing such a market and then relying on it to condemn Indiana's law.

More fundamentally, the district court erred because the mere possibility of competition between two parties in some market does not mean they are similarly situated (though, to be sure, the *absence* of any possible competition may doom a Commerce Clause claim, *see Tracy*, 519 U.S. at 299-300). This Court and the Supreme Court have repeatedly recognized that point. In *Regan*, this Court upheld a municipal ordinance distinguishing between occupant homeowners and landlords by allowing only the former to make improvements without obtaining licenses or hiring contractors. 934 F.3d at 704. The Court explained that "occupant homeowners are not similarly situated with landlords" given the "material distinctions" between them. *Id.* Importantly here, the Court emphasized that such entities did not become similarly situated simply because "both own property," which "both may ultimately sell ... in the national market." *Id.* Likewise in *United Haulers*, the Supreme Court upheld an ordinance requiring that trash be processed at a particular government facility, finding that such facilities are not similarly situated to private facilities even though private facilities could have provided the same service. 550 U.S. at 342. The Court viewed government facilities as different because "[w]aste disposal is both typically and traditionally a local government function" and because "treating public and private entities the same under the

dormant Commerce Clause would lead to unprecedented and unbounded interference by the courts with state and local government." *Id.* at 343-44. These same reasons militate in favor of the same conclusion here, given the equally long history of state utility regulation and the important differences between the favored and disfavored entities in this case.

> **B.** **HEA 1420's Preference for Owners of Connecting Facilities Is Not the Same as Favoring In-State Economic Interests.**

The district court also erred by equating HEA 1420 with laws that violate the dormant Commerce Clause because they favor "local presence" or mandate "differential treatment of in-state and out-of-state economic interests." Op.16-18. HEA 1420 does not draw those distinctions, and HEA 1420 is very different from the laws the district court invoked.

HEA 1420 gives a preference only to incumbents that own the particular "electric transmission facility" to which new projects "connect[]." Ind. Code § 8-1-38-9(a). That preference runs to vertically integrated utilities that are Indiana through and through—like Duke Energy Indiana, Indiana's largest utility, which is headquartered in Plainfield, Indiana, Dist.Dkt. 78-6 ¶ 3, and serves 900,000 Indiana customers—and also to incumbents like ComEd Indiana that do not serve Indiana interests in any meaningful sense. Thus, incumbents do not gain the preference based on the strength of their connections to Indiana interests. ComEd Indiana, though incorporated in Indiana, serves no Indiana retail customers and instead exclusively serves regional customers, including its parent, ComEd, which serves millions of Illinois retail customers. Quiniones Decl. ¶ 4. ComEd Indiana also maintains its assets "through the use of its parent company ComEd IL" and monitors and controls them through "ComEd IL's central control room located in Lombard, IL." *Verified Joint Petition of Commonwealth Edison Co. of Indiana, Inc.*, No. 45335, 2020 WL 2618184, at *11, *14 (I.U.R.C. May 20, 2020). Any transmission construction that ComEd Indiana undertakes thus does not benefit Indiana interests in any relevant

respect. The benefits are regional and flow out of state, especially to Illinois and the Illinois customers that ComEd Indiana's Illinois parent serves. By giving ComEd Indiana a ROFR, HEA 1420 allows ComEd Indiana to protect those non-Indiana interests in a manner a new developer might not.

ComEd Indiana is merely a particularly stark example of a broader point: Of the entities receiving a preference under HEA 1420, eight are headquartered outside of Indiana or are subsidiaries of entities headquartered outside of Indiana. Dist.Dkt. 45-1 ¶ 15.[3] One need not accord talismanic significance to headquarters or places of incorporation to recognize that HEA 1420, judged by its "practical effect," *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 551 (2015) (citation omitted), does not restrict its preference to in-state economic interests. Because many of the companies favored by HEA 1420 have corporate centers of gravity outside of Indiana, many of the benefits of building new transmission projects inevitably flow to non-Indiana economic interests. HEA 1420 thus does not attempt to "hoard commerce for the benefit of in-state" economic interests. *Nat'l Pork Producers*, 598 U.S. at 372-73 (quotation marks omitted).

Conversely, HEA 1420 disfavors everyone other than the existing owners of connecting facilities—no matter the extent of their local presence or the strength of their Indiana economic interests. Even Duke Energy Indiana, for example, would not receive a preference on new projects that connect to ComEd Indiana's facilities. Similarly, ComEd Indiana receives no preference for any project besides those connecting to its facilities. Because HEA 1420's scheme favors both in-state and out-of-state economic interests, and disfavors both in-state and out-of-state economic

---

[3] The cited declaration inadvertently omits ComEd Indiana, which the IURC subsequently clarified was a mistake. App.Dkt. 34-1 at 10 n.2.

interests, it cannot fairly be said to facially discriminate based on in-state status. *See LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1027 (8th Cir. 2020) (Minnesota's ROFR "draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state" (quotation omitted)); *cf. Regan*, 934 F.3d at 703 (Hammond ordinance did not facially discriminate against out-of-state interests because the "[in-state] landlord who lives next door to his Hammond rental" was treated the same as the "landlord who lives in Chicago and owns a rental property in Hammond"); *accord Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) (statute did not classify based on sex where relevant classes "include[d] members of both sexes").

The district court reached a contrary conclusion because it fixated on the fact that an incumbency preference in this context *correlates with* one type of physical connection to Indiana—transmission infrastructure in the ground. Op.16-17. But that is only because transmission infrastructure is physical. *Cf. NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 331 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 485 (2023) (Elrod, J., concurring in part and dissenting in part) (noting that "an electric company cannot provide transmission-and-distribution services without some sort of existing physical presence in the state"). That incidental feature does not turn HEA 1420's otherwise neutral preference for existing owners of connecting facilities into facial discrimination against interstate commerce. Nor does it justify constitutionalizing a policy question that States otherwise would be free to resolve.

In neglecting these critical market features, the district court ran afoul of the repeated directives of the Supreme Court and this Court that context is critical to assessing discrimination claims under the dormant Commerce Clause. In *West Lynn Creamery, Inc. v. Healy*, the Supreme Court directed courts to "eschew[] formalism for a sensitive, case-by-case analysis." 512 U.S.

186, 201 (1994). In *Tracy*, the Court similarly emphasized that "[a]ssessing these arguments [regarding discrimination] requires an understanding of the historical development of the [relevant] market." 519 U.S. at 288; *see Nat'l Pork Producers*, 598 U.S. at 373-74 ("[W]e emphasize, [that] our opinions dispose of discrete cases and controversies and they must be read with a careful eye to context."). And in *Regan*, this Court relied on a market's contextual features to reject exactly the type of conflation the district court fell into here. The occupant homeowners favored in *Regan* necessarily had a physical tie to Hammond "because by definition only a property owner who lives in Hammond can be an occupant of a Hammond residence." 934 F.3d at 704. But because that incidental feature stemmed from the nature of property ownership, it did not turn an otherwise permissible classification into prohibited discrimination against out-of-state interests. So too here.

The district court and the challengers thus err by comparing this case to cases like *Granholm v. Heald*, 544 U.S. 460 (2005) and *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980). *Cf.* Op.16-17. There, States took services with no necessary physical connection to the State (in *Granholm*, shipping wine by mail to New York consumers; in *Lewis*, financial services) and appended physical presence requirements that served only to discriminate against similarly situated out-of-state entities and had no legitimate rationale (in *Granholm*, allowing out-of-state wineries to ship into New York only if they established a branch there; in *Lewis*, prohibiting firms with their principal operations outside of the State from owning businesses offering investment management or trust administration services). *Granholm*, 544 U.S. at 470; *Lewis*, 447 U.S. at 37, 42 n.9. Such cases condemn the use of *gratuitous* physical presence requirements. *Cf. Lake*, 48 F.4th at 330-31 (Elrod, J., concurring in part and dissenting in part) (distinguishing transmission ROFRs from laws like the one in *Granholm*, which "*add* requirements

that discriminate against out-of-state entities" as to goods that "could readily be supplied by providers without any physical presence"). Those cases provide no warrant for invalidating HEA 1420's facility-specific preference, which does not discriminate against similarly situated entities, which reflects a legitimate and nondiscriminatory policy choice, and whose correlation with infrastructure in the ground in Indiana is a matter of physics, not protectionism. *Cf. Lebamoff Enters., Inc. v. Rauner*, 909 F.3d 847, 852 (7th Cir. 2018) ("[l]imiting licenses to in-state storefronts might make sense if all sales had to be on an in-person basis").

For the same reason, cases like *Dean Milk*, *Carbone*, and *Fort Gratiot* do not support the district court's conclusion. Op.17 (citing *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951); *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992)). Those cases hold that laws that discriminate against similarly situated out-of-state entities cannot survive simply because they also discriminate against some similarly situated in-state entities. But as just explained, HEA 1420 does not discriminate against similarly situated entities. And with such discrimination absent, the extent to which HEA 1420 disfavors in-state entities—including even incumbents like Duke Energy Indiana as to projects that do not connect to their systems—indeed underscores that the law does not draw lines based on the strength of an entity's in-state interests.

Nor would this Court, by reversing the district court's facial discrimination holding, license States to engage in impermissible discrimination. Challengers would remain free to try to show, for example, that a state legislature acted with a "purpose" to discriminate against out-of-state interests. *E.g.*, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 538-39 (2019). By contrast, if this Court were to endorse the district court's approach—which posits that incumbency preferences are subject to the dormant Commerce Clause's rule of virtually *per se* invalidity

whenever incumbents, due to physical necessity, have some physical connection with a State—would threaten serious and unprecedented consequences. It would imperil, for starters, state rules preserving traditional vertically integrated utilities. Some States have moved to competition on retail electric supply; in those States, out-of-state retail suppliers can enter the market and supply customers. Many other States, however, preserved vertical integration to the exclusion of that type of competition and require retail customers to buy energy only from the incumbent utility. Under the district court's approach, the dormant Commerce Clause could be read to bar States from deciding even that the retail supply of electric power can be undertaken only by highly regulated, vertically integrated monopolies—because an out-of-state entity seeking to sell that electricity could claim that this decision impermissibly favors incumbents that necessarily have a local presence. That the district court's approach threatens that result confirms that it is wrong.

## II. CAUTION IS WARRANTED BEFORE INVOKING THE DORMANT COMMERCE CLAUSE TO DIVEST STATES OF THEIR AUTHORITY TO ENFORCE TRANSMISSION RIGHTS OF FIRST REFUSAL.

At minimum, the district court should have resolved any contestable Commerce Clause questions here by respecting the centuries-old state authority that Congress and FERC have preserved. As the Supreme Court has emphasized, the "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Coop.*, 461 U.S. at 377. In the face of such authority, the district court erred in "[r]eading between the Constitution's lines," *Nat'l Pork Producers*, 598 U.S. at 368, to remove policy disputes over state ROFRs from the political and administrative processes. Indeed, in *Tracy*, the Supreme Court identified three reasons "counsel[ing] caution" before applying the dormant Commerce Clause to invalidate traditional state utility regulation. 519 U.S. at 307. All three of those reasons apply powerfully here.

First, *Tracy* emphasized the "common sense of [the Supreme Court's] traditional recognition of the need to accommodate state health and safety regulation." *Id.* at 306. Here, as in *Tracy*, state regulation as to which companies may build and operate utility infrastructure "serves important interests in health and safety in fairly obvious ways." *Id.* Transmission infrastructure keeps the lights on, which it can do only if reliably and safely built and operated. The construction of large-scale transmission facilities, moreover, has a significant impact on a State's citizens, property, and environment, and often engenders controversy. *E.g.*, *Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489, 492 (7th Cir. 2023). States have a strong interest in preferring owners of connecting facilities that they already regulate and trust to undertake these sensitive tasks.

Second, as in *Tracy*, courts "lack the expertness and the institutional resources" to reach sound decisions on the issues this case raises. *Id.* at 304. For example, as explained above, owners of connecting facilities differ from other developers in ways that reasonable legislators and policymakers have concluded render existing owners able to build faster, better, and more in harmony with regulators and stakeholders. The challengers ask this Court to effectively hold that those distinctions are not "legitimate [and] unrelated to protectionism," *United Haulers*, 550 U.S. at 343, or are not "material," *Regan*, 934 F.3d at 704. But to assess how the distinctions between existing owners and other developers affect transmission development, one must make technical and economic projections. And as *Tracy* emphasized, courts are "institutionally unsuited to gather the facts upon which [such] predictions can be made, and professionally untrained to make them." 519 U.S. at 308. Such judgments are instead the domain of legislatures and expert regulators.

Third, *Tracy* emphasized that "should intervention by the National Government be necessary" in this sphere, "Congress has both the resources and the power to strike the balance."

*Id.* at 304. Here, that concern applies with even greater force. Congress in the FPA protected States' authority over the construction of electric infrastructure. And FERC has already considered ROFRs specifically and "[struck] the balance" on them. *Id.* FERC required the elimination of a small set of federal ROFRs, preserved federal ROFRs for most projects, and stated that "nothing in" Order No. 1000 would "limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities," including ROFRs. Order No. 1000, 136 FERC ¶ 61,051 at P 227; *see MISO Transmission Owners*, 819 F.3d at 336 (recognizing that, under Order No. 1000, States could "give an incumbent transmission company a right of first refusal").

The district court did exactly the opposite of what *Tracy* instructed by, in effect, rejecting the balance that Congress and FERC have struck. Although Order No. 1000 preserved state ROFRs, the decision below in substance holds that Order No. 1000 displaced those ROFRs. Indeed, the district court went especially wrong in rejecting that balance because this case concerns a market—for the competitive procurement of transmission infrastructure—that FERC created out of whole cloth. FERC indisputably could have permitted federal ROFRs categorically, as it did for years before Order No. 1000. Or it could have sought to bar States from enforcing ROFRs for some or all transmission facilities, as the challengers here advocated FERC should do (though that attempt would have raised difficult questions about FERC's power under the FPA). It would be extraordinary for a federal court to now hold that the dormant Commerce Clause prohibits the middle course that FERC instead tried to chart for the bespoke market it has created—removing federal ROFRs in a limited sphere while preserving States' FPA-protected authority to decide that only regulated owners may build new infrastructure connecting to their existing facilities.

What is more, FERC recently signaled a retreat from its already limited experimentation with removing federal ROFRs. To recap: FERC in 2022 suggested it may "revisit" its decision to

abandon a federal ROFR given the risk that it "inadvertently *discourag[ed]* investment in and development of regional transmission facilities." *Building for the Future*, 179 FERC ¶ 61,028 at P 350.  In May 2024, FERC created a new federal ROFR.  Order No. 1920, 187 FERC ¶ 61,068 at P 1703.  And in November 2024, FERC again reaffirmed the policy benefits that such ROFRs can provide.  Order No. 1920-A, 189 FERC ¶ 61,126 at P 822.

Whatever the proper balance here, federal courts should leave it where Congress and FERC placed it—with the States and subject to further revision by FERC itself.

## CONCLUSION

The Court should reverse the preliminary injunction.

Dated:  January 8, 2025

Respectfully submitted,

*/s/ Zachary C. Schauf*

Melissa M. Root
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
mroot@jenner.com

Ian Heath Gershengorn
Zachary C. Schauf
   *Counsel of Record*
Arjun R. Ramamurti
JENNER & BLOCK LLP
1099 New York Avenue NW Suite 900
Washington, DC  20001
(202) 639-6000
zschauf@jenner.com
igershengorn@jenner.com
aramamurti@jenner.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 29 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,934 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 12-point Times New Roman font for the main text and footnotes.

Dated:  January 8, 2025                                      */s/ Zachary C. Schauf*

**CERTIFICATE OF SERVICE**

I, Zachary C. Schauf hereby certify that on January 8th, 2025, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit, using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Pursuant to ECF procedure (i)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause fifteen copies of the above cited brief to be transmitted to the Court via UPS overnight delivery, delivery fee prepaid within five days of that notice date.

Dated: January 8, 2025                    /s/ *Zachary C. Schauf*